IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DARREN LAWLEY, ET AL.,

    *Plaintiffs,*

    v.

PAUL E. NORTHAM, ET AL.,

    *Defendants.*

Civil Action No.: ELH-10-1074

## MEMORANDUM OPINION

This diversity case arises from a real estate transaction involving a single family home located at 5809 Worcester Highway in Worcester County, Maryland (the "Property"). On or about September 5, 2008, the Property was sold by Paul Northam and Lynn Immell, defendants, to Dona May Willoughby, plaintiff.[1] Debora Hileman[2] and Hileman Real Estate, Inc. ("Hileman, Inc.") (collectively, the "Hilemans"[3]), defendants, were the sellers' real estate brokers. Although Ms. Willoughby was the purchaser, her daughter and son-in-law, plaintiffs Misha and Darren Lawley, were to occupy the Property. Based on purported defects in the Property, allegedly discovered after the Lawleys moved into the Property, plaintiffs filed suit against Northam, Immell, and the Hilemans.

---

[1] Initially, Ms. Willoughby was not named as a plaintiff. After Ms. Willoughby was sued, in a third-party complaint, she was added as a plaintiff.

[2] Ms. Hileman's first name is spelled "Deborah" in her Summary Judgment Motion and her Reply. For the most part, however, her name appears as "Debora."

[3] Throughout their submissions, both sides refer to Ms. Hileman and Hileman, Inc. collectively, as "Hileman." The Court, however, will refer to them as the "Hilemans," distinguishing between Ms. Hileman, individually, and Ms. Hileman and Hileman, Inc., collectively.

Pending before the Court is the Hilemans' Motion For Partial Summary Judgment ("Motion," ECF 50), filed solely as to the claims lodged against them by the Lawleys.[4]  In particular, as to the Hilemans, plaintiffs alleged negligence (Count I), fraudulent inducement/deceit (Count III), fraud/concealment (Count IV), negligent misrepresentation (Count V), negligent supervision and retention (Count VI, against Hileman, Inc. only), respondeat superior (Count VII, against Hileman, Inc. only), civil conspiracy (Count IX), loss of consortium (Count XI), declaratory judgment (Count XII), rescission (Count XIII), and unjust enrichment (Count XIV).  *See* Amended Complaint ("Amended Compl.," ECF 43).

The issues have been fully briefed, and the Court now rules pursuant to Local Rule 105.6, as no hearing is necessary.  For the reasons that follow, the Court will deny the Hilemans' Motion, in part, and grant it, in part.

## Factual Background

Ms. Willoughby, a resident of Hawaii, purchased the Property from Northam and Immell. The sellers are the first cousins of Ms. Hileman, a real estate broker licensed in Maryland and the sole shareholder of Hileman, Inc.  Motion 1; Opposition To Motion For Partial Summary Judgment ("Opposition," ECF 52) 3.  As noted, Ms. Willoughby is the mother of Ms. Lawley and the mother-in-law of Mr. Lawley, the occupants of the Property.  Memorandum Of Grounds And Authorities In Support Of Motion For Partial Summary Judgment ("Hileman Memo.," ECF

_____

[4] The sellers recently moved for summary judgment (ECF 58).  Their motion is not yet ripe, however, and their contentions are not addressed in this Opinion.  Curiously, the Hilemans just filed a second motion for summary judgment (ECF 60), raising additional grounds.  It is not clear why they could not have filed one motion, raising all contentions.  In any event, that motion is not yet ripe, and is not addressed in this Opinion.

50-1) 2, 7; Opposition 3.[5]  In connection with the sale of the Property, Hileman, Inc. received a commission from the sellers in the amount of $4,811.25.  Opposition 22.

At the relevant time, Ms. Hileman's mother, Peggi Bortz, was Ms. Hileman's administrative assistant.  Ms. Bortz has been a "licensed real estate broker" for forty years.  *Id.* at 3-4; *see* Opposition Ex. 2, at 24:11.  At her deposition, Ms. Bortz testified that, for about twenty-eight years, she owned the house adjacent to the Property.  *Id.* at 9:1-9:4.  Her father, Otis Northam (Ms. Hileman's grandfather), had once owned the Property, as well as the adjacent Bortz property, but later subdivided and gave the portion referred to here as the Property to his son, David Northam.  *Id.* at 17:2-17:6.  In 1957, David Northam and his wife, Irene, built the subject house (i.e., the Property).  *Id.* at 12.  David Northam lived in that house until he died; Irene Northam lived there until 2003.[6]

After Irene Northam left the Property, the Northam children, Paul Northam[7] and Lynne Immell, arranged with Hileman, Inc. to rent, and later sell, the Property.  Opposition 4.  Ms. Bortz testified that she was involved with managing repairs of the Property while it was a rental.  Opposition Ex. 2, at 30:15-31:19.

---

[5] The Hilemans have used the same title for the Memorandum attached to their Motion and for their Reply (i.e., "Hileman Memo.").  The Hilemans' Reply was belatedly filed on March 21, 2011,  in violation of Local Rule 105.2.a.  It provides, in part:

> All motions must be filed within deadlines set by the Court. Unless otherwise ordered by the Court, all memoranda in opposition to a motion shall be filed within fourteen (14) days of the service of the motion and any reply memoranda within fourteen (14) days after service of the opposition memoranda.

Plaintiffs' Opposition was filed on February 22, 2011.  Therefore, pursuant to Local Rule 105.2, defendants' Reply was due on March 11, 2011.

[6] Irene Northam died on June 24, 2005.  Motion Ex. 3.

[7] Unless otherwise noted, "Northam" or "Mr. Northam" shall refer to Paul Northam, not David Northam.

During the time period in which the Property was a rental, the Hilemans allegedly learned about several defects with respect to the Property. Their alleged non-disclosure of those defects forms the basis of this suit.

*Nitrates in the Water*

The Property was rented between 2003 and 2008. James Kelly Carrigan was one of the persons who rented it. Opposition 4-5; Opposition Ex. 18. In a letter to Ms. Hileman dated January 23, 2007, Mr. Carrigan wrote: "[Y]our mother stated to me that she was concerned about nitrates in the water. Needless to say, we are very concerned not only about the safety of the water, but more so about the fact that your office has not previously disclosed any information to us indicating that the water might not be potable."[8] Opposition Ex. 4.

