IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DARREN LAWLEY, ET AL.,
    *Plaintiffs,*

v.                              Civil Action No.: ELH-10-1074

PAUL E. NORTHAM, ET AL.,
    *Defendants.*

**MEMORANDUM OPINION**

This diversity case arises from a real estate transaction involving a single-family home in Worcester County, Maryland (the "Property"), which was sold in September 2008 to Dona May Willoughby, plaintiff,[1] by Paul Northam and Lynn Immell ("Sellers"), defendants.  Although Ms. Willoughby was the purchaser, her daughter and son-in-law, Misha and Darren Lawley (the "Lawleys"), plaintiffs, were to reside at the Property.  Deborah Hileman and Hileman Real Estate, Inc. ("Hileman, Inc.") (collectively, the "Hilemans"),[2] defendants, were the Sellers' real estate agents and brokers.

Based on purported defects in the Property, allegedly discovered after the Lawleys moved in, plaintiffs filed suit against the defendants.  Their Amended Complaint ("Complaint," ECF 43) contains fourteen counts, as follows:  Negligence (Count I); Breach of Contract (Count II, against Sellers only); Fraudulent Inducement/Deceit (Count III); Fraud/Concealment (Count IV); Negligent Misrepresentation (Count V); Negligent Supervision and Retention (Count VI, against Hileman, Inc. only); Respondeat Superior (Count VII, against Hileman, Inc. only);

---

[1] Initially, Ms. Willoughby was not named as a plaintiff in this case.  After Ms. Willoughby was sued in a third-party complaint, she was added as a plaintiff.

[2] Throughout their submissions, both sides refer to Ms. Hileman and Hileman, Inc. collectively as "Hileman."  I will refer to them individually as Ms. Hileman and Hileman, Inc. and collectively as the "Hilemans."

Unfair or Deceptive Trade Practices under the Maryland Consumer Protection Act ("CPA"), MD. CODE (2005 Repl. Vol., 2011 Supp.), COM. LAW ("C.L.") § 13-101 *et seq.* (Count VIII, against Sellers only); Civil Conspiracy (Count IX); Breach of Warranty (Count X, against Sellers only); Loss of Consortium (Count XI); Declaratory Judgment (Count XII); Rescission (Count XIII); and Unjust Enrichment (Count XIV).

On February 4, 2011, the Hilemans filed a "Motion for Partial Summary Judgment" ("Hilemans' First Motion," ECF 50), as to the eleven counts in which they were sued. Briefing was completed on March 21, 2011. On April 5, 2011, I issued a Memorandum Opinion (ECF 67, "First Opinion") and Order (ECF 68), granting the Hilemans' First Motion as to the requests for Declaratory Judgment (Count XII) and Rescission (Count XIII), as well as the claim for Unjust Enrichment (Count XIV), but only as to the Lawleys, not Ms. Willoughby. Those counts remain pending as to Ms. Willoughby.

One day before I issued the First Opinion, on April 4, 2011, the Sellers filed a "Motion For Summary Judgment Of Defendants Paul E. Northam And Lynne Immell" ("Sellers' Motion," ECF 58), as well as a supporting memorandum of law ("Sellers' Memo," ECF 58-1). Plaintiffs filed an "Opposition To Motion For Summary Judgment" ("Opposition to Sellers," ECF 71),[3] to which the Sellers filed a reply ("Sellers' Reply," ECF 74).[4]

Also on April 4, 2011, the Hilemans filed a second summary judgment motion, captioned "Motion For Summary Judgment And Request For Hearing Of Defendants Hileman Real Estate, Inc. And Deborah Hileman" ("Hilemans' Second Motion," ECF 60), in which they "assert[ed]

---

[3] Plaintiffs appended four exhibits to their Opposition: excerpts from the deposition of Misha Lawley (Exhibit 1); excerpts from the deposition of Kelly Carrigan (Exhibit 2); the affidavit of Colin F. McGowan, a licensed real estate broker (Exhibit 3); and excerpts from the deposition of Darren Lawley (Exhibit 4).

[4] Sellers appended two exhibits to their Reply: excerpts from the deposition of Bruce Miller (Exhibit 1), and excerpts from the deposition of Misha Lawley (Exhibit 2).

the same arguments in support of Summary Judgment as have been asserted by Defendants Paul Northam and Lynne Immell" (*see* ECF 58), as well as several other arguments.[5]  Hilemans' Motion at 1.  The Hilemans also submitted a "Statement Of Undisputed Material Fact[,] Applicable Law And Argument Of Hileman Real Estate And Deborah Hileman" ("Hilemans' Memo," ECF 60-1).[6]  In their opposition, s*ee* plaintiffs' "Opposition To Motion For Summary Judgment" ("Opposition to Hilemans," ECF 73), plaintiffs "adopt and incorporate . . . by reference all grounds and authorities set forth" in their Opposition to Sellers (ECF 71), as well as their earlier submissions, including ECF 52, their opposition to the Hilemans' First Motion. Opposition to Hilemans at 1-2.

Thereafter, the Sellers filed an "Adoption Of Other Defense Motions For Summary Judgment By Defendants Paul E. Northam And Lynne Immell" (ECF 61), in which they adopted the "arguments, authorities, and evidence" in the Hilemans' Second Motion (ECF 60), "to the full extent to which said motion is applicable to Defendants Northam and Immell and are consistent with their positions."  In opposing this second motion for summary judgment, ECF 72, plaintiffs adopted and incorporated "all grounds and authorities set forth in their filing (ECF 71) . . . and the other filings in opposition to Motions for Summary Judgment in this matter, including ECF 52."  *Id.* at 1.

---

[5] As indicated, the Hilemans' second summary judgment motion was filed one day before I issued my First Opinion.  As I had already written my First Opinion by the time of the filing of the Hilemans' Second Motion, I did not consider any additional arguments set forth in the Hilemans' Second Motion.  The points advanced in the Hilemans' Second Motion should have been combined with their First Motion.

[6] The Hilemans appended three exhibits to their Memo:  Misha Lawley's answers to the interrogatories of Hileman, Inc. (Exhibit A); excerpts from the deposition of Misha Lawley (Exhibit B); and excerpts from the deposition of Darren Lawley (Exhibit C).

The issues have been fully briefed, and the Court now rules pursuant to Local Rule 105.6, as no hearing is necessary.  For the reasons that follow, defendants' motions for summary judgment shall be granted in part and denied in part.

## Factual Background[7]

Ms. Willoughby, a resident of Hawaii, purchased the Property from Northam and Immell on September 5, 2008.  Complaint ¶ 26.  "The purchase offer . . . was in the amount of $192,450.00."  *Id.* ¶ 22.  Ms. Willoughby is the mother of Ms. Lawley and the mother-in-law of Mr. Lawley, the occupants of the Property.  *See* Hilemans' "Memorandum Of Grounds And Authorities In Support Of Motion For Partial Summary Judgment" ("First Memo," ECF 50-1) at 2, 7; Plaintiffs' "Opposition To Motion For Partial Summary Judgment" ("First Opposition," ECF 52) at 3.  The Sellers are the first cousins of Ms. Hileman, a real estate broker licensed in Maryland and the sole shareholder of Hileman, Inc.  *See* Hilemans' First Motion at 1; First Opposition at 3.[8]  In connection with the sale of the Property, Hileman, Inc. received a commission from the Sellers in the amount of $4,811.25.  First Opposition at 22.

At the relevant time, Ms. Hileman's mother, Peggi Bortz, was Ms. Hileman's administrative assistant.  Ms. Bortz has been a "licensed real estate broker" for forty years.  *Id.* at

---

[7] The Court must construe the facts alleged in the light most favorable to the plaintiffs, as the parties opposing the summary judgment motions.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *accord Scott v. Harris*, 550 U.S. 372, 380 (2007).

Many of the relevant facts appear only in the filings concerning the Hilemans' First Motion.  The factual summary is drawn largely from the statement of facts set forth in my First Opinion (ECF 67).  I have designated references to the documents filed in connection with the Hilemans' First Motion by reference to "First Motion," "First Memo" and "First Opposition."  In addition, I have considered the earlier submissions of deposition testimony, including that of Ms. Hileman and Ms. Bortz.

[8] Numerous exhibits were appended to the First Opposition, including: excerpts from Ms. Hileman's deposition (Exhibit 1); excerpts from the deposition of Peggi Bortz (Exhibit 2); a letter dated August 6, 2008, from Worcester County to the Sellers, on which the Hilemans were copied (Exhibit 18); and excerpts from Ms. Lawley's deposition (Exhibit 19).

3-4; *see* First Opposition Exh. 2, at 24:11.  At her deposition, Ms. Bortz testified that, for about twenty-eight years, she owned the house adjacent to the Property.  *Id.* at 9:1-9:4.  Her father, Otis Northam (Ms. Hileman's grandfather), had once owned the Property, as well as the adjacent Bortz property, but later subdivided and gave the portion referred to as the Property to his son, David Northam.  *Id.* at 17:2-17:6.  In 1957, David Northam and his wife, Irene, built the Property.  *Id.* at 12.  David Northam lived in that house until he died; Irene Northam lived there until 2003.[9]

After Irene Northam moved from the Property, Paul Northam[10] and his sister, Lynne Immell, arranged with Hileman, Inc. to rent, and later sell, the Property.  First Opposition at 4.  Ms. Bortz testified that she was involved with managing repairs of the Property while it was a rental.  First Opposition Exh. 2, at 30:15-31:19.  The Property was rented between 2003 and 2008.  James Kelly Carrigan was one of the persons who rented it.  First Opposition at 4-5; First Opposition Exh. 18.  During the period in which the Property was a rental, the Hilemans allegedly learned about several defects with respect to the Property.  Their alleged non-disclosure of those defects forms the basis of this suit.

## *Nitrates in the Water*

On January 23, 2007, Mr. Carrigan, who was living at the Property with his son and daughter-in-law, wrote a letter to Ms. Hileman, stating: "[Y]our mother stated to me that she was concerned about nitrates in the water.  Needless to say, we are very concerned not only about the safety of the water, but more so about the fact that your office has not previously disclosed any information to us indicating that the water might not be potable."  First Opposition Exh. 4.

---

[9] The deed transferring the Property from Northam and Immell to Willoughby states that Irene Northam died on June 24, 2005.  That deed was appended to the First Motion as Exhibit 3.

[10] Unless otherwise noted, "Northam" or "Mr. Northam" shall refer to Paul Northam, not David Northam.

In an e-mail dated February 14, 2007, Ms. Hileman wrote to Northam to discuss the Property, including the "high number of nitrates currently (14 versus a safe level [which] should be less than 10) in the water." First Opposition Exh. 5. A letter addressed to Ms. Hileman from the Worcester County Department of Environmental Programs, dated March 27, 2007, indicated that a point of use system on the kitchen sink would be sufficient to address the nitrate level, but that "the well owner must notify any future owner or tenant that the water is considered potable only through the treatment system." First Opposition Exh. 6.

*Asbestos*

By letter to Ms. Hileman dated January 23, 2007, Mr. Carrigan indicated that "asbestos in the basement is a huge concern." First Opposition Exh. 4. In an e-mail from Ms. Hileman's attorney to Ms. Hileman, dated August 16, 2007, regarding Mr. Carrigan's complaints concerning the Property, counsel acknowledged that asbestos was "a really big issue." First Opposition Exh. 7.[11]

*Water Infiltration*

The basement of the Property has a history of "water intrusion." First Opposition at 6. According to Ms. Bortz's deposition testimony, the basement flooded in 1989 and, as a result, Mr. Northam arranged for installation of a sump pump. First Opposition Exh. 2, at 55-56. Ms. Hileman testified at her deposition that, when the water level became high, the sump pump pumped the excess water into a ditch along Worcester Highway. First Opposition Exh. 1, at 111:3-111:10. In a letter dated February 28, 2007, in which Ms. Hileman requested repair service for the sump pump, she stated: "Just to give you a bit of information to keep in mind for your service people, this is a system that is needed on a daily basis to keep the basement dry."