In an email dated February 14, 2007, Ms. Hileman wrote to Northam to discuss the Property, including the "high number of nitrates currently (14 versus a safe level [that] should be less than 10) in the water." Opposition Ex. 5. A letter addressed to Ms. Hileman from the Worcester County Department of Environmental Programs, dated March 27, 2007, indicated that a point of use system on the kitchen sink would be sufficient to address the nitrate level, but that "the well owner must notify any future owner or tenant that the water is considered potable only through the treatment system." Opposition Ex. 6.

*Asbestos*

By letter to Ms. Hileman dated January 23, 2007, Mr. Carrigan indicated that "asbestos in the basement is a huge concern." Opposition Ex. 4. In an email from Ms. Hileman's attorney to

---

[8] In his letter, Mr. Carrigan indicated that he was living at the Property with his son and daughter-in-law. *Id.*

Ms. Hileman, dated August 16, 2007, regarding Mr. Carrigan's complaints about the Property, counsel acknowledged that asbestos was "a really big issue."[9]  Opposition Ex. 7.

*Water Infiltration*

The basement of the Property had a history of "water intrusion."  Opposition 6. According to Ms. Bortz's deposition testimony, the basement flooded in 1989 and, as a result, Mr. Northam arranged for installation of a sump pump.  Opposition Ex. 2, at 55-56.  Ms. Hileman testified at her deposition that, when the water level became high, the sump pump pumped the excess water into a ditch along Worcester Highway.  Opposition Ex. 1, at 111:3-111:10.  In a letter dated February 28, 2007, in which Ms. Hileman requested service for the sump pump, she stated:  "Just to give you a bit of information to keep in mind for your service people, this is a system that is needed on a daily basis to keep the basement dry."  Opposition Ex. 8.  Ms. Hileman also testified that she had seen water in the basement around the sump pump area when the backup battery was not functioning.  Opposition Ex. 1, at 104:9-104:10.

From 2005 to 2007, the sump pump was repaired or replaced on a number of occasions, under Ms. Bortz's watch.  *See* Opposition Exs. 10-16.  In an email dated June 20, 2005, from Ms. Bortz to Ms. Hileman and Northam, Ms. Bortz wrote that the plumber had not been able to find a sump pump with sufficient horsepower "to suit him."  Opposition Ex. 11.

*Mold*

The basement of the Property suffered from mold problems.  By email dated August 25, 2005, Ms. Bortz wrote Northam and Ms. Immell, stating:  "I know there is mold."  Opposition

---

[9]  In their Opposition, the Lawleys characterize this email as "an apparently non-privileged communication."  Opposition 6.  In their Reply, the defendants do not assert privilege as to the email communication.

Ex. 16.  The email was forwarded to Ms. Hileman "for the file."  *Id.*  On July 11, 2008, Ms. Hileman wrote to Mr. Northam and Ms. Immell, stating:  "There is quite a bit of white mold spores on the joists in the basement that will be a problem with a sale if we don't spray with some bleach or mold killing product."  Opposition Ex. 17.

*The Worcester County Department of Development Review and Permitting Letter*

As a result of a "Nuisance Complaint" filed by Mr. Carrigan with the Worcester County Department of Development Review and Permitting, Bruce Miller, a building inspector, inspected the Property for violations of the Worcester County Rental Housing Code.  Opposition Ex. 18.  Mr. Miller sent a letter on behalf of The Worcester County Department of Review and Permitting, dated August 6, 2008, to Northam and Immell, with a copy to Ms. Hileman as the listing agent.  *Id.*  He identified four potential defects with the Property:  (1) high level of nitrates in the water, (2) peeling lead paint, (3) black mold growth around the windows and on the wall, and (4) asbestos siding and insulation.  *Id.*  At her deposition, Ms. Hileman indicated that she had received the letter.  Opposition Ex. 1, at 135:4-135:6.

With regard to the potability issue, the letter provided:  "The water supply shall be maintained free of contamination . . . . Owner shall prove that the water supply is free from contamination before next tenant occupies this property."  Opposition Ex. 18.  The letter further required that a "state certified inspector" inspect the Property for lead paint before the next occupancy, and that "[a]ll discovered deficiencies . . . be corrected by a state certified contractor with successful inspection by a lead inspector before occupation by another tenant."  *Id.*  With respect to mold, the letter required repair of all roof and wall leaks, and said:  "While not specifically addressed in the [Rental Housing] code, this inspector strongly recommends that

- 6 -

owner cause to have this [P]roperty inspected for mold with subsequent abatement of affected areas by a qualified contractor."[10]  *Id.*  In addition, Miller wrote: "The asbestos insulation around the pipes must be properly abated by a state certified contractor."  *Id.*  The letter acknowledged that, at the time, "the Property was vacant and listed for sale," and stated:  "Corrections noted above shall be corrected before occupancy of this unit to another family."  *Id.*

*Sale of the Property*

It is undisputed that the Property was purchased by Ms. Willoughby.[11]  However, Ms. Willoughby did not attend the closing.  Opposition 13.  Ms. Lawley testified at her deposition that Ms. Willoughby was not involved in the decision to purchase the Property.  Rather, Ms. Lawley is the one who made the "decision" to buy the Property.  Opposition Ex. 19, at 286:12. In addition, Ms. Lawley stated:  "Dona Willoughby was not involved with the inspection process, with any of the dealings with the house.  I dealt with everything or my husband did." *Id.* at 363:11-363:15.

---

[10]  The letter cited the following anecdotal evidence:  "[T]he tenant's grandson allegedly suffered from many sicknesses while residing at the house and the pediatrician found mold cultures taken from the child's nose.  These illnesses disappeared after moving to a new residence.  The [industrial hygienist] report supports the health hazard of the mold found at this residence."  *Id.*

[11]  Ms. Willoughby is identified by the Maryland Department of Assessments and Taxation and the deed as the owner.  Motion Exs. 2-3.  At her deposition, Ms. Lawley agreed that Ms. Willoughby owned the Property.  Motion Ex. 1, at 393:18-393:21.  She also indicated that her mother paid the property taxes for 2009 and 2010, *id.* at 485:19-486:1, and she "believe[d]" that her mother also paid the property taxes for 2008.  *Id.* at 485:17-485:18.  Ms. Lawley testified that these payments are a loan from her mother, to whom the Lawleys owe "[a]pproximately $60,000."  *Id.* at 485-487.

Ms. Lawley paid for the home inspection as well as the deposit of $1,000 on the Property. *Id.* at 289:9-289:15.  However, Ms. Willoughby reimbursed Ms. Lawley for these costs.  *Id.* at 356:16-357:4.