---

[11] No claim of attorney-client privilege has been asserted as to the e-mail.

First Opposition Exh. 8.  Ms. Hileman also testified that she had seen water in the basement around the sump pump area when the backup battery was not functioning.  First Opposition Exh. 1, at 104:9-104:10.

The sump pump repeatedly malfunctioned and was repaired or replaced on a number of occasions, under Ms. Bortz's watch.  *See* First Opposition Exh. 10-15.[12]  It appears there was at least one other flood, in 2004.  First Opposition Exh. 10.  In an e-mail dated June 20, 2005, from Ms. Bortz to Ms. Hileman and Northam, Ms. Bortz wrote that the plumber had not been able to find a sump pump with sufficient horsepower "to suit him."  First Opposition Exh. 11.

### *Mold*

By e-mail dated August 25, 2005, Ms. Bortz wrote Northam and Immell about the Property, stating: "I know there is mold."  First Opposition Exh. 16.  The e-mail was forwarded to Ms. Hileman "for the file."  *Id.*  By e-mail dated July 11, 2008, Ms. Hileman wrote to Northam and Immell, stating:  "There is quite a bit of white mold spores on the joists in the basement that will be a problem with a sale if we don't spray with some bleach or mold killing product."  First Opposition Exh. 17.

### *The Worcester County Department of Development Review and Permitting Letter*

As the result of a "Nuisance Complaint" filed by Mr. Carrigan with the Worcester County Department of Development Review and Permitting, Bruce Miller, a building inspector, inspected the Property for violations of the Worcester County Rental Housing Code.  First

---

[12] Plaintiffs' Exhibit 10 is an invoice dated February 12, 2004, for repairs due to a flood, directed to Bortz, Hileman, Inc., and Northam.  Plaintiffs' Exhibit 11 is an e-mail dated June 20, 2005, from Bortz to Northam and Hileman, regarding installation of a sump pump.  Exhibit 12 is an invoice to Bortz dated June 29, 2005, for the installation of a new sump pump.  Exhibit 13 is an invoice to Bortz dated December 31, 2006, for a new sump pump.  Exhibit 14 is a memorandum from Bortz addressing the backup battery for the sump pump, dated February 14, 2007.  Exhibit 15 is an e-mail from Bortz to Hileman and Northam, dated February 26, 2007, noting continued problems with the sump pump.

Opposition Exh. 18.  Mr. Miller sent a letter to Northam and Immell, on behalf of the Worcester County Department of Review and Permitting, dated August 6, 2008, with a copy to Ms. Hileman as the listing agent.  *Id.*  He identified four potential defects with the Property:  (1) high level of nitrates in the water, (2) peeling paint that was, given the age of the house, potentially lead paint, (3) black mold growth around the windows and on the wall, and (4) asbestos siding and insulation.  *Id.*  At her deposition, Ms. Hileman indicated that she had received a copy of the letter.  First Opposition Exh. 1, at 135:4-135:6.

With regard to the potability issue, the letter provided: "The water supply shall be maintained free of contamination . . . . Owner shall prove that the water supply is free from contamination before next tenant occupies this property."  First Opposition Exh. 18.  Further, the letter required that a "state certified inspector" inspect the Property for lead paint before the next occupancy, and that "[a]ll discovered deficiencies . . . be corrected by a state certified contractor with successful inspection by a lead inspector before occupation by another tenant."  *Id.*  With respect to mold, the letter required repair of all roof and wall leaks, and said:  "While not specifically addressed in the [Rental Housing] code, this inspector strongly recommends that owner cause to have this [P]roperty inspected for mold with subsequent abatement of affected areas by a qualified contractor."[13]  *Id.*  In addition, Miller wrote: "The asbestos insulation around the pipes must be properly abated by a state certified contractor."  *Id.*  The letter acknowledged that, at the time, "the Property was vacant and listed for sale," and stated:  "Corrections noted above shall be corrected before occupancy of this unit to another family."  *Id.*

---

[13] The letter cited the following anecdotal evidence in support of that recommendation: "[T]he tenant's grandson allegedly suffered from many sicknesses while residing at the house and the pediatrician found mold cultures taken from the child's nose.  These illnesses disappeared after moving to a new residence.  The [industrial hygienist] report supports the health hazard of the mold found at this residence."  *Id.*

### *Sale of the Property*

As noted, Ms. Willoughby purchased the Property in 2008.[14]  However, Ms. Lawley

testified at her deposition that Ms. Willoughby was not involved in the decision to purchase the

Property.  Rather, it was Ms. Lawley's "decision" to buy it.  First Opposition Exh. 19, at 286:12.

In addition, Ms. Lawley testified:  "Dona Willoughby was not involved with the inspection

process, with any of the dealings with the house.  I dealt with everything or my husband did."

*Id.* at 363:11-363:15.  Nor did Ms. Willoughby attend the closing.  First Opposition at 13.

Ms. Lawley also testified that she "was acting on behalf of Dona Willoughby from the

very beginning."  First Opposition Exh. 19,  at 363:9-363:10.  Ms. Lawley signed the necessary

documents, pursuant to a power of attorney ("POA").[15]  First Opposition at 1, 5-6.  The Lawleys

moved into the Property on September 5, 2008, allegedly as tenants of Ms. Willoughby.  First

Memo at 15; *see* Complaint ¶ 27.[16]  On September 11, 2009, Ms. Willoughby executed an

---

[14]  Ms. Willoughby is identified by the Maryland Department of Assessments and Taxation and the deed as the owner.  First Motion Exh. 2-3.  At her deposition, Ms. Lawley agreed that Ms. Willoughby owned the Property.  First Motion Exh. 1, at 393:18-393:21.  She also indicated that her mother paid the property taxes for 2009 and 2010, *id.* at 485:19-486:1, and she "believe[d]" that her mother also paid the property taxes for 2008.  *Id.* at 485:17-485:18.  Ms. Lawley testified that these payments are a loan from her mother, to whom the Lawleys owe "[a]pproximately $60,000."  *Id.* at 485-487.

Ms. Lawley paid for the home inspection as well as the deposit of $1,000 on the Property.  *Id.* at 289:9-289:15.  However, Ms. Willoughby reimbursed Ms. Lawley for these costs.  *Id.* at 356:16-357:4.

[15]  Ms. Lawley signed the following documents by "POA" for Ms. Willoughby:  "Residential Contract of Sale," signed by Ms. Lawley on July 31, 2008; "Like-Kind Replacement Property Exchange Addendum"; "Maryland Residential Property Disclosure And Disclaimer Statement"; "Addendum To The Property Disclosure And Disclaimer Statement"; "Disclosure of Licensee Status Addendum"; "Home Inspection"; "On-Site Sewage Disposal System (OSDS) Inspection And Test Addendum"; "Inspection/Certification – Well"; and other addenda referring to the Contract of Sale.  The documents bearing Ms. Lawley's signature as POA were appended to the Hilemans' First Motion as Exhibit 4.

[16]  Ms. Lawley testified as follows with respect to the tenancy arrangement:

Q.  You mentioned your arrangement with your mother for living there.  There was no

assignment to Misha Lawley of "all [her] right, title and interest in any and all causes of action . . . arising out of [her] purchase of improved real property located at 5809 Worcester Highway."  First Opposition Exh. 20.

At the time of sale, Ms. Hileman knew that the Lawleys were going to reside at the Property.  First Opposition Exh. 1 at 130:15-131:3.  The following deposition testimony of Ms. Hileman is pertinent:

> Q. . . . Who did you understand the potential buyer was to be?
>
> [COUNSEL FOR THE HILEMANS]:  Objection as to form.  You can answer.
>
> A.  Whatever the contract says.
>
> Q.  Well, did you understand that Ms. Lawley was operating under a power of attorney?
>
> A.  To be honest, it was a little confusing.  I didn't understand who the, you know . . .
>
> Q.  Did you understand that the Lawleys were intending to live at the property as Ms. Willoughby's tenant?
>
> A.  I know that Darren -- they were going to live there.  I knew they were going to live there.
>
> Q.  You knew that at the time?
>
> A.  That they were the ones that were going to live there?
>
> Q.  Yes.
>
> A.  Yes.  That's what I understood.

*Id.* at 130:6-131:3.

At her deposition, Ms. Hileman indicated that she understood that, under Maryland law, sellers must provide a disclosure statement or an "as is" disclaimer to purchasers of single-family residential properties.  First Opposition Exh. 1, at 62; *see* Md. Code (2010 Repl. Vol.), § 10-702

---

> written agreement?
> A. No.
> Q. Did you ever pay her any rent?
> A. Our rent was paying our own bills and taking care of the house and fixing up the house.  It was more of my inheritance you could think of it as.

First Motion Exh. 1, at 290:5-290:16.

of the Real Property Article ("R.P.").   Northam and Immell chose to provide the Maryland Residential Property Disclosure And Disclaimer Statement (the "Disclosure Statement"), rather than the "as is" disclaimer, and signed it in April 2008.[17]   First Opposition Exh. 1, at 68:16.

Ms. Hileman testified that the Sellers completed the Disclosure Statement "at the time of the listing," First Opposition Exh. 1, at 161:16-161:17, and that it was furnished to potential buyers for their review prior to any offer.   *Id.* at 162:2-162:6.[18]   The Disclosure Statement was also included as an addendum to the contract of sale.   *Id.* at 162:7-162:15.   However, it did not mention asbestos, mold, or potability issues as to the Property.   First Opposition at 10-11.   Ms. Hileman explained that the information in the letter of August 6, 2008, sent by Bruce Miller, was not disclosed because she viewed that information as "unreliable."   First Opposition Exh. 1, at 145-46.   In relevant part, the Disclosure Statement provided:

2.  Basement:  Any leaks or evidence of moisture?  Yes.

Comments:  Drainage system in place

* * *

4.  Other Structural Systems, including exterior walls and floors:

Comments:  [blank]

Any defects (structural or otherwise)?  No.

Comments:  [blank]

* * *

10.  Water Supply:  Any problem with water supply?  No.[19]

Comments:  [blank]

Home water treatment system:  Yes.

---

[17] The Disclosure Statement was appended to the Hileman's First Motion as part of Exhibit 4.  It indicates that Mr. Northam signed it on April 8, 2008, and Ms. Immell signed it on April 29, 2008.

[18] Under Maryland law, the disclosure statement must be provided "on or before entering into a contract of sale by the vendor and the purchaser."  R.P. § 10-702(f)(1).

[19] It appears that "No" is checked, as there is a faint pen mark.

Comments: [blank]

* * *

14.  Are there any hazardous or regulated materials (including, but not limited to, licensed landfills, asbestos, radon gas, lead-based paint, underground storage tanks, or other contamination) on the property?  No.

If yes, specify below

Comments: [blank]

* * *

19.  Are there any other material defects, including latent defects, affecting the physical condition of the property? No.

Comments:  [blank]

Hilemans' First Motion Exh. 4 at 19-21.