Ms. Lawley also testified that she "was acting on behalf of Dona Willoughby from the very beginning." *Id.* at 363:9-363:10. Ms. Lawley signed the necessary documents, pursuant to a power of attorney ("POA").[12] Opposition at 1, 5-6. The Lawleys moved into the Property on September 5, 2008, allegedly as tenants of Ms. Willoughby. Hileman Memo. 15; *see* Amended Compl. ¶ 27.[13]

Notably, Ms. Hileman knew that the Lawleys were going to reside at the Property. Opposition Ex. 1, at 130:15-131:3. The following deposition testimony of Ms. Hileman is pertinent:

Q. . . . Who did you understand the potential buyer was to be?

[COUNSEL FOR THE HILEMANS]: Objection as to form.
    You can answer.

A. Whatever the contract says.

Q. Well, did you understand that Ms. Lawley was operating under a power of attorney?

---

[12] Ms. Lawley signed the following documents by "POA," for Ms. Willoughby: "Residential Contract of Sale," signed by Ms. Lawley on July 31, 2008; "Like-Kind Replacement Property Exchange Addendum"; "Maryland Residential Property Disclosure And Disclaimer Statement"; "Addendum To The Property Disclosure And Disclaimer Statement"; "Disclosure of Licensee Status Addendum"; "Home Inspection"; "On-Site Sewage Disposal System (OSDS) Inspection And Test Addendum"; "Inspection/Certification – Well"; and other addenda referring to the Contract of Sale. Motion Ex. 4.

[13] Ms. Lawley testified as follows with respect to the tenancy arrangement:

Q. You mentioned your arrangement with your mother for living there. There was no written agreement?
    A. No.
    Q. Did you ever pay her any rent?
    A. Our rent was paying our own bills and taking care of the house and fixing up the house. It was more of my inheritance you could think of it as.
Motion Ex. 1, at 290:5-290:16.

A.  To be honest, it was a little confusing.  I didn't understand who the, you know . . .

Q.  Did you understand that the Lawleys were intending to live at the property as Ms. Willoughby's tenant?

A.  I know that Darren -- they were going to live there.  I knew they were going to live there.

Q.  You knew that at the time?

A.  That they were the ones that were going to live there?

Q.  Yes.

A.  Yes.  That's what I understood.

*Id.* at 130:6-131:3.

Ms. Hileman understood that, under Maryland law, sellers must provide a disclosure statement or an "as is" disclaimer to purchasers of single family residential properties. Opposition Ex. 1, at 62; *see* Md. Code (2010 Repl. Vol.), § 10-702 of the Real Property Article ("R.P.").  Northam and Immell chose to provide the Maryland Residential Property Disclosure And Disclaimer Statement ("disclosure statement"), which they both signed.[14]  Opposition Ex. 1, at 68:16.

Ms. Hileman testified that the sellers completed the disclosure statement "at the time of the listing," Opposition Ex. 1, at 161:16-161:17, and it was furnished to potential buyers for their review prior to any offer.  *Id.* at 162:2-162:6.[15]  The disclosure statement was also included as an addendum to the contract of sale.  *Id.* at 162:7-162:15.  It did not mention asbestos, mold, or

---

[14]  The disclosure statement indicates that Mr. Northam signed it on April 8, 2008, and Ms. Immell signed it on April 29, 2008.  Motion Ex. 4.

[15]  Under Maryland law, the disclosure statement must be provided "on or before entering into a contract of sale by the vendor and the purchaser."  R.P. § 10-702(f)(1).

potability issues as to the Property.  Opposition 10-11.  Ms. Hileman explained that the information in the letter of August 6, 2008, sent by Bruce Miller, was not disclosed because she viewed that information as "unreliable."  Opposition Ex. 1, at 145-46.

In relevant part, the disclosure statement provided:

2.  Basement:  Any leaks or evidence of moisture?  Yes.
Comments:  Drainage system in place

\* \* \*

3.  Other Structural Systems, including exterior walls and floors:
Comments:  [blank]
         Any defects (structural or otherwise)?  No.
Comments:  [blank]

\* \* \*

10.  Water Supply:  Any problem with water supply?  No.[16]
Comments:  [blank]
         Home water treatment system:  Yes.

\* \* \*

14.  Are there any hazardous or regulated materials (including, but not limited to, licensed landfills, asbestos, radon gas, lead-based paint, underground storage tanks, or other contamination) on the property?  No.
If yes, specify below
Comments:  [blank]

\* \* \*

16.  Are there any zoning violations, nonconforming uses, violation of building restrictions or setback requirements or any recorded or unrecorded easement, except for utilities, on or affecting the property?  No.
If yes, specify below
Comments:  [blank]

Motion Ex. 4, at 19-21.

---

[16] It appears that "No" is checked, as there is a faint pen mark.

Ms. Lawley testified that her "real estate agent" and Ms. Hileman gave her the disclosure statement. Opposition Ex. 19, at 364:13-364:16. She indicated that the disclosure statement, in conjunction with some "contingencies [she] requested,"[17] led her to believe that the Property was "guaranteed to be free of defects and deficiencies." *Id.* at 364:9-364:16.

According to Ms. Lawley, Jim Newcombe conducted the home inspection prior to closing, and "only" identified "electrical" problems, which were addressed at settlement. *Id.* at 285, 363. Ms. Lawley claimed that she was reimbursed, by check, to resolve the electrical issues. *Id.* at 285:5. However, in addition to the electrical problems noted by Ms. Lawley, the "Amendment/Addendum" to the contract of sale (attached as Exhibit 4 to the Motion) identified "items to be completed by the sellers as a result of the home inspection performed on August 11, 2008." It stated, in part:

> 6. There are asbestos wrapped pipes in the basement. Due to the potential health hazard the buyers are requesting that the seller properly covers undisclosed asbestos wrapped pipes.

According to Ms. Lawley, when she and her husband first moved into the house, "[t]here were already a couple thick coats of white paint. It looked very nice." Opposition Ex. 19, at 322:15-322:16. However, she claimed that in March 2009 the Lawleys learned from Bruce Miller about the mold in the house. *Id.* at 58:6. She recalled that, in the course of erecting a fence in the front yard, Miller[18] arrived at the Property to check on the fence. *Id.* at 57:13-59:8. Ms. Lawley testified at her deposition: "The inspector that came to inspect the fence wasn't

---

[17] Ms. Lawley did not identify the contingencies.