At her deposition, Ms. Lawley testified that her "real estate agent" and Ms. Hileman gave her the Disclosure Statement.  First Opposition Exh. 19, at 364:13-364:16.  She indicated that the Disclosure Statement, in conjunction with some "contingencies [she] requested,"[20] led her to believe that the Property was "guaranteed to be free of defects and deficiencies."  *Id.* at 364:9-364:16.

According to Ms. Lawley, Jim Newcombe conducted the home inspection prior to closing, and "only" identified "electrical" problems, which were addressed at settlement.  *Id.* at 285, 363.  Ms. Lawley claimed that she was reimbursed, by check, for resolving the electrical issues.  *Id.* at 285:5.  In addition to the electrical problems noted by Ms. Lawley, the "Amendment/Addendum" to the contract of sale, attached as Exhibit 4 to the Hilemans' First Motion, identified "items to be completed by the sellers as a result of the home inspection performed on August 11, 2008."  It stated, in part:

6.  There are asbestos wrapped pipes in the basement.  Due to the potential health hazard the buyers are requesting that the seller properly covers undisclosed asbestos wrapped pipes.

---

[20] Ms. Lawley did not identify the contingencies.

Ms. Lawley recounted that, when she and her husband moved into the house, "[t]here were already a couple thick coats of white paint. It looked very nice." First Opposition Exh. 19, at 322:15-322:16. In March 2009 the Lawleys learned from Bruce Miller, the housing inspector,[21] about the mold in the house. *Id.* at 58:6. Ms. Lawley recalled that, while they were erecting a fence in the front yard, Miller arrived at the Property to check on the fence. *Id.* at 57:13-59:8. Ms. Lawley testified: "The inspector that came to inspect the fence wasn't concerned about the fence. He was concerned about if we had been told and were aware of the mold and the conditions of the house . . . ." *Id.* at 57:18-58:1. According to Ms. Lawley, after Mr. Miller's comment, "[e]verything that we were experiencing," i.e., medical issues,[22] "became understandable." *Id.* at 59:12-59:13.

Because of mold problems, the Lawleys vacated the Property on or about April 19, 2009. *Id.* at 327:7-327:17; Complaint ¶ 39. Regarding the mold, the following deposition testimony of Ms. Lawley is relevant:

> Q. Every wall, every ceiling, every doorknob [of the house is covered in mold]?
>
> A. There is some mold on every portion that my eyes could see, to my recollection, yes, now, if you are asking about now to this day.
>
> * * *
>
> Q. . . . What color is that mold?
>
> A. They are black and white and gross, large clumps, black with white poky things all over.

First Opposition Exh. 19, at 478:16-479:10.

---

[21] It appears that Bruce Miller is the same person who authored the letter of August 6, 2008. *See id.* at 58:21-59:1 (Ms. Lawley testified: "He had been the inspector who did the inspection for Kelly Carrigan.").

[22] Plaintiffs assert that "[a]fter moving into the house, Misha Lawley developed a number of health related problems requiring medical treatment, including facial swelling, sinus pain, and various upper-respiratory symptoms." Complaint ¶ 36.

In December 2009, after the Lawleys vacated the Property, there was an "extensive water intrusion" of "six to seven feet of water in the basement."  First Opposition Exh. 19, at 67:11-68:3.  This suit followed, on April 28, 2010.

## Discussion

### Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is properly granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party must demonstrate through the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any," that a reasonable jury would be unable to reach a verdict for the non-moving party.  *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).  When this burden is met, the non-moving party then bears the burden of demonstrating that there are disputes of material fact and that the matter should proceed to trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

A material fact is one that "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  In considering a motion for summary judgment, a judge's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id.* at 249.  Notably, the court must construe the facts in the light most favorable to the party opposing the motion.  *United States v. Diebold*, 369 U.S. 654, 655 (1962); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).

As indicated, jurisdiction is based on diversity of citizenship.  *See* 28 U.S.C. § 1332.

Where an action is based on diversity of citizenship, relevant state law controls.  *Erie R.R. v.*

*Tompkins*, 304 U.S. 64, 78 (1938).  Maryland follows the rule of *lex loci delicti* for tort actions,

which means that the court applies the substantive law of the state where the wrong occurred.

*Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 620, 925 A.2d 636, 648-49 (2007).  As to contract

actions, Maryland courts ordinarily apply the law of the jurisdiction where the contract was

made, under the principle of *lex loci contractus*.  *Id.* at 618, 925 A.2d at 648.  Because the

contract at issue was signed in Maryland, and the alleged torts occurred in Maryland, the

substantive law of Maryland will apply.  *See, e.g.*, *Tung v. Peters*, No. AW-09-576, 2009 WL

5206627, at *3 (D. Md. Dec. 23, 2009) ("This Court must use Maryland law in interpreting [the

plaintiff's] right of rescission as the contract was signed in Maryland.").

<u>Claims Based in Law</u>

Defendants have advanced a number of arguments in support of their motions for

summary judgment with respect to plaintiffs' claims of Negligence (Count I); Breach of Contract

(Count II); Fraudulent Inducement/Deceit (Count III); Fraud/Concealment (Count IV); Negligent

Misrepresentation (Count V); Negligent Supervision and Retention (Count VI); Respondeat

Superior (Count VII); Unfair or Deceptive Trade Practices under the CPA (Count  VIII); Civil

Conspiracy (Count IX); Breach of Warranty (Count X); and Loss of Consortium (Count XI).[23,24]

---

[23] Counts VI and VII were not addressed in the Sellers' Motion, as those counts are only directed at Hileman, Inc.  However, the Hilemans posit in their Second Motion that the legal theories and arguments advanced by the Sellers also apply to Counts VI and VII.  *See* Hilemans' Second Motion ¶ 7.  As the defendants have each adopted the motion of the other, the contentions of each shall be considered the contentions of all.

[24] As to some counts, defendants advance multiple grounds in support of their motions.  I will consider each argument, in turn.  As a result, some counts are addressed more than once.

Defendants' first three arguments relate to the Lawleys' capacity to assert various claims. Defendants argue that they owed no duty in tort to the Lawleys; that they were not in contractual privity with the Lawleys; and that they owed the Lawleys no duty under the CPA. Defendants also contend that plaintiffs cannot establish key elements of their various claims, including proximate cause; justifiable reliance; intent to deceive or defraud; and the existence of a warranty.

### 1.   Legal Duty

With respect to the claim of Negligence, plaintiffs aver that "Northam, Immell, and Hileman owed a duty to Willoughby and the Lawleys to fully disclose all material defects in the property, including any latent defects, as the failure to disclose those defects posed a foreseeable risk of personal injury to the Lawleys." Complaint ¶ 43. With respect to their claim of Negligent Misrepresentation, plaintiffs allege: "At all times relevant hereto, Northam, Immell, and Hileman owed a duty to transmit accurate information as to the condition of the property." *Id.* ¶ 66. And, with respect to their Fraud/Concealment claim, plaintiffs assert: "Northam, Immell, and Hileman had affirmative obligations to disclose whether there existed any material defects, including latent defects, affecting the physical condition of the property." *Id.* ¶ 58.[25]

---

[25] In their Fraudulent Inducement/Deceit claim, plaintiffs do not explicitly allege that defendants breached a duty. To prevail on a fraudulent inducement claim, a plaintiff must show:

> (1) a material representation of a party was false, (2) falsity was known to that party or the misrepresentation was made with such reckless indifference to the truth as to impute knowledge to him, (3) the misrepresentation was made with the purpose to defraud (scienter), (4) the person justifiably relied on the misrepresentation, and (5) the person suffered damage directly resulting from the misrepresentation.

*Lapides v. Trabbic*, 134 Md.App. 51, 67, 758 A.2d 1114, 1122 (2000). To the extent that the element of justifiable reliance implies a duty on the part of defendants, the analysis that follows applies equally to the Fraudulent Inducement/Deceit Claim.

Defendants contend that the Lawleys "cannot recover under any tort, contract or statutory cause of action because they were strangers to the transaction" and "were therefore owed no duty . . . ." Sellers' Memo at 32. Thus, defendants maintain that the Lawleys' Negligence, Fraudulent Inducement/Deceit, Fraud/Concealment and Negligent Misrepresentation claims (Counts I, III, IV, and V) must fail because, without a legal duty, there can be no breach of the duty of care or the duty to disclose. Sellers' Memo at 32.[26]

Plaintiffs dispute defendants' contention that the defendants owed no duty of care or duty to disclose to the Lawleys. They note that Ms. Lawley suffered a physical illness allegedly caused by the mold; that her injury was foreseeable; and that foreseeability of injury is enough to establish a duty of care. *See* Opposition to Sellers 19-21. Plaintiffs also contend that defendants owed the Lawleys a statutory duty of care based on the legal requirement to provide a disclosure statement, which is intended to protect the health and safety of purchasers and occupants alike. *Id.* at 21-22; 24-26. Further, plaintiffs argue that the Lawleys are entitled to assert "fraud and negligent misrepresentation claims despite being 'third parties,'" because the relevant misrepresentations were made to the Lawleys, with the intent to induce reliance. *Id.* at 26-27.

The Lawleys' Negligence, Fraudulent Inducement/Deceit, Fraud/Concealment, and Negligent Misrepresentation claims against the defendants are not actionable in the absence of a legal duty. "In Maryland, in order to establish a cause of action for negligence, a plaintiff must prove a duty owed to the plaintiff or to a class of which the plaintiff is a part; a breach of that duty; a causal relationship between the breach and the harm; and damages suffered." *Simmons v.*

---

[26] In my First Opinion, at 21, I rejected, as to the Hilemans, the "legal contention that, because the Lawleys were not the purchasers, no duty was owed to them." In reaching that conclusion, I relied upon Maryland case law, as well as the Hilemans' professional obligations under Section 17-322(b)(4) of the Business Occupations and Professions Article of the Maryland Code (2004), and the Code of Maryland Administrative Regulations, Title 9, Subtitle 11, Chapter 2, both of which govern real estate brokers.

*Lennon*, 139 Md. App. 15, 34, 773 A.2d 1064, 1075 (2001); *accord Schultz v. Bank of America, N.A.*, 413 Md. 15, 27, 990 A.2d 1078, 1086 (2010).

To prevail on a fraudulent inducement claim, a plaintiff must show, as discussed *supra*, note 25:

> (1) a material representation of a party was false, (2) falsity was known to that party or the misrepresentation was made with such reckless indifference to the truth as to impute knowledge to him, (3) the misrepresentation was made with the purpose to defraud (scienter), (4) the person justifiably relied on the misrepresentation, and (5) the person suffered damage directly resulting from the misrepresentation.

*Lapides*, 134 Md.App. 51 at 67, 758 A.2d at 1122.

To establish a cause of action for fraudulent concealment, a plaintiff must establish the following elements:

> "(1) the defendant owed a duty to the plaintiff to disclose a material fact; (2) the defendant failed to disclose that fact; (3) the defendant intended to defraud or deceive the plaintiff; (4) the plaintiff took action in justifiable reliance on the concealment; and (5) the plaintiff suffered damages as a result of the defendant's concealment."

*Lloyd v. General Motors Corp.*, 397 Md. 108, 138, 916 A.2d 257, 274 (2007) (citation omitted).

And to establish a cause of action for negligent misrepresentation, a plaintiff must establish the following:

> "(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence."

*Id.* at 135-36, 916 A.2d at 273.[27]

---

[27] Plaintiffs' Negligence claim is largely duplicative of the Negligent Misrepresentation claim.  The Negligence claim seems to focus on omissions by the defendants, while the Negligent Misrepresentation claim focuses on affirmative representations.