[18] It appears that Bruce Miller is the same Bruce Miller who authored the letter of August 6, 2008. *See id.* at 58:21-59:1 (Ms. Lawley testified: "He had been the inspector who did the inspection for Kelly Carrigan.").

concerned about the fence.  He was concerned about if we had been told and were aware of the mold and the conditions of the house . . . ."  *Id.* at 57:18-58:1.  According to Ms. Lawley, after Mr. Miller's comment, "[e]verything that we were experiencing," i.e., medical issues, "became understandable."  *Id.* at 59:12-59:13.  Because of the mold problem, the Lawleys vacated the Property.[19]  *Id.* at 327:7-327:17.

In December 2009, after the Lawleys moved out, there was an "extensive water intrusion" of "six to seven feet of water in the basement."  Opposition Ex. 19, at 67:11-68:3.[20]  This suit followed.[21]

---

[19] With regard to the mold, the following colloquy from Ms. Lawley's deposition is relevant:

> Q.  Every wall, every ceiling, every doorknob [of the house is covered in mold]?
>
> A.  There is some mold on every portion that my eyes could see, to my recollection, yes, now, if you are asking about now to this day.
>
> * * *
>
> Q.  . . . What color is that mold?
>
> A.  They are black and white and gross, large clumps, black with white poky things all over.

Opposition Ex. 19, at 478:16-479:10.

[20] On September 11, 2009, Ms. Willoughby executed an assignment to Misha Lawley of "all [her] right, title and interest in any and all causes of action . . . arising out of [her] purchase of improved real property located at 5809 Worcester Highway."  Opposition Ex. 20.

[21] As noted, jurisdiction is based on diversity of citizenship.  *See* 28 U.S.C. § 1332.  Where an action is based on diversity of citizenship, the relevant state law controls.  *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).  Maryland follows the rule of *lex loci delicti* for tort actions, which means that the court applies the substantive law of the state where the wrong occurred.  *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 620, 925 A.2d 636, 648-49 (2007).  As to contract actions, Maryland courts ordinarily apply the law of the jurisdiction where the contract was made, under the principle of *lex loci contractus*.  *Id.* at 618, 925 A.2d at 648.  Because the contract at issue was signed in Maryland, and the alleged torts occurred in Maryland, the substantive law of Maryland will apply.  *See, e.g.*, *Tung v. Peters*, No. AW-09-576, 2009 WL

**Discussion**

<u>I.  Standard of Review</u>

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party must demonstrate through the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that a reasonable jury would be unable to reach a verdict for the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  When this burden is met, the non-moving party then bears the burden of demonstrating that there are disputes of material fact and that the matter should proceed to trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A material fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id.* at 249.  Of import here, the court must construe the facts in the light most favorable to the party opposing the motion.  *United States v. Diebold*, 369 U.S. 654, 655 (1962); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).

---

(...footnote continued)

5206627, at *3 (D. Md. Dec. 23, 2009) ("This Court must use Maryland law in interpreting [the plaintiff's] right of rescission as the contract was signed in Maryland.").

- 13 -

## II.  Claims Based in Negligence or Fraud

The Hilemans assert:  "As tenants of Willoughby, neither Darren nor Misha Lawley has any viable cause of action against [the] Hileman[s] for any of [the eleven] counts" asserted against the Hilemans.  Hileman Memo. 10.  They seek summary judgment as to "Counts I, III, IV, V, VI, VII, IX, and XII,"[22] claiming that because they are all tort claims, they "all require the defendant to owe a duty to the plaintiff," but, as the "seller's agent," they "owed no duty to the purchaser" of the Property.[23]  *Id.*  Moreover, they contend that, even if they owed a duty to the purchaser, the Lawleys were not the purchasers.  Because the Lawleys are only tenants, the Hilemans claims that "they are legal strangers to all other parties in the transaction," with no standing to bring the tort claims.  *Id.* at 11.  In the Hilemans' view, "[t]o the extent the Lawleys have suffered compensable damages as a result of living the in [sic] the Property, their recourse lies with the owner of the Property (and their landlord), Willoughby."  Reply 2.

Additionally, the Hilemans argue that because they were not a party to the contract of sale (*see* Motion Ex. 4), they had no duty of disclosure relating to that document.  Motion 12.  Similarly, they contend that, because the Lawleys were not parties to that contract, no duty was owed to them with respect to it.

The Lawleys counter:  "[I]t is beyond dispute that under Maryland law a real estate agent owes duties not just to his or her principal, but also to others involved in real estate

---

[22] Count XI (loss of consortium) is included by the Hilemans as one of the eleven counts for which "[n]either Darren nor Misha Lawley has any viable cause of action against Hileman." But, they do not address it in their Memorandum.

[23]  The Hilemans later argue that "the law imposes only a limited duty upon a seller's agent to disclose latent defects known to that agent, to a purchaser.  The Lawleys were not the purchaser.  To the extent any action lies in tort, Willoughby is the only person [who] could prosecute such a claim."  Motion 12.

transaction[s]."  Opposition 17.  According to the Lawleys, "the agent does have a duty to disclose information where the agent has reason to know of a defect in the property."  *Id.*  They contend that, "as a real estate professional in Maryland, Hileman owes duties to the general public . . . . Hileman not only had a detailed knowledge as to the property's history, but she also had particular knowledge as to the Lawley's involvement."  *Id.*  In support of their claim that "a tort duty of care exists under Maryland law," *id.* at 18, the Lawleys rely on Md. Code (2004 Repl. Vol.), § 17-322(b)(4) of the Business Occupations and Professions Article ("Bus. Occ. & Prof.").  Opposition 19-20.

Bus. Occ. & Prof. § 17-322, entitled "**Denials, reprimands, suspensions, revocations, and penalties—Grounds.**," governs real estate brokers.  It provides, in part:

> (b)  Subject to the hearing provisions of § 17-324 of this subtitle, the Commission may deny a license to any applicant, reprimand any licensee, or suspend or revoke a license if the applicant or licensee:
>
> * * *
>
>       (4) intentionally or negligently fails to disclose to any person with whom the applicant or licensee deals a material fact that the licensee knows or should know and that relates to the property with which the licensee or applicant deals . . . .