A.

In the seminal Maryland case of *Jacques v. First National Bank of Maryland*, 307 Md. 527, 534, 515 A.2d 756, 759 (1986), the Maryland Court of Appeals explained:  "In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties."  The court continued: "Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability.  This intimate nexus is satisfied by contractual privity or its equivalent.  By contrast, where the risk created is one of personal injury, no such direct relationship need be shown, and the principal determinant of duty becomes foreseeability."  *Id.* at 534-35, 515 A.2d at 759-60.

Determining whether a relationship is sufficiently close to substitute for privity "calls for the production of evidence of 'some conduct on the part of the [defendants] linking them to that party or parties, which evinces the [defendant's] understanding of that party's reliance.'"  *Walpert, Smullian, & Blumenthal, P.A. v. Katz*, 361 Md. 645, 692-4, 762 A.2d 582 (2000) (internal citation omitted).  The *Simmons* Court explained, 139 Md. App. at 40-41, 773 A.2d at 1064: "The common denominator of the Maryland cases, where no contractual privity existed but nevertheless a tort was found, is that in each case the relationship of the litigants was close enough that the defendant knew that the plaintiff was likely to take some action based on what the defendant said or did."  The Lawleys presented evidence to establish an "intimate nexus" with defendants so as to undergird their claims regarding economic loss.

Regarding the claims for personal injuries, the Lawleys also presented evidence to show that the risk of illness due to mold was foreseeable.[28]   *Matthews v. Amberwood Associates Ltd. Partnership, Inc.*, 351 Md. 544, 719 A.2d 119 (1998), provides guidance.  In that case, a toddler and his mother were visiting a tenant in the tenant's apartment, when the child was mauled to death by a dog belonging to the tenant.  *Id.* at 550-51, 719 A.2d at 122.  The Maryland Court of Appeals found that the landlord owed a tort duty to the tenant's guests, although the landlord had no direct relationship with them.  The court recognized that the landlord "retained control over the matter of animals in the tenant's apartment," had "knowledge of past vicious behavior" by the dog, and knew of "the extremely dangerous nature of pit bull dogs."  *Id.* at 570, 719 A.2d at 131. It concluded that, due to "the foreseeability of harm to persons and property in the apartment complex, the jury was justified in finding that the landlord had a duty to the plaintiffs and that the duty was breached."  *Id.* at 570, 719 A.2d at 131-32.

The case of *B.N. v. K.K.*, 312 Md. 135, 143, 538 A.2d 1175, 1179 (1988), is also noteworthy.  There, the Maryland appellate court held that a doctor with active genital herpes owed a duty to the nurse with whom he had sexual intercourse to disclose his illness or refrain from intercourse, because "it would be reasonably foreseeable by [the doctor] (or a fact-finder could so conclude) that [the nurse] would be harmed by his conduct.  She was a clearly identified potential victim."

---

[28]  Defendants argue: "The bare, conclusory statement that Mrs. Lawley became ill because of the alleged non-disclosure of defects in the property is sheer speculation and should be disregarded by this Court."  Sellers' Reply at 17.  At this stage in the proceedings, however, I must construe the facts alleged in the light most favorable to plaintiffs, as the parties opposing the Motions.  *See Diebold*, 369 U.S. at 655; *accord Harris*, 550 U.S. at 380.  Moreover, defendants only raised the alleged insufficiency of evidence of Ms. Lawley's illness in their Reply, not in their Motions or supporting memoranda.

Here, defendants had notice that a previous resident of the Property, Mr. Carrigan's grandson, allegedly was injured as a result of the presence of mold.   Moreover, they were instructed by the Worcester County Department of Review and Permitting that the mold problem, along with the asbestos, lead paint, and nitrates in the water, "shall be corrected before occupancy of this unit to another family."   First Opposition Exh. 18.   A reasonable jury could find foreseeable the potential for harm to an occupant of the Property.   A reasonable jury could also find that the parties at risk were identifiable; defendants "interacted solely with the Lawleys and knew that they were the ones who intended to occupy the premises, even though the Property was to be titled to Ms. Willoughby."   First Opinion at 21.   If the risk of harm was clear, it was equally clear that it would be borne by the Lawleys.   Pursuant to the reasoning articulated in *Jacques* and its progeny*,* the risk of personal injuries to future occupants of the Property due to the alleged mold problem and other alleged defects could give rise to a duty on the part of the defendants to exercise due care with respect to their disclosures.

### B.

Defendants rely on *Fegeas v. Sherrill,* 218 Md. 472, 147 A.2d 223 (1958), for their contention that they had "no duty to disclose."   Sellers' Memo at 32.   In that case, the Maryland Court of Appeals said: "Unless the seller of real estate, because of a fiduciary or other similar relations of trust, is under a duty to disclose facts as to the property known to him but not to the buyer, generally he need not do so, particularly if those facts may be ascertained by the buyer by reasonable inspection or investigation, and the transaction is at arm's length."   *Id.* at 477, 147 A.2d. at 226.   Defendants' reliance is misplaced.   In the intervening half century since *Fegeas* was decided, the Maryland legislature has seen fit to impose a duty to disclose, through the requirements of R.P. § 10-702.

In Maryland, sellers must provide either a disclosure statement or an "as is" disclaimer to purchasers of single family residential properties. R.P. § 10-702(c). In particular, the statute "requires the seller of real property to disclose known hazardous conditions or to disclaim any warranties as to the condition or their property." *Cofield v. Lead Industries Ass'n, Inc*., No. 99–3277, 2000 WL 34292681, at *8 n. 11 (D. Md. Aug. 17, 2000). Thus, in Maryland, "the common law rule of caveat emptor" has been "legislatively abrogated in the context of residential property." *Rosenblatt v. Exxon Co., U.S.A.*, 335 Md. 58, 75 n. 7, 642 A.2d 180, 188 n. 7 (1994).

The Maryland Court of Appeals has said: "Where there is an applicable statutory scheme designed to protect a class of persons which includes the plaintiff," a "defendant's duty ordinarily 'is prescribed by the statute' . . . and . . . violation of the statute . . . is itself evidence of negligence." *Brooks v. Lewin Realty III, Inc.,* 378 Md. 70, 78, 835 A.2d 616, 620 (2003). "Under this principle, in order to make out a *prima facie* case in a negligence action, all that a plaintiff must show is: (a) the violation of a statute or ordinance designed to protect a specific class of persons which includes the plaintiff, and (b) that the violation proximately caused the injury complained of." *Id.* at 79, 835 A.2d at 621. *Accord Rivers v. Hagner Management Corp.*, 182 Md. App. 632, 959 A.2d 110 (2008).

Based on the plain language of the disclosure statute, R.P. § 10-702, the Lawleys are among those within its scope. The statute provides for the disclosure of "latent defects" that "[w]ould pose a direct threat to the health or safety of . . . [t]he purchaser[] *or [a]n occupant of the real property, including a tenant or invitee of the purchaser*." R.P. § 10-702(a)(2) (emphasis added).

To be sure, the statutory duty of disclosure or disclaimer is owed to purchasers, not tenants.  R.P. § 10-702(c)(1) ("A vendor of single family residential real property shall complete and deliver to each *purchaser* . . .") (emphasis added).  Yet, the duty was created to protect tenants and occupants as well as owners.  Moreover, it was known that the Lawleys intended to reside in the Property.  Indeed, they played a significant role in the purchase of the Property.  Indeed, the Disclosure Statement was provided directly to them, not to Ms. Willoughby.  Under the circumstances, a jury could conclude that the Lawleys were entitled to rely on the Disclosure Statement.

A jury could also conclude that the lack of disclosure and/or affirmative misrepresentations were the proximate cause of the Lawleys' alleged injuries.  According to the plaintiffs, had they known of the extent of the defects of which they now complain, they would never have urged Ms. Willoughby to purchase the Property, nor would they have moved in.  They aver in their Complaint, at ¶ 40:

> As a direct and proximate result of the Defendants' failure to disclose the numerous defects in the property, including serious water problems, and the subsequent mold growth, the Lawleys and Willoughby have sustained substantial economic losses including property damages and repair costs, have suffered personal injuries to their bodies, have been faced disruption of their lives and usual activities, have suffered substantial non-economic injury and insult, and were forced to move from the property.  Since moving from the property, the Lawleys have incurred substantial additional living expense. In addition, they continue to incur substantial expense in ongoing efforts to maintain the house which suffers advanced deterioration due to the extensive water intrusion, with the resulting ongoing mold and other fungal growth, and have otherwise suffered harm.

Viewed in the light most favorable to plaintiffs, a reasonable jury could find that defendants violated R.P. § 10-702, and are thus liable to the Lawleys.

C.

Even assuming, *arguendo*, that *Fegeas, supra,* 218 Md. 472, remains viable as to negligence claims, despite the enactment of R.P. § 10-702, it is not relevant to plaintiffs' fraud claims in Counts III and IV.

Plaintiffs allege that defendants knew it was the Lawleys' decision whether to purchase the Property.  They assert that defendants fraudulently concealed material facts in order to deceive them into purchasing the Property, that they took action in justifiable reliance on that concealment, and that they sustained damages as a result.  "[I]t was the Lawleys who relied on the concealment and non-disclosure in deciding to purchase and move to the property." Opposition to Sellers at 27.

In *Fegeas*, the purchasers of a home sued the sellers for rescission or, in the alternative, damages, alleging that the sellers had failed to disclose that the house was infested with termites. Prior to the purchase, the sellers had covered the termite damage with cement and "replaced baseboards and door frames and had painted the new installations" in what plaintiffs alleged was an effort to conceal that damage.  *Id.* at 475, 147 A.2d at 224-25.  The Maryland Court of Appeals affirmed a judgment for the defense, stating: "The painting of newly installed trim would be natural and consistent with good stewardship by an owner intending to continue to live in a house, as would the necessary plugging of timber with cement."  *Id.* at 477, 147 A.2d at 226. Notably,  the court said: "It is not said by purchasers that sellers did these things with the intent to deceive purchasers, nor can this intent be fairly inferred from any facts alleged in the bill.  (In fact, purchasers admit that sellers' reason for moving was that their family had grown too large for that house.)."  *Id.*  Further, "there were no representations of facts by the sellers either direct or implied; there were no questions asked by the purchasers as to termites or other conditions of

the house; and they had full opportunity to inspect the premises themselves or by a knowledgeable agent . . .[and] a proper but routine inspection would have revealed them." *Id.* at 479-80, 147 A.2d at 227.

In contrast, plaintiffs here *do* allege that defendants acted with intent to deceive. A jury could reasonably conclude that defendants made affirmative representations and omissions about the alleged defects. Also, it is disputed in the case at bar whether, in light of defendants' alleged efforts to conceal, plaintiffs could have discovered the extent of the defects.

In *Rhee v. Highland Development Corp.*, 182 Md. App. 516, 527, 958 A.2d 385, 391 (2008), the Maryland Court of Special Appeals concluded that a seller/developer of a residential property had a "duty not to conceal" from the purchasers a material defect in the property, i.e., the presence of a hidden cemetery. Moreover, the *Rhee* Court determined that the duty is owed not only to the immediate purchaser of the property in issue, but also to subsequent purchasers, when it is foreseeable that subsequent purchasers would take the property without notice of the fraudulently concealed condition. The court stated:

> [W]hen concealment of a defect in real property is the seller's (or seller/developer's) intended objective, and he takes active measures to hide the defect, he is expecting that in the ordinary course of events the defect will remain concealed, not only from the initial purchasers but also from future purchasers, *i.e.,* that, absent an intervening event, the concealment will be passed on. The more ingenious the deception by concealment, the more likely it is that the defect will be passed unknowingly from one property purchaser to the next. If the concealment keeps the seller/developer's immediate purchasers in the dark about the existence of the defect, that is due to his proficiency in perpetrating the fraud. He should not be protected from liability for fraud because the defect he has concealed does not become manifest until after the property has transferred hands.