The Code of Maryland Administrative Regulations ("COMAR"), Title 9, Subtitle 11, Chapter 2, is also relevant; it contains the code of ethics for real estate brokers.  COMAR 09.11.01.C provides, in part:  "The licensee shall protect the public against fraud, misrepresentation, or unethical practices in the real estate field."  Further, COMAR 09.11.01.D states:  "The licensee shall make a reasonable effort to ascertain all material facts concerning every property for which the licensee accepts the agency, in order to fulfill the obligation to avoid error, exaggeration, misrepresentation, or concealment of material facts."

- 15 -

Maryland's Court of Appeals has indicated that the propriety of the conduct of a seller's broker must be considered in light of Bus. Occ. & Prof. § 17-322(b)(4). *Gross v. Sussex Incorp.*, 332 Md. 247, 274-76, 630 A.2d 1156, 1170-71 (1993). *Gross* involved the construction and sale of a single family home in St. Mary's County, Maryland. *Id.* at 251, 630 A.2d at 1158. At the execution of the contract in April 1987, the builder and the listing real estate broker for the subdivision told the Grosses, who were the purchasers, that "building permits had been obtained; that construction could begin immediately; and that . . . the home would be completed by the settlement date." *Id.* at 252, 630 A.2d at 1158. In reliance on these representations, the Grosses listed their residence for sale. *Id.* Construction was delayed beyond the August settlement date, but the construction supervisor represented that the new home would be ready by the end of September. *Id.* Again in reliance on these representations, the Grosses enrolled their children in St. Mary's County schools and rented a temporary residence in Charles County. *Id.* In October of that year, the Grosses discovered that the property had not been subdivided, and that the construction company did not have building permits. *Id.* The house was not habitable until September 1988. *Id.* at 253, 630 A.2d at 1158-59.

The Grosses sued the real estate agency for fraud and negligent misrepresentation,[24] based on the conduct of the agency's sales associate. *Id.* at 253, 630 A.2d at 1159. The Maryland Court of Appeals recognized that, ordinarily, an agent only owes a duty to his or her own principal, and "not to the party with whom he or she deals on behalf of his or her principal." *Id.* at 273, 630 A.2d at 1169. As a result, a "broker could owe no duty to the purchaser when representing the seller." *Id.* (citation omitted). Nevertheless, the court determined that the issue

---

[24] The Grosses also sued the builder and its officers for breach of contract, fraud, and negligent misrepresentation. *Id.* at 253, 630 A.2d at 1159.

of the real estate agency's liability for negligent misrepresentation had to be "assessed" in light of the real estate broker licensing statute.[25] *Id.* at 273-74, 630 A.2d at 1169-70. The Maryland Court of Appeals observed, *id.* at 274, 630 A.2d at 1170: "The plain language of the statute makes apparent its purpose: to protect the public in its dealings with real estate brokers, to place a duty of good faith and fair dealing on real estate brokers."

According to the Maryland court, the licensing statute "prescribes the standard [of conduct] that a real estate broker must meet when dealing with the public." *Id.* at 275, 630 A.2d at 1170. Because the sales associate knew that the property had not been subdivided and that the permits had not been issued, the court reversed the award of summary judgment in favor of the real estate agency. *Id.* at 276, 630 A.2d at 1170-71. *See also Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 78, 835 A.2d 616, 620 (2003) (noting that "where there is an applicable statutory scheme designed to protect a class of persons which includes the plaintiff . . . . the defendant's duty ordinarily 'is prescribed by the statute' or ordinance and . . . the violation of the statute or ordinance is itself evidence of negligence.");[26] *Lewis v. Long & Foster, Inc.*, 85 Md. App. 754, 760, 584 A.2d 1325, 1328) (noting that Bus. Occ. & Prof. § 17-322(b)(4) and the code of ethics set forth in COMAR set "minimum guidelines for professional conduct," and stating that their purpose is to "safeguard the public"), *cert. denied*, 323 Md. 34 (1991).

---

[25] The statute was, at the time, codified at Bus. Occ. & Prof. § 16-322(a)(4). It was renumbered in 1994 to § 17-322(b)(4).

[26] *Brooks* was a lead paint action brought by a tenant (individually and on behalf of her minor son) against her landlord. *Id.* at 72-73, 835 A.2d at 617-18. The Maryland Court of Appeals looked to the Baltimore City Housing Code as establishing a landlord's duty to ensure that rental dwellings be "free of flaking, loose, or peeling [lead] paint." *Id.* at 84, 835 A.2d at 624; *see also MFI-DPLH, LLC v. Ingram*, No. WDQ-09-2358, 2010 WL 311636, at *6-7 (D. Md. Jan. 20, 2010) (referencing Bus. Occ. & Prof. § 10-306, which governs a lawyer's use of trust money, in examining whether an attorney exercised reasonable care in his handling of escrow funds).

In *Lopata v. Miller*, 122 Md. App. 76, 712 A.2d 24, *cert. denied*, 351 Md. 286 (1998), the Maryland Court of Special Appeals considered *Gross*'s application where "real estate agents"[27] did not know that the information that they conveyed to the purchaser of a property was inaccurate. *Id.* at 91, 712 A.2d at 31. In that case, the real estate agents whose brokerage coordinated the sale represented that the property consisted of three acres of land, but in actuality (as the purchasers discovered after moving in), the property was only 1.87 acres. *Id.* at 81, 712 A.2d at 26. The court distinguished *Gross* by pointing to the real estate agents' lack of actual knowledge or reason to know of a defect in the property.[28] *Id.* at 91, 712 A.2d at 31. The court reasoned that, absent "an agency relationship giving rise to a fiduciary duty," *or* "actual knowledge on the part of the real estate agents, . . . [or] facts giving rise to a reason to know of a defect in the property," the real estate agents did not owe the purchasers a duty to verify the lot size information relayed to them by the seller. *Id.* at 91-92, 712 A.2d at 31.

The *Lopata* Court also rejected the application of strict liability where the real estate agent made an "affirmative factual representation that turns out to be false or incorrect." *Id.* at 94, 712 A.2d at 32. Consistent with its reasoning as to the negligent misrepresentation claim, the court stated: "[W]e read the [relevant real estate licensing and ethics] provisions as having the more limited effect of prohibiting real estate agents from making affirmative misrepresentations *and omissions* of fact that the agent knows or has a duty to discover." *Id.* (emphasis added); *see also Jacobsen v. Sweeney*, 82 F. Supp. 2d 458, 462 n.2 (D. Md. 2000) ("Real estate agents owe property buyers a duty, in some circumstances, to disclose defects of which they know or should

_____

[27] *Lopata* referred to "real estate sales agents," but the contract of sale in that case refers to "listing and selling brokers, their agents and employees." *Id.* at 80-83, 712 A.2d at 26-27.