*Rhee,* 182 Md. App. at 536-37, 958 A.2d at 397 (internal citation omitted). Therefore, in a fraud case, strict privity is not required.

Based on a genuine dispute of material facts, as well as the analysis concerning legal duty, summary judgment in favor of defendants is not appropriate with respect to the Negligence, Fraudulent Inducement/Deceit, Fraud/Concealment, and Negligent Misrepresentation claims.

### 2.   *Contractual Relationship*

With respect to the claim for Breach of Contract (Count II) and, by implication, the claim for Breach of Warranty (Count X), defendants contend that the Lawleys cannot recover because they were not parties to the contract of sale, nor were they third party beneficiaries to the contract.  Sellers' Memo at 30, 33-34; Reply at 18-20.  Plaintiffs counter that the Lawleys were third party beneficiaries of the contract that Ms. Willoughby signed.  Opposition to Sellers at 22-24.

The contract and warranty claims pose an issue that was not addressed in my First Opinion, as Counts II and X are brought only against Northam and Immell, not the Hilemans. With respect to the Breach of Contract and Breach of Warranty claims, I am satisfied that there is a genuine dispute of material fact regarding the Lawleys' argument that they are third-party beneficiaries to the contract.

Under Maryland law, a third party beneficiary is one who can show that "the contract was intended for his benefit" and that "the parties intended to recognize him as the primary party in interest and as privy to the promise." *Marlboro Shirt Co. v. Am. Dis. Tel. Co.,* 196 Md. 565, 569, 77 A.2d 776, 777 (1950).  Moreover, "[d]espite the fact that a third-party beneficiary is not a party to the contract, he or she can bring suit to enforce the contract." *Dickerson v. Longoria*, 414 Md. 419, 452, 995 A.2d 721, 742 (2010) (citing *Shillman v. Hobstetter,* 249 Md. 678, 687, 241 A.2d 570, 575 (1968)).

In determining whether one is a third party beneficiary, it is proper to look to the terms of the contract, as well as the surrounding circumstances. *Gray & Son, Inc. v. Maryland Deposit Ins. Fund Corp.*, 83 Md. App. 584, 593, 575 A.2d 1272, 1276 (1990). In addition to the traditional elements of the existence of a contract, breach, and damages, the plaintiff must prove "that the contract was expressly made for the plaintiff's benefit and that the plaintiff was intended to be the primary beneficiary of the contract." *Parlette v. Parlette*, 88 Md. App. 628, 640, 596 A.2d 665, 671 (1991). Further, in regard to a summary judgment motion, when "reasonable inferences from facts in the record suggest that [plaintiff] is a third-party beneficiary" of a contract, a court should "make that assumption for purposes of the pending motion." *Schaefer v. Aetna Life & Cas. Co.*, 910 F.Supp. 1095, 1099 (D. Md. 1996).

Plaintiffs contend that the Lawleys "were known to the sellers and their agent to be the ones who would be living in the property, attended the home inspection and closing, and Mrs. Lawley executed all the critical documents necessary for the contract's formation. Based on the circumstances presented, the sellers and their agent knew that the Lawleys were relying on their disclosures in deciding whether to live at the property." Opposition to Sellers at 23-24.

As discussed, *supra,* Ms. Hileman knew that the Lawleys were to live in the house. She became aware of the Lawleys' role in the transaction while performing her duties as the Sellers' real estate agent. "One of the general principles of an agency relationship is that the 'knowledge of the agent is knowledge of the principal.' Where the matter is one that falls within the agent's scope of authority, the principal is charged with that knowledge." *Anderson v. General Cas. Ins. Co.,* 402 Md. 236, 248, 935 A.2d 746, 753 (2007) (internal citation omitted). Furthermore, Ms. Lawley spoke to Northam about the Property during a conference call. Sellers' Motion Exh. 2, at 95:18-96:5.

In my view, a reasonable jury could conclude that, "[f]rom the totality of the circumstances, it is clear that Willoughby entered the contract with Northam and Immell for the Lawley's [sic] benefit." *Id.* at 24. As I see it, there is a disputed question of material fact as to whether the Lawleys were third party beneficiaries of the contract for the sale of the Property. Therefore, as to the contention that summary judgment is appropriate as to Counts II and X because the Lawleys were not parties to the contract, I will deny the motions for summary judgment.

### 3. *Proximate Causation*

According to defendants, plaintiffs cannot show that defendants' alleged misrepresentations, concealment, or failure to disclose were the proximate cause of plaintiffs' claims for Negligence (Count I), Breach of Contract (Count II), Fraudulent Inducement/Deceit (Count III), Fraud/Concealment (Count IV), Negligent Misrepresentation (Count V), Negligent Supervision and Retention (Count VI), Respondeat Superior (Count VII), and CPA violations (Count VIII). Sellers' Memo at 11, 20. Defendants argue that because "[p]laintiffs had knowledge, prior to closing, of the defects about which they complain," *id.*, they cannot support "the inference that 'but for' the alleged conduct . . . [they] would not have purchased the Property." *Id.* at 22. Further, they assert: "Because the purchase was completed when the buyer had full knowledge of the conditions that are now the source of complaints, those conditions cannot be considered *material* and, as a matter of law, are not subject to disclosure requirements." Hilemans' Motion ¶ 3.

In support of their contention that, prior to closing, plaintiffs had actual knowledge of the defects at issue, defendants note that, on the Disclosure Statement, defendants checked "yes" as to leaks or evidence of moisture in the basement, and stated that there was a drainage system in

place.  *Id.* at 12.  They also claim that plaintiffs knew the drainage system was a sump pump. Moreover, they point out that plaintiffs' home inspector noticed areas of water intrusion in the basement and crawl space, missing shingles on the roof, and that the grading of the land enhanced the prospect of water damage to the house, with minor water damage already evident along the foundation.  *Id.* at 12-13.  With regard to mold, defendants allege that plaintiffs' home inspector observed "moderate fungal growth" on a floor joist in the basement, and recognized that the moisture in the basement could produce mold.  *Id.* at 14.  In addition, the home inspector informed plaintiffs of the presence of asbestos, which defendants removed, at their own expense, as well as an underground storage tank, which was not included on the Disclosure Statement.  *Id.* at 15-16.  As for the problem with the potable water supply, i.e., the high level of nitrates in the water, defendants argue that plaintiffs were aware of the existence of a filtration system prior to closing and were "satisified that there was a sufficient drinking water supply in the house."  *Id.* at 17.  Further, defendants point out that a lead-based paint disclosure was included in the contract. *Id.* at 18.

Finally, defendants contend that the notice of August 6, 2008 from Worcester County, which they failed to disclose to plaintiffs, simply reiterated the problems with the water supply, mold, and the possibility of lead paint and asbestos, which were either specified on the Disclosure Statement or timely discovered by plaintiffs.  *Id.* at 20.  Therefore, they insist that their failure to furnish a copy of the notice to plaintiffs was of no  consequence, because plaintiffs "had actual knowledge of each of these issues, before closing."  *Id.*

Plaintiffs vigorously dispute that they were on notice of all the alleged defects prior to closing.  Specifically, they claim they "lacked critical knowledge as to material defects that were withheld from them—a long history of serious water intrusion into the property and the

reoccurring black mold growth in the living space of the property that, according to records from Worcester County, had caused a previous resident to seek medical attention."   Opposition to Sellers at 3.   Plaintiffs also cite several material factual disputes: the extent of plaintiffs' pre-purchase "inspection," *id.* at 5; the extent to which the problem with leaking and flooding was observable, *id.* at 5-6; their knowledge of the history of flooding, *id.* at 6; and whether plaintiffs' awareness of moderate fungal growth in the basement constituted notice of widespread fungal growth throughout the house.   *Id.* at 7-8.   Plaintiffs also focus on the failure of defendants to provide the letter from Worcester County*, id.* at 8-9, disagreeing with defendants' contention that the omission was not significant.   *Id.* at 10.

In sum, defendants allege that plaintiffs were on notice of all the defects of which they currently complain, whereas plaintiffs argue that they were not aware of the extent of the defects. It is evident that there are material factual disputes as to proximate cause that render inappropriate on this basis the disposition of the claims by way of summary judgment.

### 4.   Justifiable Reliance

With respect to Counts III, IV, and V (Fraudulent Inducement/Deceit, Fraud/Concealment, and Negligent Misrepresentation), in an argument related to proximate cause, defendants allege that plaintiffs cannot show that they justifiably relied on defendants' representations.   Defendants assert: "Plaintiffs allege that it was represented to them that there were no defects in the Property, but during their own inspections, [they] discovered many conditions they contend are material defects."   Sellers' Memo at 23.   Therefore, they maintain that, even if defendants failed to make the requisite disclosures, plaintiffs were aware of "potential deception," and thus any reliance on defendants' conduct was "unreasonable, as a matter of law."   *Id.*

Plaintiffs counter that they justiably relied on the Disclosure Statement, which they contend was inaccurate and misleading, and would not  have purchased the Property had the full extent of the problems with the Property been brought to light.  Opposition to Sellers at 10-11. Further, plaintiffs challenge what they characterize as defendants' "'shame on you—you trusted us' argument."  *Id.* at 15.

A party's reliance on allegedly false statements is unreasonable when the falsity of the statements is "obvious."  *Lasater v. Guttmann*, 194 Md. App. 431, 473, 5 A.3d 79, 104 (2010). But, it appears from case law that Maryland courts do not readily conclude that a misrepresentation is obvious.  *Gross v. Sussex Inc.*, 332 Md. 247, 630 A.2d 1156 (1993), is instructive.

In April 1987, Thomas and Ann Louise Gross executed a contract with Sussex for the construction of a home in St. Mary's County, Maryland.  *Id.* at 251, 630 A.2d at 1158.  It was represented to the Grosses that Sussex had the permits required for construction and that the site had been staked off, with settlement scheduled for August 1, 1987.  *Id.* at 252, 630 A.2d at 1158. Based on these representations, the Grosses sold their home in Charles County, Maryland.  *Id.* In July 1987, with construction not yet begun, the Grosses were told the house would be finished by the third or fourth week in September, which was obviously beyond the August 1, 1987 settlement date.  *Id.*  In October 1987, the Grosses discovered that the subdivision had neither been approved nor recorded in the county record office, and building permits for the construction of their home were not issued until that month.  *Id.*  In the meantime, the Grosses had enrolled their children in St. Mary's County schools, but were unable to rent a home in St. Mary's County.  *Id.*  As a result, the Grosses had to rent a home in Charles County and transport their children to St. Mary's County for the entire school year, requiring more than 100 miles of travel

per school day.  *Id.*  Construction was not completed until September 1988.  *Id.* at 253, 630 A.2d 1159.