[28] In its discussion of *Gross*, the Maryland Court of Special Appeals referred to the broker in *Gross* as both a "broker" and a "real estate agent." *Id.* at 90-91, 712 A.2d at 30-31.

have known, *see Gross*, but recent cases have limited this duty to the disclosure of material facts known to the seller's agent, *see Lopata*." (citations omitted)).

*Allen v. Dackman*, 413 Md. 132, 137, 991 A.2d 1216, 1219 (2010), a lead paint case, makes clear that, even in the absence of contractual privity, a statutory scheme in Maryland may give rise to a tort duty. There, the plaintiffs, a mother and her children, lived in a rental property that was sold during the course of their tenancy to Hard Assets, LLC ("Hard Assets"). *Id.* at 138-39, 991 A.2d at 1219-20. At the time Hard Assets acquired title, it did not intend to lease the property, nor was it or its members aware that the plaintiffs were residing at the property. *Id.* at 139, 991 A.2d at 1220. Once Hard Assets became aware of the presence of plaintiffs, they were forcibly removed. *Id.* The plaintiffs later filed suit for negligence, complaining of "'elevated blood-lead levels'" attributable to their occupancy of the property, including the time during which Hard Assets owned it. *Id.* at 138-40, 991 A.2d at 1219-20 (quoting *Allen v. Dackman*, 184 Md. App. 1, 5, 964 A.2d 210, 212 (2009), *rev'd*, 413 Md. 132).

The defendant, a member of Hard Assets when it owned the property, *id.* at 135, 991 A.2d at 1218, argued that he did not owe a duty to the plaintiffs under the Baltimore City Housing Code, because the plaintiffs "ha[d] no legal right to possess the property," and the Housing Code "did not impose a duty on owners of property unless they leased, or at least intended to lease, that property." *Id.* at 156, 991 A2d at 1230. The Maryland Court of Appeals disagreed. Of import here, it concluded that the defendant owed the plaintiffs a duty, "regardless of whether [the plaintiffs] had a legal right to possess the property." *Id.* at 158, 991 A.2d at 1231. The court reasoned: "Petitioners are within the class of persons that the Housing Code was intended to protect, and they have alleged injuries that the statute was designed to prevent.

The express purposes of the Housing Code demonstrated that the City Council intended to protect the occupants of dwellings." *Id.* at 157, 991 A.2d at 1231. Specifically, said the Court, "the Housing Code was intended 'to protect children from lead paint poisoning,'" *id.* at 158, 991 A.2d at 1231 (quoting *Brown v.* Dermer, 357 Md. 344, 367, 744 A.2d 47, 60 (2000)), and the plaintiffs' claims were based on a harm purportedly caused by lead poisoning. *Id.*

The Maryland Court of Appeals also found a tort duty in *Matthews v. Amberwood Associates Limited Partnership, Inc.*, 351 Md. 544, 719 A.2d 119 (1998), despite the absence of contractual privity or (unlike the cases discussed previously) an applicable statutory scheme. In *Matthews,* a tenant's guest, a toddler, was "killed by a highly dangerous pit bull dog kept by the tenant, when the landlord knew of the dog's presence and was aware of the dog's dangerousness, when the presence of the dog was in violation of the lease, and where the landlord could have taken steps to abate the danger." *Id.* at 548, 719 A.2d at 120. In determining that the landlord owed a "duty of abating the dangerous condition consisting of a vicious pit bull dog being in the apartment," *id.* at 553, 719 A.2d at 123, the court looked to the "landlord's control and ability to abate the danger of a vicious pit bull," as well as the known vicious propensities of the pit bull and the "foreseeability of . . . harm." *Id.* at 560-61, 719 A.2d at 127.

Construing the facts in the light most favorable to the Lawleys, I can discern no reason why the Lawleys, the known intended occupants, would fall outside the protective ambit of Bus. Occ. & Prof. § 17-322(b)(4), COMAR 09.11.01.D, and *Gross*, 332 Md. at 274, 630 A.2d at 1170, merely because they were not the actual purchasers. To the contrary, the cases discussed above lead me to conclude that the Hilemans owed a duty to disclose to the Lawleys material defects of which they had actual knowledge, even though the Lawleys were not the actual

purchasers, because, in the light most favorable to plaintiffs, Ms. Hileman interacted solely with the Lawleys, rather than the purchaser, and knew that the Lawleys were the ones who intended to occupy the premises.[29] Indeed, Ms. Lawley had a "POA" and signed various documents on behalf of Ms. Willoughby, making her, in effect, Ms. Willoughby's agent. *See Dickerson v. Longoria*, 414 Md. 419, 443 n. 13, 995 A.2d 721, 736 n.13 (2010) ("A power of attorney is a 'written document[ ] by which one party, a principal, appoints another as attorney-in-fact and confers upon the latter [i.e., the agent] the authority to perform certain specified acts on behalf of the principal.'" (alteration in original) (citation omitted)).

To be clear, the Court expresses no opinion as to the propriety of the Hilemans' conduct in regard to communicating potential defects to the Lawleys, or the Lawleys' reliance on these purported non-disclosures. Those issues are not before the Court in this Motion. The Court merely rejects the Hilemans' legal contention that, because the Lawleys were not the purchasers, no duty was owed to them. Accordingly, the Court shall deny the Hilemans' motion for summary judgment as to the claims asserted in Counts I, III, IV, V, VI, VII, IX, and XI.[30]

### III. Equitable Claims

The Hilemans contend that because the Lawleys have no ownership rights in the Property, they cannot bring a claim for declaratory judgment. Hileman Memo. 12. Moreover, they maintain that, because the Hilemans were not parties to the contract of sale or the deed, they are not "interested parties" to any controversy to be resolved by declaratory judgment. *Id.* at 13. With regard to the claim for rescission, the Hilemans assert that "the Lawleys have no standing,"

---

[29] In fact, the only involvement of the actual purchaser was the purported document sent for signing in advance of settlement. *See* Opposition Ex. 19, at 286:15-286:20.