The Grosses conceded that they had visited the construction site many times, that Mr. Gross had twelve years of experience as a real estate agent, and that they could have discovered the lack of permits by their own investigation, as Mr. Gross eventually did in October 1987.  *Id.* at 264-65, 630 A.2d 1165.  Nevertheless, the Maryland Court of Appeals reversed the lower court's grant of summary judgment in favor of defendants, concluding that plaintiffs did not unreasonably rely on defendants' representations.  The court stated, *id.* at 270, 630 A.2d 1167:

> That Thomas Gross is a part-time real estate agent, has possessed a real estate license for 12 years, and has experience in new home construction does not render him, as a purchaser of real property, automatically ineligible to rely on the representations of the seller.  Although the representation that building permits had been issued could easily have been verified, as the petitioners ultimately did, its falsity and that of the subsequent representations that flowed from it were neither obvious nor apparent.  And they were not necessarily made so by the fact that the petitioners visited the subdivision site on a number of occasions and spoke to the respondents about the delays.  At best, these facts create a genuine dispute of material fact, requiring the denial of the respondents' summary judgment motions.

The court also cited with approval the following passage from a Fourth Circuit case, *Bishop v. E.A. Stout Realty,* 182 F.2d 503, 505 (4th Cir.1950):

> "There is nothing in the law or in reason which requires one to deal as though dealing with a liar or scoundrel, or that denies the protection of the law to the trustful who have been victimized by fraud. The principle underlying the caveat emptor rule was more highly regarded in former times than it is today; but it was never any credit to the law to allow one who had defrauded another to defend on the ground that his own word should not have been believed."

*Gross,* 332 Md. at 267, 630 A.2d 1166 (quoting *Bishop,* 182 F.2d at 505).  *See also Savings Bank Retirement System v. Clarke,* 258 Md. 501, 265 A.2d 921 (1970) (stating that, but for having hired counsel, plaintiffs' access to public land records that would have informed them of an encumbrance on the land they purchased would not preclude their reliance on the defendant's

misrepresentation that title to the property was free of liens); *Schmidt v. Millhauser,* 212 Md. 585, 594, 130 A.2d 572, 577 (1957) (holding that plaintiff reasonably relied on defendant's statement that the roof had been replaced, although a person skilled in construction would immediately have seen the roof was old and in poor condition, and accounting records to which plaintiffs had access did not show any recent expenditure on the roof; the defect was "not so obvious or apparent that the purchasers must have known").

Defendants rely on *Kiddie Academy Domestic Franchising LLC v. Faith Enterprises DC, LLC,* No. WDQ-07-705, 2009 WL 2169060 (D. Md. July 17, 2009), in which Judge Quarles held that plaintiffs unreasonably relied on defendant's statements regarding expected profits because those statements directly contradicted documents in plaintiffs' possession, and plaintiffs conducted no investigation concerning the apparent discrepancy.  The facts of the case at bar more closely resemble those of *Gross* and *Schmidt* than *Kiddie Academy*. In my view, even though Willoughby was represented by a real estate professional and had secured the professional opinion of a home inspector, and Willoughby and Ms. Lawley had previously purchased real estate, arguably evincing some level of sophistication, Sellers' Reply at 8, a reasonable jury could find that defendants' alleged misrepresentations were not so obvious as to vitiate plaintiffs' reasonable reliance.  Alternatively, a jury might determine that defendants' partial disclosure was part of an effort to mislead plaintiffs into believing that defendants were being above-board, which, in turn, might have deterred plaintiffs from conducting an in-depth investigation.

Accordingly, defendants' contentions as to unjustifiable reliance do not support their request for summary judgment with respect to plaintiffs' claims of Fraudulent

Inducement/Deceit (Count III), Fraud/Concealment (Count IV), and Negligent Misrepresentation (Count V).

### 5.   Intent to Deceive or Defraud

Defendants argue that, with respect to Counts III and IV, Fraudulent Inducement/Deceit and Fraud/Concealment, plaintiffs cannot show that defendants acted with an intent to deceive or defraud. Sellers' Memo at 25. They assert: "There is no evidence that Northam and Immell acted with the intent to deceive or defraud Willoughby or the Lawleys, and the alleged concealment was not 'effective.' All of the conditions Plaintiffs claim were misrepresented, concealed, or not disclosed were actually known to them prior to closing." *Id.* at 26.

Plaintiffs have not directly responded to this contention. However, as discussed, plaintiffs vigorously contest defendants' assertion that, prior to closing, they were fully aware of the defects of which they complain. Plaintiffs also assert, in response to defendants' argument concerning punitive damages, that defendants "intentionally misrepresented the condition of the property." Opposition to Sellers at 29. Further, plaintiffs point to defendants' repeated non-disclosures (e.g., the letter from Worcester County, the history of flooding, and the extent of the mold, *id.* at 5-9), and defendants' active attempts to conceal defects with the Property (e.g., the thick white paint allegedly used to conceal evidence of the mold, *id.* at 10).

"Fraud is a scienter tort consisting of the representation of a material fact that is false, deceptive and injurious. Although fraudulent intent is a necessary element, a legal inference of fraud is permissible from the conduct of the parties, without regard to their [actual] intent." *Fuller v. Horvath*, 42 Md. App. 671, 685, 402 A.2d 134, 142 (1979). Plaintiffs would not have to show direct evidence of "intent to deceive or defraud" to prevail at trial, and they need not show it to survive a motion for summary judgment.

There is clearly a factual dispute regarding the element of intent that renders summary judgment inappropriate on this ground. Therefore, I will deny the motions for summary judgment as to plaintiffs' claims for Fraudulent Inducement/Deceit (Count III) and Fraud/Concealment (Count IV).

> 6. *Plaintiffs' Entitlement to Bring a Claim Under the CPA*

With respect to Count VIII, plaintiffs' claim under the CPA, defendants contend that the Lawleys were not actual or prospective purchasers of consumer realty, and therefore are not protected under the CPA. Sellers' Memo at 34. Plaintiffs counter that "the Lawleys are certainly authorized to make a claim within the contemplation of the CPA." Opposition to Sellers at 28.

Among other things, the CPA prohibits the use of unfair or deceptive trade practices in the sale of consumer realty. Plaintiffs assert that the Sellers violated the CPA in representing that the Property "was safe and fit for human habitation" when they knew that it was not. Complaint ¶¶ 88-89. According to plaintiffs, "Northam and Immell did engage in and commit unfair or deceptive trade practices," in violation of C.L. § 13-301(1), by making a "[f]alse . . . or misleading oral or written statement . . . or other representation . . . which has the capacity, tendency or effect of deceiving or misleading consumers"; C.L. § 13-301(2), by representing that "consumer realty . . . [was] of a particular standard[ or] quality which [it was] not"; C.L. § 13-301(3), through their "[f]ailure to state a material fact [that] deceives or tends to deceive"; and C.L. § 13-301(9), through their "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that the consumer rely on the same." *Id.* ¶ 89.

"In its application, the CPA is to be construed 'liberally to promote its purpose'": the protection of consumers. *Forrest v. P & L Real Estate Inv. Co.*, 134 Md. App. 371, 386, 759

A.2d 1187, 1195 (2000) (quoting C.L. § 13-105).   It protects the "actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit," C.L. § 13-101(c)(1), not just "purchasers," as defendants erroneously assert. Sellers' Memo at 34.   Furthermore, the CPA authorizes "[a]ny person" to bring an action to recover "for injury or loss sustained . . . as the result of a practice prohibited by [the CPA]."  C.L. § 13-408(a).

To be sure, "[a]ny person" is not a term without limit.  Both plaintiffs and defendants cite *Penn-Plax, Inc. v. L. Schultz, Inc.*, 988 F. Supp. 906 (D. Md. 1997), in which it was held that commercial competitors are not consumers within the contemplation of the CPA.  However, I am unaware of any authority precluding *consumers* from claiming the protection of the CPA.

The Maryland Court of Appeals has not taken a cramped view of the scope of the CPA. It has said that it is "[r]eliance by consumers" that is a "necessary precondition" to prevailing on a CPA claim.  *Philip Morris Inc. v. Angeletti*, 358 Md. 689, 753, 752 A.2d 200, 235 (2000). And, the court has repeatedly rejected the proposition that the obligations of the CPA apply only to the immediate sellers of a subject property.  In *Morris v. Osmose Wood Preserving,* 340 Md. 519, 541, 667 A.2d 624, 635 (1995), the court explicitly stated that "one who directly sells or offers to sell to consumers" is not "the only entity that can engage in a deceptive trade practice." It reasoned: "It is quite possible that a deceptive trade practice committed by someone who is not the seller would so infect the sale or offer for sale to a consumer that the law would deem the practice to have been committed 'in' the sale or offer for sale."  *Id.*

And, in *MRA Property Management, Inc. v. Armstrong*, ____ Md. ____, No. 93, Sept. Term 2007, 2011 WL 5042388 (filed Oct. 25, 2011), the Maryland Court of Appeals recently confirmed that the obligations of the CPA apply to actors who were not actually parties to a

subject contract.   In *Armstrong*, the Maryland court held that a condominium association had a duty to comply with the requirements of the CPA, and not to utilize unfair or deceptive trade practices, even though the association was not a "party" to the sale of the purchasers' condominium units.   The court said: "In light of the statutory duties imposed upon them, it is of no consequence that Appellants were not 'parties' to the real estate transactions in which Appellees purchased their units." *Id.*, 2011 WL 5092388, at *13.

In the case at bar, plaintiffs allege that the Sellers engaged directly with the Lawleys, in the course of which they made false statements with the intent to deceive, in violation of C.L. § 13-301(1); misrepresented the quality of consumer realty, in violation of C.L. § 13-301(2)(iv); omitted material facts with the intent to deceive, in violation of C.L. § 13-301(3); and engaged in fraudulent and deceptive conduct in order to induce the sale of consumer realty, in violation of C.L. § 13-301(9)(i).   Defendants knew, as discussed, that the Property was purchased with the intent that the Lawleys would live there.   Plaintiffs allege that the "unfair and deceptive trade practices" of which they complain were used directly against the Lawleys, in order to induce their reliance, thereby convincing Willoughby to purchase the Property, and inducing the Lawleys to move in.   Complaint ¶ 91.   Construing the facts in the light most favorable to the plaintiffs, the conduct of which they complain is precisely the kind described in C.L. § 13-301 and proscribed by the CPA.   In light of the broad protections of the CPA, I decline to award summary judgment to defendants as to Count VIII, plaintiffs' claim under the CPA.

### 7.   Breach of Warranty and CPA

In asserting that Sellers[29] violated the CPA and committed breach of warranty, Counts VIII and X, plaintiffs allege in the Complaint, ¶¶ 88, 98, respectively:

---

[29] Counts VIII and X were lodged only against the Sellers.

In listing, offering to sell and selling the property to Willoughby on or about September 5, 2008, Northam and Immell made explicit and implicit representations, warranties, assurances and statements that the subject property was safe and fit for human habitation and would not expose Willoughby and the Lawleys to an unreasonable danger or risk to life, health and safety, and that the property was in compliance with the Worcester County Code and other applicable statutes, laws, regulations and code provisions.

In regard to the CPA claim (Count VIII), plaintiffs allege that defendants committed the following violations of the CPA: "making a false or misleading oral or written statement or other representation . . . which has the capacity, tendency or effect of deceiving or misleading consumers"; "representing that the property was of a particular standard or quality which it was not"; "failure to state a material fact [which] deceives or tends to deceive"; and "deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that the consumer rely on the same." *Id.* ¶ 89.

With respect to the warranty claim (Count X), plaintiffs assert, *id.* ¶ 99:

By listing, offering to sell and ultimately selling the property when it was not safe and not fit for human habitation, Northam and Immell exposed Willoughby and the Lawleys to an unreasonable danger and risk to life, health and safety; and did sell a property which was not in compliance with the Worcester County Code and other applicable statutes, laws, regulations and code provisions; by so doing, Northam and Immell did thereby breach warranties owed to Willoughby and the Lawleys.