[30] The Court need not address the elements of each tort, as the Hilemans' entire argument hinges on whether the Hilemans owed a tort duty to the Lawleys.

and reiterate that "Hileman is not a party to the Contract either." *Id.* at 14. In their view, "only Willoughby has the right to seek rescission of the contract," as she was the sole purchaser under the contract. *Id.* In addition, the Hilemans contend that the Lawleys cannot maintain a claim for unjust enrichment, as "they are not the owners of the Property, and they paid nothing for the Property" and "conferred no benefit" on the Hilemans. Hileman Memo. 14-15.

The Lawleys counter that the Hilemans are necessary parties to the equitable claims. They contend: "Hileman Real Estate had a substantial interest in the settlement – as the recipient of $4,811.25 in commissions that must be disgorged." Opposition 22. Further, they posit that "the existence of a $4,811.25 dispute as to disgorged profits makes Hileman Real Estate a necessary party to the equitable claims."[31] *Id.* at 23. According to the Lawleys, given "their sizeable claim for damages," in the event of rescission, they "certainly have a right to pursue incidental damages for the amounts they incurred in reliance upon the fraudulently induced transaction," as such damages are within the "clean-up" powers of the court.[32] *Id.*

In *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227 (1937), the Supreme Court explained that the requirement of an "actual controversy" as set forth in the Declaratory Judgment Act, 28 U.S.C. § 2201, is synonymous with Article III's case or controversy requirements. *Id.* at 240-41. The Court stated: "It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 241. Similarly, the Fourth Circuit has explained: "'Although declaratory judgments are frequently

---

[31] As noted, both sides refer to Ms. Hileman and Hileman, Inc. collectively, as "Hileman." *Id.* Therefore, Ms. Hileman is included in the Lawleys' argument relating to the equitable claims.

[32] For instance, the Lawleys cite "damages such as taxes paid for the property." *Id.*

sought in advance of the full harm expected, they must still present a justiciable controversy rather than abstract, hypothetical or contingent questions.'" *Miller v. Augusta Mut. Ins. Co.*, 157 Fed. App'x 632, 637 (4th Cir. 2005) (citation omitted).

In their Amended Complaint, plaintiffs state that, although Ms. Willoughby assigned to the Lawleys her claims arising from the sale of the Property, Ms. Willoughby "joins as a Plaintiff in view of Defendants' claimed defense that the Lawleys were not parties to the subject contract." Amended Compl. ¶ 41. But, at issue here is the Lawleys' own claim for rescission, and not their claim as assignees; they do not, in the argument section of their Opposition, contend that their entitlement to rescission arises from their position as assignees.

*Black's Law Dictionary* defines rescission as follows: "**1.** A party's unilateral unmaking of a contract for a legally sufficient reason, such as the other party's material breach, or a judgment rescinding the contract . . . . Rescission is generally available as a remedy or defense for a nondefaulting party and is accompanied by restitution of any partial performance, thus restoring the parties to their precontractual positions." BLACK'S LAW DICTIONARY 1420-21 (9th ed. 2009).

If one party to a contract materially breaches it, "'the other party has a right to rescind.'" *Washington Homes, Inc. v. Interstate Land Dev. Co., Inc.*, 281 Md. 712, 728, 382 A.2d 555, 563 (1978) (citation omitted); *accord Maslow v. Vanguri*, 168 Md. App. 298, 323, 896 A.2d 408, 423, *cert. denied*, 385 Md. 163 (2006). However, "rescission will not be granted 'for casual or unimportant breaches, but only for a substantial breach tending to defeat the object of the contract.'" *Maslow*, 168 Md. App. at 324, 896 A.2d at 423 (quoting *Vincent v. Palmer*, 179 Md. 365, 373, 19 A.2d 183, 188 (1941)). Notably, "contracts . . . may be subject to rescission on a

finding of fraud, duress, undue influence, or negligent misrepresentation in their making, and declaratory judgments may be issued determining the validity of such contracts." *Hale v. Hale*, 66 Md. App. 228, 233, 503 A.2d 271, 274, *cert. denied*, 306 Md. 118 (1986); *accord Tung*, *supra*, 2009 WL 5206627, at *3 (citing *Hale*); W.H. Beach, *Application of Declaratory Judgment Acts to Questions in Respect of Contracts or Alleged Contracts*, 162 A.L.R. 756 (1946) (citing *Hale*).

Regarding the proper defendants in a rescission claim, Henry Campbell Black, in his *Treatise on the Rescission of Contracts and Cancellation of Written Instruments*, stated:

> In order to obtain a decree in equity for the rescission of a contract or the cancellation of a written instrument, it is necessary to bring before the court, as parties to the action, all those having interests in the subject-matter, or whose rights or claims must be adjudicated and concluded in order to do complete equity in the premises. . . . *It is proper, if not necessary, to join as defendants in an action for rescission or cancellation all the parties who participated in the fraud which is the basis of the complaint*, or who conspired or colluded together to defraud the complainant, though the several defendants may have different interests in the result of the fraud.

2 Henry Campbell Black, A Treatise on the Rescission of Contracts and Cancellation of Written Instruments §§ 657-58 (1916) (emphasis added).

Indeed, where the cause for rescission is predicated on fraud, rather than on contract, the common law supports the view that a plaintiff may be granted rescission against a defendant who was not a party to the contract to be rescinded. *See Pinter v. Dahl*, 486 U.S. 622, 647 n.23 (1988) ("There is authority at common law, however, for granting a plaintiff rescission against a defendant who was not a party to the contract in question, in particular, against the agent of the vendor. . . . When rescission is predicated on fraud, rather than based on contract theory, privity

is not essential.").  A consideration of the basic equities explains why contractual privity is not always essential:

> As between two tortfeasors, one the seller and the other not a privy to the transaction, it is desirable that the seller be the person from whom the purchaser recover; otherwise, the seller will benefit from his fraud to the extent of the purchase price. The choice, then is between returning the seller to the status quo prevailing prior to the fraud or forcing the defrauder not in privity to a worse status than he occupied quo ante. To avoid unjust enrichment, general equitable principles indicate the preferability of the purchaser pursuing first the seller, rather than his partner in the fraud. However, as between the innocent purchaser and the wrongdoer who, though not a privy to the fraudulent contract, nonetheless induced the victim to make the purchase, equity requires the wrongdoer to restore the victim to the status quo.