Plaintiffs also aver with respect to both Counts VIII and X: "At the time of the contract with the Plaintiffs, and subsequent settlement, the Defendants, Northam and Immell, knew or should have known that the property suffered from water intrusion, contained substantial and material defects, and was not safe nor fit for human habitation." Complaint ¶¶ 90, 100. Further, they allege: "Willoughby was wrongfully induced into buying the property. The Lawleys were wrongfully induced into moving to the property, exposed to toxic molds and other fungi, forced to move from their home and to incur additional living expense, directly resulting in significant

and substantial consequential damages, including economic loss, personal injury, non-economic losses, and other harm." *Id.* ¶¶ 91, 101.

The Sellers dispute that they made any implied or express warranties to plaintiffs. Sellers' Memo at 29, 30-31.[30]   According to the Sellers, no implied warranties were created by virtue of the sale of the Property, and there is "no evidence of any express warranties." *Id.* at 30-31.   For example, they insist that the Disclosure Statement is not a warranty, *id.* at 29, 31, and assert: "There is no evidence of any other express or implied representation, 'assurance,' or statement that the house was safe, fit for human habitation, would not expose Plaintiffs to an 'unreasonable danger,' or that the Property was in compliance with any codes, statutes, laws or regulations." *Id.* at 29.

Contrary to defendants' suggestion, plaintiffs' CPA claim (Count VIII) does not rely solely on plaintiffs' assertion that defendants made express and/or implicit warranties regarding the Property.   Rather, in the CPA claim, plaintiffs assert that defendants made affirmative misrepresentations and material omissions regarding the Property.   *See* Complaint ¶ 89.

As to the breach of warranty claim (Count X), defendants correctly assert that there is no implied warranty of habitability with respect to the sale of improved real estate in Maryland, except as to newly constructed homes.   *See Andrulis v. Levin Construction Corp.,* 628 A.3d 197, 331 Md. 354 (1993); R.P. § 10-203.   Defendants also correctly assert that plaintiffs have not provided any evidence of an express or implied warranty made by defendants.   But, plaintiffs contend that the Disclosure Statement itself serves as a warranty.   Opposition to Sellers at 27-28.

---

[30] With respect to the CPA claim, the Hilemans argue that the CPA "expressly exempts real estate brokers and real estate salespersons from coverage.   For this additional reason, Plaintiffs' claims against these Defendants under the CPA must fail as a matter of law." Hilemans' Motion ¶ 1.   However, as noted, neither Count VIII nor Count X was brought against the Hilemans.

In support of their position, plaintiffs cite R.P. § 10-702(i), which states, in relevant part:

> A disclosure statement made under this section does not constitute a warranty by the vendor as to (i) the condition of the property of which the vendor has no actual knowledge; or (ii) other conditions of which the vendor has no actual knowledge.

According to plaintiffs, because defendants had actual knowledge of the alleged defects, the disclosure constituted a warranty. *See* Opposition to Sellers at 27-28.

The language of the statute appears to support plaintiffs' position that, under certain circumstances, a disclosure statement can serve as a warranty. But, plaintiffs offer no case law or legislative history in support of their interpretation. Conversely, although defendants dispute plaintiffs' position, *see* Sellers' Memo at 31, they offer no case law or legislative history in rebuttal.

At this juncture, neither side has persuaded me that its interpretation is legally correct. Given the posture of the proceedings, it is defendants' burden to persuade the Court that they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When, on a motion for summary judgment, a question of law is at issue, "summary judgment may be awarded if the defendant has demonstrated a clear entitlement to judgment in its favor as a matter of law." *King v. Government Employees Ins. Co.*, 843 F.Supp. 56 (D. Md. 1994). Because the burden rests with the defendants, as the moving party, their motion will be denied as to plaintiffs' breach of warranty claim (Count X). However, at trial, the burden will rest with the plaintiffs.

The parties may present additional briefing on this issue in conjunction with the pre-trial conference.

### 8.   *Civil Conspiracy and Loss of Consortium*

Defendants argue that the Civil Conspiracy and Loss of Consortium claims, Counts IX and XI, must fail because they are derivative claims and must attach to other tort claims, all of

which are unsustainable.  Hilemans' Motion ¶ 4; Sellers' Memo at 34-35.  Further, with regard to the Civil Conspiracy claim, defendants argue that there is "no evidence of any agreement among Northam, Immell, and Hileman to defraud Plaintiffs.  There is also no evidence of an overt unlawful or tortious act committed by Northam, Immell, or Hileman in furtherance of any agreement."  Sellers' Memo at 30.

Plaintiffs have not addressed the contentions regarding Counts IX and XI in their responsive pleadings.  Nevertheless, there is no merit to defendants' argument that these claims must fail on the grounds that the underlying tort claims are defective.  To the contrary, the underlying tort claims survived defendants' motions for summary judgment.  However, that does not mark the end of the inquiry with respect to the civil conspiracy claim.

In Maryland, to state a claim for civil conspiracy, a plaintiff must show an agreement or understanding between two or more persons "'to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal,'" and "an overt act, in furtherance of the agreement, that caused the plaintiff to suffer actual injury."  *Hoffman v. Stamper*, 385 Md. 1, 24-25, 867 A.2d 276, 290 (2005) (citation omitted).  "For [a] common law civil conspiracy claim to survive summary judgment, [plaintiff] must produce evidence to prove an agreement . . . to engage in unlawful activity."  *Electronics Store, Inc. v. Cellco Partnership*, 127 Md. App. 385, 411, 732 A.2d 980, 993 (1999) (affirming grant of summary judgment to defendant on a civil conspiracy claim because plaintiff produced "no evidence" of an agreement between the alleged conspirators).  *See also Lloyd*, 397 Md. at 156, 916 A.2d at 285 (reversing grant of summary judgment to defendant because plaintiff offered "pointed facts alleging specific acts of conspiracy," not "vague assertions").

In their Complaint, ¶¶ 94-96, plaintiffs assert:

Defendants, acting in concert, pursued a common plan and design to defraud Willoughby and the Lawleys, conspired with each other and engaged in the various activities set forth herein, took action in furtherance of the conspiracy and agreed to participate in the operation of the conspiracy and scheme to defraud the Plaintiffs, and aided and abetted one another in these activities, all as proscribed by applicable law. In furtherance of the conspiracy, Defendants effected the concealment of material defects in the property, despite their actual knowledge of the same, in order to induce Willoughby and the Lawleys to purchase the property and to move there. Plaintiffs were and continue to be harmed by Defendants [sic] concerted action to defraud them. Willoughby was wrongfully induced into buying the property. The Lawleys were wrongfully induced into moving to the property, exposed to toxic molds and other fungi, forced to move from their home and to incur additional living expense, directly resulting in significant and substantial consequential damages, including economic loss, personal injury, non-economic losses, and other harm.

However, plaintiffs have not put forth any evidence of an agreement between Northam and Immell, or between Northam and Immell and the Hilemans, to engage in unlawful activity or to defraud plaintiffs. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are not enough to survive even a motion to dismiss. *Ashcroft v. Iqbal*, __ U.S. __, 129 S.Ct. 1937, 1949 (2009). Once a case has "advanced to the summary judgment stage, such 'allegations' . . . no longer suffice and [plaintiffs are] required, under Federal Rule of Civil Procedure 56(e), to 'set out' by affidavit or other evidence 'specific facts'" in support of their assertions. *Long Term Care Partners, LLC v. U.S.*, 516 F.3d 225, 242 (4th Cir. 2008). *See also* FED. R. CIV. P. 56.

Moreover, plaintiffs' failure to respond to defendants' arguments regarding the merits of Count IX is a sufficient ground to grant defendants' motion. *Mentch v. Eastern Sav. Bank, FSB*, 949 F. Supp. 1236, 1247 (D. Md. 1997) (holding that failure to address defendant's arguments for summary judgment in opposition brief constituted abandonment of claim). Accordingly, as to Count IX, Civil Conspiracy, summary judgment is granted in favor of defendants.

As to Count XI, Loss of Consortium, defendants do not argue that plaintiffs' evidence is insufficient to support the claim. The only ground asserted by defendants – that the underlying tort claims are defective, and thus the consortium claim is also defective – is without merit. Therefore, at this juncture, summary judgment is denied as to the consortium claim.

*9. Equitable Claims*

Defendants argue that they are entitled to summary judgment as to plaintiffs' equitable claims: Counts XII (Declaratory Judgment), XIII (Rescission) and XIV (Unjust Enrichment).

As to plaintiffs' claim for Declaratory Judgment, defendants assert that it is "not clear what Plaintiffs seek in a declaratory judgment," and that a declaratory judgment would not settle the entire controversy, as the claim for monetary damages would remain unresolved. Sellers' Memo at 36. Defendants also contend that the Lawleys have no standing to seek a declaratory judgment, because none of plaintiffs' tort claims are viable, and thus there is no "actual controversy." *Id.*

With respect to Count XIII, Rescission, defendants note that R.P. § 10-702(g) says: "[A] purchaser who receives the disclosure or disclaimer statement on or before entering into the contract of sale does not have the right to rescind the contract of sale based upon information contained in the statement." Moreover, if a plaintiff brings a cause of action as to information omitted from the disclosure statement (as plaintiffs in the case at bar are attempting to do), they can maintain such an action only if they choose not to seek damages. Sellers' Memo at 37.

Finally, with respect to Count XIV, Unjust Enrichment, defendants argue that they are entitled to summary judgment because there is "no evidence of circumstances that would make it unconscionable for Northam and Immell to retain the proceeds of the sale paid to them by Willoughby. There was no 'scheme to defraud' or concealment of known defects in the

property." *Id*. at 38.  They add that "the Lawleys cannot avail themselves of this remedy because they paid nothing to Northam and Immell in connection with the sale of the Property and therefore conferred no benefit on Northam and Immell." *Id.*

Plaintiffs did not respond to defendants' contentions regarding Count XII.  Regarding Counts XIII and XIV, plaintiffs argue that rescission is appropriate when there has been justifiable reliance on a material misrepresentation.  Opposition to Sellers at 28-29.

In my First Opinion, addressing the Hilemans' First Motion, I stated, at 27 n.33:

[Plaintiffs'] claims for declaratory judgment, rescission, and unjust enrichment are necessarily in the alternative to the claims in tort.  At some point, Ms. Willoughby must elect to pursue either the claims for rescission or the claims for compensatory and punitive damages.  *See Merrill v. Craig,* 130 Md. App. 350, 366, 746 A.2d 923, 931 ("The restoration of the parties to their original position is incompatible with the circumstance when the complaining party is, at once, relieved of all obligations under the contract while simultaneously securing the windfall of compensatory and punitive damages beyond incidental expenses."), *cert. denied,* 359 Md. 29 (2000); *see also Benjamin v. Erk,* 138 Md. App. at 480, 771 A.2d at 1119 (stating that the plaintiffs' election of equitable rescission precluded legal claims for compensatory or punitive damages against any of the participants in the fraudulent scheme").