*Gordon v. Burr*, 506 F.2d 1080, 1084-85 (2d Cir. 1974); *cf. Johns Hopkins Univ. v. Hutton*, 297 F. Supp. 1165, 1224 (D. Md. 1968) (allowing a rescission claim to proceed against a stock broker pursuant to § 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77l(a)(2)), *rev'd on other grounds*, 422 F.2d 1124 (4th Cir. 1970).

As indicated, the Lawleys have also sued the Hilemans based on a claim of unjust enrichment.  Under Maryland law, a plaintiff's claim for unjust enrichment must satisfy the following elements:  "(1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return."  *Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 574, 952 A.2d 304, 327, *cert. denied*, 406 Md. 444 (2008).

"A successful unjust enrichment claim serves to 'deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits quite honestly in the first instance, and even though the plaintiff may have suffered no

demonstrable losses.'" *Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295, 936 A.2d 343, 352 (2007) (citation omitted). "'A person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner and amount necessary to prevent unjust enrichment.'" *Bank of Am. Corp. v. Gibbons*, 173 Md. App. 261, 267, 918 A.2d 565, 569 (2007).

Indeed, "[r]estitution involves the disgorgement of unjust enrichment." *Consumer Prot. Div. v. Morgan*, 387 Md. 125, 168, 874 A.2d 919, 944 (2005). They "'are simply flip sides of the same coin.'" *Bank of Am. Corp.*, 173 Md. App. at 267, 918 A.2d at 569 (citation omitted). "The purpose of restitution, therefore 'is to prevent the defendant's unjust enrichment by recapturing the gains the defendant secured in a transaction.'" *Id.* at 268, 918 A.2d at 569 (citation omitted). An unjust enrichment claim, then, "'requires restitution to the plaintiff of something that came into defendant's hands but belongs to the plaintiff in some sense.'" *Id.* at 271, 918 A.2d at 571.

Unjust enrichment is a quasi-contract claim that "'may not be brought where the subject matter of the claim is covered by an express contract between the parties.'" *Janusz v. Gilliam*, 404 Md. 524, 537, 947 A.2d 560, 567 (2008) (quoting *Cnty. Comm'r of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 96, 747 A.2d 600, 607 (2000)). But, "when there is evidence of fraud or bad faith, . . . when recission [sic] is warranted, or when the express contract does not fully address a subject matter," a court may allow a claim for unjust enrichment. *J. Roland Dashiell & Sons, Inc.*, 358 Md. at 100, 747 A.2d at 609; *accord Janusz*, 404 Md. at 537, 947 A.2d at 567-68; *see Benjamin v. Erk*, 138 Md. App. 459, 471, 771 A.2d 1106, 1113 ("Restitutionary damages may be awarded in connection with an equitable claim for

rescission."), *cert. denied*, 364 Md. 461 (2001). Such damages, frequently referred to as "incidental" damages, are characterized as equitable damages rather than legal damages; they reflect "clean up powers" to be employed by a court sitting in equity. *Benjamin*, 138 Md. App. at 471, 771 A.2d at 113 (internal quotation marks omitted).

Given that the claims for rescission, unjust enrichment, and declaratory judgment are based on the alleged fraud of both the sellers and the Hilemans, the Hilemans are proper parties to the rescission claims *lodged by the purchaser*, Ms. Willoughby, even though the Hilemans did not sign the contract of sale.[33] The Hilemans' potential liability springs from their alleged fraud. However, this does not resolve whether the Lawleys have viable equitable claims, in their own names, against the Hilemans.[34]

---

[33] The claims for declaratory judgment, rescission, and unjust enrichment are necessarily in the alternative to the claims in tort. At some point, Ms. Willoughby must elect to pursue either the claims for rescission or the claims for compensatory and punitive damages. *See Merrill v. Craig,* 130 Md. App. 350, 366, 746 A.2d 923, 931 ("The restoration of the parties to their original position is incompatible with the circumstance when the complaining party is, at once, relieved of all obligations under the contract while simultaneously securing the windfall of compensatory and punitive damages beyond incidental expenses."), *cert. denied,* 359 Md. 29 (2000); *see also Benjamin v. Erk,* 138 Md. App. at 480, 771 A.2d at 1119 (stating that the plaintiffs' election of equitable rescission precluded legal claims for compensatory or punitive damages against any of the participants in the fraudulent scheme").

[34] The parties have not addressed whether Ms. Willoughby's assignment confers on the Lawleys a right to seek rescission. Maryland recognizes the modern rule that a "chose in action, whether arising in tort or ex contractu, is generally assignable. The only limitation, in the absence of a contrary statutory provision, is that the right of action be of a sort which would survive the death of the assignor and pass to his personal representatives." *Summers v. Freishtat*, 274 Md. 404, 407, 335 A.2d 89, 90-91 (1975) (citations and footnote omitted). *But see* W. W. Allen, Annotation, *Assignability of Right to Rescind or of Right to Return of Money or Other Property as Incident of Rescission*, 110 A.L.R. 849 (1937) (stating that "most of the cases give support to the proposition that a mere naked right to rescind or to sue for a rescission is not assignable" but acknowledging that "where the assignment is, in form, merely of a 'claim' or cause of action, it is, by some courts, upheld, if regarded as carrying with it the beneficial interest [in the property], or, as is sometimes held, a share therein" (footnotes omitted)). As it is not

It is undisputed that the Lawleys were not parties to the contract of sale that they seek to rescind. Nor is there any evidence before the Court that any benefit was conferred on the Hilemans as a result of their contact with the Lawleys, so as to justify the Lawleys' claim for unjust enrichment. Although the Lawleys point to the commission received by Hileman, Inc., it was not paid by the Lawleys. The real estate taxes—the sole example noted by the Lawleys as "incidental damages" to which they would be entitled in the event of rescission—cannot be characterized as a benefit conferred on the Hilemans. Therefore, in the light most favorable to the Lawleys, there is no basis for the Lawleys' equitable claims against the Hilemans. Accordingly, as to the Lawleys, the Court shall grant the Hilemans' motion for summary judgment as to Counts XII, XIII, and XIV.[35]

## CONCLUSION

For the foregoing reasons, the Hilemans' motion for summary judgment shall be granted, in part, and denied in part. A separate Order consistent with this Opinion will follow.

Date: April 5, 2011                                    ____/s/_____
                                                       Ellen Lipton Hollander
                                                       United States District Judge

---

(...footnote continued)

before the Court, the Court need not decide whether the assignment granted to the Lawleys their own right, independent of Willoughby's, to sue for rescission.

[35] Those counts remain pending as to Ms. Willoughby.