In addition, I said that there was "no basis for the Lawleys' equitable claims against the Hilemans," *id.* at 28, but that "[t]hose counts remain pending as to Ms. Willoughby." *Id.* at n. 35.  I reasoned, *id.* at 28:  "It is undisputed that the Lawleys were not parties to the contract of sale that they seek to rescind.  Nor is there any evidence before the Court that the Lawleys conferred any benefit on the Hilemans so as to justify a claim for unjust enrichment.  Although the Lawleys point to the commission received by Hileman, Inc., it was not paid by the Lawleys. The real estate taxes—the sole example noted by the Lawleys as 'incidental damages' to which they would be entitled in the event of rescission—cannot be characterized as a benefit conferred

on the Hilemans."[31]   The same reasoning applies to the Lawleys' equitable claims against the Sellers.   Therefore, as to the Lawleys' claims in Counts XII, XIII and XIV, I will grant summary judgment to Northam and Immell.

As to the motion for summary judgment with respect to Willoughby's claims in Counts II, XIII, and XIV, those claims remain.

As I stated in my First Opinion, if one party to a contract materially breaches it, "'the other party has a right to rescind.'"   *Washington Homes, Inc. v. Interstate Land Dev. Co., Inc.*, 281 Md. 712, 728, 382 A.2d 555, 563 (1978) (citation omitted); *accord Maslow v. Vanguri*, 168 Md. App. 298, 323, 896 A.2d 408, 423, *cert. denied*, 385 Md. 163 (2006).   However, "rescission will not be granted 'for casual or unimportant breaches, but only for a substantial breach tending to defeat the object of the contract.'"   *Maslow*, 168 Md. App. at 324, 896 A.2d at 423 (quoting *Vincent v. Palmer*, 179 Md. 365, 373, 19 A.2d 183, 188 (1941)).   Notably, "contracts . . . may be subject to rescission on a finding of fraud, duress, undue influence, or negligent misrepresentation in their making, and declaratory judgments may be issued determining the validity of such contracts."   *Hale v. Hale*, 66 Md. App. 228, 233, 503 A.2d 271, 274, *cert.*

---

[31] Notably, in the First Opinion, at 27 n. 34, I wrote: "The parties have not addressed whether Ms. Willoughby's assignment confers on the Lawleys a right to seek rescission. Maryland recognizes the modern rule that a 'chose in action, whether arising in tort or ex contractu, is generally assignable.  The only limitation, in the absence of a contrary statutory provision, is that the right of action be of a sort which would survive the death of the assignor and pass to his personal representatives.' *Summers v. Freishtat*, 274 Md. 404, 407, 335 A.2d 89, 90-91 (1975) (citations and footnote omitted).  *But see* W. W. Allen, Annotation, *Assignability of Right to Rescind or of Right to Return of Money or Other Property as Incident of Rescission*, 110 A.L.R. 849 (1937) (stating that "most of the cases give support to the proposition that a mere naked right to rescind or to sue for a rescission is not assignable" but acknowledging that "where the assignment is, in form, merely of a 'claim' or cause of action, it is, by some courts, upheld, if regarded as carrying with it the beneficial interest [in the property], or, as is sometimes held, a share therein" (footnotes omitted)).  As it is not before the Court, the Court need not decide whether the assignment granted to the Lawleys their own right, independent of Willoughby's, to sue for rescission."

*denied*, 306 Md. 118 (1986); *accord Tung*, *supra*, 2009 WL 5206627, at *3 (citing *Hale*); W.H.

Beach, *Application of Declaratory Judgment Acts to Questions in Respect of Contracts or*

*Alleged Contracts*, 162 A.L.R. 756 (1946) (citing *Hale*).

Both the Sellers and the Hilemans are appropriate defendants for Willoughby's rescission

claim.  Regarding the proper defendants in a rescission claim, Henry Campbell Black, in his

*Treatise on the Rescission of Contracts and Cancellation of Written Instruments*, stated:

> In order to obtain a decree in equity for the rescission of a contract or the cancellation of a written instrument, it is necessary to bring before the court, as parties to the action, all those having interests in the subject-matter, or whose rights or claims must be adjudicated and concluded in order to do complete equity in the premises. . . . *It is proper, if not necessary, to join as defendants in an action for rescission or cancellation all the parties who participated in the fraud which is the basis of the complaint*, or who conspired or colluded together to defraud the complainant, though the several defendants may have different interests in the result of the fraud.

2 Henry Campbell Black, A Treatise on the Rescission of Contracts and Cancellation

of Written Instruments §§ 657-58 (1916) (emphasis added).  Indeed, where the cause for

rescission is predicated on fraud, rather than on contract, the common law supports the view that

a plaintiff may be granted rescission against a defendant who was not a party to the contract to be

rescinded. *See Pinter v. Dahl*, 486 U.S. 622, 647 n.23 (1988) ("There is authority at common law

. . . for granting a plaintiff rescission against a defendant who was not a party to the contract in

question, in particular, against the agent of the vendor. . . . When rescission is predicated on

fraud, rather than based on contract theory, privity is not essential.").[32]

Willoughby's unjust enrichment claim also withstands defendants' motion for summary

judgment.  Unjust enrichment is a quasi-contract claim that "'may not be brought where the

subject matter of the claim is covered by an express contract between the parties.'"  *Janusz v.*

---

[32] This ruling does not preclude the Hilemans' right at trial to renew their contention that the rescission claim is not applicable as to them.

*Gilliam*, 404 Md. 524, 537, 947 A.2d 560, 567 (2008) (quoting *Cnty. Comm'r of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 96, 747 A.2d 600, 607 (2000)).  But, "when there is evidence of fraud or bad faith, . . . when recission [sic] is warranted, or when the express contract does not fully address a subject matter," a court may allow a claim for unjust enrichment.  *J. Roland Dashiell & Sons, Inc.*, 358 Md. at 100, 747 A.2d at 609; *accord Janusz*, 404 Md. at 537, 947 A.2d at 567-68.

As outlined in my First Opinion, under Maryland law, a plaintiff's claim for unjust enrichment must satisfy the following elements: "(1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return."  *Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 574, 952 A.2d 304, 327, *cert. denied*, 406 Md. 444 (2008).  "'A person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes restitution to him in the manner and amount necessary to prevent unjust enrichment.'"  *Bank of Am. Corp. v. Gibbons*, 173 Md. App. 261, 267, 918 A.2d 565, 569 (2007).

Defendants argue that there is "no evidence of circumstances that would make it unconscionable for Northam and Immell to retain the proceeds of the sale paid to them by Willoughby.  There was no 'scheme to defraud' or concealment of known defects in the property."  Sellers' Memo at 38.  I am satisfied that there is a genuine question of material fact regarding the allegations that defendants affirmatively concealed defects as to the Property.  Consequently, Willoughby has a viable claim to recover the benefits defendants accrued as a result of their allegedly fraudulent conduct.

With regard to Count XII, Declaratory Judgment, defendants present two arguments that were not addressed in my First Opinion.  First, defendants argue that it is unclear what Willoughby seeks in a declaratory judgment.  I disagree.  Willoughby clearly states that she seeks a determination "that the Contract of Sale and Deed were procured by fraud, [and that] those documents are void and of no effect."  Complaint ¶ 107.  Second, defendants argue that a declaratory judgment would not settle all issues before the Court because the matter of damages would remain.  However, Willoughby's "claims for declaratory judgment, rescission, and unjust enrichment *are necessarily in the alternative to the claims in tort*."  First Opinion at 27, n. 33 (emphasis added).  Again, "contracts . . . may be subject to rescission on a finding of fraud, duress, undue influence, or negligent misrepresentation in their making, and declaratory judgments may be issued determining the validity of such contracts."  *Hale*, 66 Md. App. at 233, 503 A.2d at 274.

Accordingly, as to Willoughby, I will deny the defendants' motion for summary judgment as to plaintiffs' claims for Declaratory Judgment (Count XII), Rescission (Count XIII), and Unjust Enrichment (Count XIV).

### 10. Punitive Damages

Defendants contend they are entitled to summary judgment on the matter of punitive damages.  They argue: "There is no evidence that Northam and Immell acted with actual malice or were otherwise motivated by evil motive, ill will, fraud or intent to injure."  Sellers' Memo at 40.  "'[W]ith respect to both intentional and non-intentional torts, . . . an award of punitive damages must be based upon actual malice, in the sense of conscious and deliberate wrongdoing, evil or wrongful motive, intent to injure, ill will, or fraud.'"  *Scott v. Jenkins,* 345 Md. 21, 33,

690 A.2d 1000, 1006 (1997) (internal citations omitted).  Claiming that there is no actual malice here, defendants maintain that they are entitled to summary judgment.

Plaintiffs maintain that Maryland law supports the principle that, if a party has committed fraud, a party has demonstrated the "actual malice" to justify an award of punitive damages. They argue: "[A] reasonable jury could easily conclude that the false disclosure statements provided by the sellers were intended to induce reliance and thereby dispose of the property in question.  . . . An affirmative decision was made to not disclose key facts, and based on the evidence there is a dispute of fact as to concealment.  Based on this record, a triable issue of fact is presented as to actual malice supporting an award of punitive damages."  Opposition to Sellers at 30.

In Maryland, "[w]ith respect to both intentional and non-intentional torts, . . . an award of punitive damages generally must be based upon actual malice . . . ."  *Montgomery Ward v. Wilson*, 339 Md. 701, 733, 664 A.2d 916, 932 (1995).  The term "actual malice" refers to "conduct characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill will or fraud . . . ."  *Id.* at 729 n.5, 664 A.2d at 930 n.5.  In *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 235, 652 A.2d 1117, 1126 (1995), the Maryland Court of Appeals held that "the elements of the tort of fraud or deceit in Maryland, where the tort is committed by a defendant who knows that his representation is false, include the type of deliberate wrongdoing and evil motive that has traditionally justified the award of punitive damages."  The court was exceptionally clear, repeating several times the principle that "a person's actual knowledge that his statement is false, coupled with his intent to deceive another by means of that statement, constitute the 'actual malice' required for the availability of punitive damages."  *Id.* at 240, 652 A.2d at 1129.

Put another way, "a plaintiff satisfies the element of 'actual malice' and supports a punitive damage award when the evidence shows that the defendant committed fraud with 'actual knowledge of falsity, coupled with [an] intent to deceive.'" *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md. 249, 265, 841 A.2d 828, 837 (2004) (quoting *Ellerin, supra*). "What is needed to support an award of punitive damages is conscious and deliberate wrongdoing." *Hoffman*, 385 Md. at 42, 867 A.2d at 301. "Negligence or misjudgment, 'however gross,' does not satisfy the knowledge element." *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 704, 715 A.2d 188, 193 (1998).

Plaintiffs in the case at bar have alleged that defendants "knew that representations made by them as to the condition of the property were false at the time that they were made or acted with such reckless indifference to the truth that it would be reasonable to charge them with knowledge of the falsity of those representations." Complaint ¶ 53. According to plaintiffs, defendants "were desirous of inducing Willoughby and the Lawleys into a false sense of security about the condition of the property, so that they would not terminate their interest in the property or otherwise cancel the transaction." *Id.* ¶ 54. If a jury finds the requisite actual malice, a punitive damages award would be justified under Maryland law.

Given that I have denied summary judgment as to plaintiffs' fraud claims, it follows that there is a triable question of fact as to whether defendants acted with the requisite "actual malice" necessary to justify an award of punitive damages. Accordingly, I will deny defendants' Motion as to the punitive damages claim.

**Conclusion**

For the foregoing reasons, defendants' motions for summary judgment shall be granted, in part, and denied in part.  A separate Order consistent with this Opinion will follow.


Date:  December 1, 2011                          _____/s/_____
                                                 Ellen Lipton Hollander
                                                 United States District Judge