IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DARREN LAWLEY, ET AL.,
    *Plaintiffs,*

    v.                             Civil Action No.: ELH-10-1074

PAUL E. NORTHAM, ET AL.,
    *Defendants.*

**MEMORANDUM OPINION**

This case arose from a real estate transaction consummated in September 2008, involving the purchase and sale of a single family home in Worcester County, Maryland (the "Property"), pursuant to a Residential Contract of Sale (the "Contract") executed in July 2008. Dona May Willoughby, plaintiff, was the purchaser, and her daughter and son-in-law, Misha and Darren Lawley (the "Lawleys"), plaintiffs, were to reside at the Property. Paul Northam and Lynn Immell, defendants, were the sellers ("Sellers"). Debora Hileman ("Ms. Hileman") and Hileman Real Estate, Inc. ("Hileman, Inc.") (collectively, the "Hilemans"), defendants, were the Sellers' real estate agent and broker. Claiming that the house was defective, and that defendants failed to disclose latent defects of which they had knowledge, plaintiffs filed a fourteen-count Complaint (ECF 1), seeking $1,000,000 in compensatory damages and $2,000,000 in punitive damages.[1] In particular, plaintiffs claimed the house was filled with mold that caused Ms. Lawley to become ill, and that it was subject to severe water intrusion in the basement. They sold the Property in February 2012, at a loss, which they attributed to the defects in the Property.

Following plaintiffs' filing of an Amended Complaint, *see* ECF 43, the defendants filed several motions for summary judgment, culminating in two judicial opinions that resolved a few

---

[1] Ms. Willoughby assigned her claims to Misha Lawley.

of the claims. *See* ECF 67; ECF 75. Thereafter, plaintiffs filed a Second Amended Complaint. *See* ECF 84. After a flood of pretrial motions, *see* ECF 88; ECF 89; ECF 90; ECF 92; ECF 93; ECF 94; ECF 108, the case was tried to a jury, commencing October 31, 2012, on five counts: Negligence (Count I); Negligent Misrepresentation (Count II); Fraud (Count III); Unfair or Deceptive Trade Practices under the Maryland Consumer Protection Act, MD. CODE (Repl. Vol. 2005), COM. LAW § 13-101 *et seq.* (Count IV, against Sellers only); and Loss of Consortium (Count V).

At the close of the evidence, the defendants moved for judgment under Fed. R. Civ. P. 50(a). I reserved ruling on the motion. *See* Fed. R. Civ. P. 50(a) (indicating that a court need not decide a Rule 50(a) motion before the jury's ruling, and can instead consider a renewed motion under Rule 50(b), if necessary); Fed. R. Civ. P. 50(b) ("If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion."); *e.g. E.E.O.C. v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009) ("If the judge denies or defers ruling on the motion, and if the jury then returns a verdict against the moving party, the party may renew its motion under Rule 50(b).").

On November 16, 2012, the jury initially found in favor of the plaintiffs and against the Hilemans as to negligence (Count I), but also found that plaintiffs had "assumed the risk of purchasing property with knowledge of the defects that they allege." *See* Verdict ¶¶ 7-7A (ECF 168). It awarded $33,600 to plaintiffs in connection with the Property.[2] *See id.* ¶ 16. As to all other claims, the jury found in favor of the Hilemans as well as the Sellers.

---

[2] The verdict form included an itemization of damages related to the Property and for personal injuries. *See* Verdict ¶¶ 15-16.

In Maryland, "[i]f established by the evidence, assumption of the risk functions as a complete bar to recovery." *Poole v. Coakley & Williams Constr. Inc.*, 423 Md. 91, 110, 31 A.3d 212, 224 (2011). Accordingly, the jury's verdict was inconsistent. *See Smith v. Jefferson Cnty. Chamber of Commerce, Inc.*, 885 F.2d 866, 1989 WL 106803, at *2 n.1 (4th Cir. 1989) (unpublished per curiam) (explaining that a jury's finding for plaintiffs on a claim of negligence, while simultaneously finding assumption of the risk as to that claim, "would be an inconsistent verdict"). Therefore, before the verdict was entered, the Court provided supplemental jury instructions, explaining that assumption of the risk is a complete bar to recovery. The jury was then instructed to reconsider the issues of negligence and the affirmative defense of assumption of the risk. A supplemental verdict sheet was also submitted to the jury ("Supplemental Verdict," ECF 168-1). *See Bristol Steel & Iron Works v. Bethlehem Steel Corp.*, 41 F.3d 182, 190-91 (4th Cir. 1994) (explaining that "the district court exercises the discretion to determine whether the jury's findings as evidenced by the special verdicts will support the verdict rendered or whether certain issues should be resubmitted to the jury," and the court may "'give such supplemental instructions as may be necessary'") (citations omitted); *see e.g.*, *Kerman v. City of New York*, 261 F.3d 229, 242-44 (2d Cir. 2001) (finding trial judge exercised discretion properly in accepting partial verdict as to eight of nine defendants, while returning verdict sheet to the jury to resolve inconsistent verdict as to remaining defendant).

Thereafter, the jury again found against the Hilemans as to negligence, and also found that plaintiffs did not assume the risk. *See* Supplemental Verdict. It again awarded $33,600 in connection with the sale of the Property. *See id.*[3] Although plaintiffs argued at trial that the

---

[3] Because the jury did not award damages for personal injuries in the original Verdict, the supplemental verdict form only instructed the jury to award damages, if any, in connection with the Property. *See* Supplemental Verdict. ¶ 16.

Hilemans were negligent based on the presence of mold and the history of water intrusion, the jury was not asked to specify the basis on which it found the Hilemans negligent. Nonetheless, the parties seem to agree that water intrusion was the sole basis on which the verdict was rendered.

The Court issued an Order of Partial Judgment on November 20, 2012, *see* ECF 170, entering partial judgment in favor of plaintiffs and against the Hilemans, in the amount of $33,600.00, with costs, and entering partial judgment in favor of Sellers and against plaintiffs, with costs. *Id.* ¶¶ 1-2. It stated: "If any party intends to file a renewed motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), that party is instructed to submit such motion within 28 days after this Order is docketed." *Id.* ¶ 5. The Order of Partial Judgment also stated that final judgment would be entered "after determination of the parties' entitlement to attorneys' fees." *Id.* ¶ 6 & n.2.

The Hilemans subsequently filed a Motion for Judgment ("Brokers' Motion," ECF 178), and a supporting memorandum ("Brokers' Memo," ECF 178-1), seeking judgment under Fed. R. Civ. P. 50(b), on the grounds that the verdict against the Hilemans on Count I (negligence) was contrary to the evidence. Plaintiffs filed an opposition, focusing on the Hilemans' failure to disclose material facts as to the history of water intrusion in the basement. *See* ECF 183.[4]

Additionally, in accordance with the Order of Partial Judgment, Local Rule 109.2, and Appendix B: Rules and Guidelines for Determining Attorneys' Fees in Certain Cases ("Appendix B" or "App. B"), the Sellers filed a motion to recover $240,015.31 in attorneys' fees, pursuant to the Contract. *See* Motion for Attorneys' Fees ("Sellers' Motion," ECF 171); Memorandum in Support of Motion for Attorneys' Fees ("Sellers' Memo," ECF 171-1);

---

[4] The Hilemans did not reply to plaintiffs' opposition to the Brokers' Motion.

Supplemental Memorandum in Support of Defendants' Motion for Attorneys' Fees (ECF 176). In support of Sellers' Motion, the Sellers submitted two affidavits of Thomas P. Bernier, Esq., one of the attorneys for the Sellers. *See* Affidavit of Thomas P. Bernier, Esq., ("Bernier Aff.," ECF 171-7); Second Affidavit of Thomas P. Bernier, Esq. ("Bernier Aff. II," ECF 176-3). On behalf of himself, his co-counsel, Susan Smith, Esq., as well as an associate attorney and two paralegals, Mr. Bernier claimed legal fees and expenses of $131,036.31 for the period of July 20, 2010, through September 28, 2012, Bernier Aff. ¶ 7, and $108,979 for the period of October 1, 2012, through November 31, 2012. Bernier Aff. II ¶ 7.[5] Pursuant to Fed. R. Civ. P. 54(d)(1) and Local Rule 109.1, the Sellers also claimed $6,610.80 in costs, to be taxed against plaintiffs. *See* ECF 172 (Sellers' bill of costs); ECF 172-1 (Sellers' memorandum in support of bill of costs). Plaintiffs opposed the Sellers' Motion, *see* ECF 179, and Sellers' claim for costs, *see* ECF 181, and Sellers replied. *See* ECF 182 (reply as to attorneys' fees); ECF 184 (reply as to costs).

Plaintiffs filed a motion for attorneys' fees and expenses as to the Hilemans, in the amount of $173,590, also pursuant to the Contract. *See* Plaintiffs' Motion for Attorneys' Fees ("Plaintiffs' Motion," ECF 173); Memorandum in Support of Motion for Attorneys' Fees ("Plaintiffs' Memo," ECF 173-1); Affidavit of Samuel L. Riley, Esq., Plaintiffs' Counsel ("Riley Aff.," ECF 173-4).[6] And, plaintiffs claimed $11,116.29 in costs, to be taxed against the Hilemans. *See* ECF 172 (plaintiffs' bill of costs). The Hilemans opposed the Plaintiffs' Motion, *see* ECF 180, and plaintiffs replied. *See* ECF 185. However, the Hilemans did not oppose plaintiffs' claim for costs.

---

[5] The Sellers attached various documents, including invoices, *see* ECF 171-3; ECF 171-4; ECF 176-1, as well as task code analyses. *See* ECF 171-5; ECF 176-2.

[6] The plaintiffs also attached documentation, including invoices, *see* ECF 173-2, and quarterly bills. *See* ECF 173-3.

The issues have been fully briefed, and the Court now rules pursuant to Local Rule 105.6, as no hearing is necessary. For the reasons that follow, I will deny the Brokers' Motion; I will grant, in part, the Sellers' Motion; and I will deny the Plaintiffs' Motion. I will also award costs to plaintiffs and against the Hilemans, and to the Sellers and against plaintiffs, as set forth herein.

## Factual Background[7]

On or about September 5, 2008, Ms. Willoughby purchased the Property from Northam and Immell for $192,450, pursuant to the Residential Contract of Sale executed in July 2008. *See* Exh. 2.[8] As noted, she purchased it for her daughter and son-in-law, the Lawleys, who wanted to move to the Eastern Shore of Maryland to lead a sustainable lifestyle as organic farmers.

The home was built in 1957 by David Northam[9] and his wife, Irene Northam, the parents of the Sellers and the aunt and uncle of Ms. Hileman. David Northam died in 1979. Irene Northam moved from the Property in 2002, and died in 2005.[10] Her son, Paul Northam, has

---

[7] The factual summary is drawn largely from the Court's notes of the evidence adduced at trial, supplemented by facts recited in the parties' motions and trial exhibits. In preparing this Memorandum Opinion, I did not have the benefit of a trial transcript, and thus cannot provide citations to the trial record. All citations to trial exhibits are to joint exhibit numbers, as indicated on the parties' list of Joint Trial Exhibits, ECF 160. In citing to particular pages of the trial exhibits, I may refer to the "Bates stamp" on the exhibit, such as "HILE" followed by a numerical reference.

For the sake of brevity, evidence has been omitted if not material to the jury's finding of negligence with respect to the claim of water intrusion. With respect to the particular arguments made in the Brokers' Motion, the facts adduced at trial are viewed in the light most favorable to plaintiffs as the prevailing party. *See Gregg v. Ham*, 678 F.3d 333, 341 (4th Cir. 2012).

[8] Ms. Lawley signed the Contract on behalf of Ms. Willoughby, by way of a Power of Attorney. *See* Exh. 2 at HILE 0618.

[9] Unless otherwise noted, "Northam" or "Mr. Northam" shall refer to Paul Northam, not David Northam.

[10] The deed transferring the Property from Northam and Immell to Willoughby states that Irene Northam died on June 24, 2005. *See* Exh. 5.

lived in Texas for approximately twenty years, and her daughter, Lynn Northam Immell, has lived in Pennsylvania since 1984. After Irene Northam moved from the Property, her children arranged with Hileman, Inc. to rent out the Property. Between 2003 and 2008, Margaret "Peggi" Bortz, then a real estate broker at Hileman, Inc., and her daughter, Debora Hileman, also a real estate broker, were involved with managing the Property as a rental. Bortz is the sister of David Northam and the Sellers' aunt. She is presently employed as an administrative assistant at Hileman, Inc. At the relevant time, she lived in a house adjacent to the Property.

The Lawleys testified at length regarding their discovery of the alleged defects in the Property. Soon after the Lawleys moved to the Property in September 2008, Misha Lawley began to experience respiratory problems. Believing that these symptoms were the result of pervasive mold in the house, the Lawleys moved out on or about April 19, 2009. On December 16, 2009, Mr. Lawley returned to check on the Property and discovered about five or six feet of water in the basement, which reached the base of the electrical box. *See* Exh. 41 (photographs of Dec. 16, 2009 basement flood). The electrical power was on at the time. *See id.* However, Mr. Lawley turned off the power because he was concerned about water coming into contact with the electrical box.

The Lawleys hired Derrick Largent to pump the water from the basement. Largent testified that it took him approximately twelve hours to do so, using two sump pumps and a generator. He stated that the existing basement sump pump was not operational. Largent had to return the next day because water had again flooded the basement to about the same height. According to Largent, the basement had to be pumped out three times. Although a new sump pump was installed, Largent testified that a year after installation, he had to install another sump pump, because the sump pump had "worked so hard that it burned out."

From September 2008, when the Lawleys moved to the Property, until the flood was discovered in December 2009, the Lawleys did not experience water intrusion in the basement. During their absence after April 2009, the Lawleys had someone check on the house every one-to-two weeks, and there were no issues with flooding, nor had the power been out during any of these inspections. Plaintiffs introduced evidence that the Property had such a high water table that the sump pump had to operate on a daily basis to keep the basement dry, and that during prior tenancies the sump pump needed numerous repairs and service calls, discussed *infra*.

On or about February 10, 2012, the Property was sold to Donald Shockley for approximately $100,000—a little more than half of the original purchase price. *See* Exh. 52 (residential contract of sale); Exh. 53 (settlement documents). Thus, plaintiffs claimed a total loss in property value of $92,450. According to Shockley, the basement has been dry since he purchased the Property.

### 1. Prior Water Intrusion

At Bortz's deposition, portions of which were read into evidence at trial, Bortz indicated that she managed the Property while it was rented, and also lived next door. She stated that she knew the house "about as well as I know my own." *See also* Exh. 76 (email dated March 4, 2008, from Bortz to Cindy Crockett regarding the Property). According to Bortz, the basement of the Property had flooded years ago. The first flood occurred in 1989, when the entire town of Snow Hill was inundated with water. At that time, water accumulated in the basement to a height of between three and four feet. Bortz explained that, after that flood, a sump pump system was installed in the basement, which pumped water into a drainage ditch. It operated on a daily basis, and had to be replaced on a number of occasions. When Bortz did not see water flowing into the drainage ditch, she would get concerned that water was accumulating in the basement.

According to Bortz, the sump pump had been an ongoing problem—sometimes it worked, sometimes it did not work. Bortz also testified that another flood occurred in 2004, when the sump pump was disconnected and thus not operational.

Plaintiffs introduced several exhibits reflecting ongoing issues with the sump pump, including an invoice dated February 12, 2004, for repairs after the basement flooded due to a "disconnected" sump pump, directed to Bortz, Hileman, Inc., and Northam, *see* Exh. 58; an e-mail from Bortz to Northam and Ms. Hileman dated June 20, 2005, regarding installation of a sump pump, indicating that the plumber "had not been able to find one that had enough horsepower to suit him," *see* Exh. 61; an invoice to Bortz for a new sump pump, dated December 31, 2006, *see* Exh. 64; an e-mail from Bortz to Ms. Hileman and Northam, dated February 26, 2007, noting continuing problems with the sump pump, *see* Exh. 69; a letter from Bortz and Hileman, Inc. to Royal Plus, Inc., dated February 28, 2007, requesting an assessment of "the sump pump operation," and stating that "this is a system that is needed on a daily [sic] to keep the basement dry," *see* Exh. 70; and an email dated March 14, 2007, from Ms. Hileman to Sharon Donahue, Esq., an attorney for the tenant then residing at the Property, requesting assistance in scheduling service calls for the sump pump, and stating: "This is a rather important issue as there is currently no water coming from the drain which could mean that it's not pumping properly and could be filling up the basement." *See* Exh. 71. A battery-operated back-up sump pump was installed in 2007. *See* Exh. 74 (invoice from Royal Plus, Inc.).

Arlene Schneider, a former tenant at the Property, resided there for approximately a year and a half, beginning in November 2003. She testified that when she moved in, Bortz had recommended not to leave anything of value in the basement because it had a history of flooding. Schneider also testified that, twice during her tenancy, "quite a bit" of water had accumulated in

the basement, and that it was deep enough for her belongings to float. Schneider reported the incidents to Bortz, who, as noted, managed the Property at that time.

Kelly Carrigan, also a former tenant, lived at the Property between May 2005 and June 2008. Carrigan testified that he saw water on the basement floor on several occasions, and that, at one point, it accumulated to a level between the first and third step of the basement stairs. He reported this information to the Hilemans. He claimed that he used his own pump several times to remove the water. Eventually, he decided to replace the sump pump in the basement, and sent Bortz an invoice for the cost and labor. *See* Exh. 64. Between January 2007 and April 2008, Carrigan's son, David Corey Carrigan,[11] also lived at the Property. He confirmed that there had been high levels of water in the basement on several occasions, including one instance when it came close to the height of the electrical panel, *i.e.*, five or six feet high. However, he did not report this to the Hilemans.

Carrigan presented the Hilemans with a variety of complaints, ranging from nitrates in the drinking water to possible asbestos and mold growth. *See* Exh. 65 (letter from Carrigan to the Hilemans, dated Jan. 23, 2007). Through his lawyer, Sharon Donahue, Esq., Carrigan pursued the issue of nitrates in the drinking water. *See, e.g.*, Exh. 106 (letter from Donahue to Mr. Northam, the Hilemans, and Bortz, dated March 19, 2007); Exh. 111 (letter from Donahue to Spencer Stevens, Esq., counsel for the Hilemans, dated April 19, 2007); Exh. 114 (letter from Donahue to Ms. Hileman dated Sept. 27, 2007). Notably, Carrigan's written correspondence with the Hilemans did not mention water intrusion in the basement.

---

[11] All references to "Carrigan" indicate Kelly Carrigan, not David Carrigan.

On or about May 29, 2008, Carrigan filed a nuisance complaint with Worcester County, raising several concerns as to the Property. Just prior to his moving from the Property,[12] Carrigan met with Bruce Miller, of the Worcester County Department of Development Review and Permitting. Carrigan voiced his concerns regarding the Property, and Miller inspected it for possible violations of the Worcester County Rental Housing Code. Carrigan also hired an industrial hygienist, Susan White, Ph.D., to conduct a "limited fungal growth evaluation" of the Property, which took place on June 3, 2008. *See* Exh. 83 at P0007-11. Dr. White issued a Report dated June 9, 2008. *See id.* On August 6, 2008, Miller sent a letter to Northam and Immell, on behalf of the Worcester County Department of Review and Permitting, with a copy to Ms. Hileman as the listing agent, regarding Carrigan's concerns, in which he enclosed Dr. White's report. *See id.* at P0001-02. The County's letter did not mention water intrusion in the basement. Dr. White's report indicated the presence of "excessive moisture in [the] basement," on which plaintiffs relied at trial as to their mold claim. *See id.* at P00010.[13]

Ms. Hileman, who has lived in the town of Snow Hill, where the Property is located, since 1984, testified that she lived next door to the Property for several years, and acted as the Property's rental manager for Northam and Immell between 2003 and 2008. Ms. Hileman testified that she did not recall any complaints regarding flooding during the five years that the

---

[12] Relations between Carrigan and the Hilemans deteriorated. Although Carrigan's lease expired at the end of May 2008, he was permitted to remain for a few extra days, and left the Property in June 2008. Before Carrigan's departure, he had changed his mind about moving out, but was not permitted to extend his rental.

[13] Dr. White's expertise was the subject of a pretrial motion *in limine*, in which defendants sought to exclude her testimony. *See* ECF 89. Dr. White, who is an industrial hygienist, received her Ph.D. in Safety Engineering from Kennedy-Western University, an online university that, according to her testimony, has ceased operating for lack of accreditation. Because the defense's challenge was based largely on information obtained from defendants' expert, whose report was not produced until the motion *in limine* was filed, in violation of Fed. R. Civ. P. 26(a) and 37, Dr. White was permitted to testify. *See* ECF 117; ECF 135.

Property was rented, and that she had no personal recollection of basement flooding. According to Ms. Hileman, the sump pump did not run all the time. Additionally, she claimed that Carrigan had fabricated his concerns about the Property, and that Carrigan "complained a lot."

### 2. *Plaintiffs' Purchase of the Property*

Willoughby, who resided in Hawaii at the relevant time, did not visit the Property before she purchased it. Nor did she attend the closing. Moreover, she had no contact with the Sellers or the Hilemans. Instead, Ms. Lawley signed the necessary documents pursuant to a power of attorney ("POA"). On July 31, 2008, Misha Lawley signed the Contract on behalf of Ms. Willoughby, along with the various addenda thereto, by way of the POA. *See* Exh. 2.

Willoughby testified that she regarded the Property as Ms. Lawley's inheritance, and the Lawleys, as the intended occupants, took responsibility for choosing the house and negotiating the price. The Lawleys traveled from Colorado to Maryland in July 2008 to look at houses in the town of Snow Hill with a real estate agent, Elaine Gordy. They negotiated the price of the Property, attended the home inspection on August 11, 2008, and identified numerous repairs that they wanted the Sellers to perform as a condition of the purchase.[14] As discussed, *infra*, Mr. Lawley's father also attended the home inspection, which was conducted by a home inspector selected by plaintiffs.

Pursuant to § 10-702(c) of the Real Property Article ("R.P.") of the Maryland Code (2003 Repl. Vol., 2008 Supp.), sellers of a single family residential real property[15] must either disclose certain aspects of the property's physical condition, or make an "as is" disclaimer, using a standard form issued by the Maryland Real Estate Commission. The statement must be provided

---

[14] Misha Lawley testified that she spoke directly with the Sellers only once, during a phone call with Northam regarding an easement on the Property.

[15] The section does not apply to the initial sale of a new home. *See* R.P. § 10-702(b)(2).

"on or before entering into a contract of sale by the vendor and the purchaser." *Id.* § 10-702(f)(1). Regardless of whether sellers choose to disclose or disclaim, they are obligated to disclose "latent defects" "of which the vendor has actual knowledge." *Id.* §§ 10-702(d)(1), (e)(2). R.P. § 10-702 defines "latent defects" as:

> [M]aterial defects in real property or an improvement to real property that:
> (1) A purchaser would not reasonably be expected to ascertain or observe by a careful visual inspection of the real property; and
> (2) Would pose a direct threat to the health or safety of:
>    (i) The purchaser; or
>    (ii) An occupant of the real property, including a tenant or invitee of the purchaser.

In connection with the Contract, the Sellers provided the Maryland Residential Property Disclosure And Disclaimer Statement (the "Disclosure Statement," Exh. 1), which they completed and signed in April 2008. It is undisputed that the Lawleys received the Disclosure Statement from Elaine Gordy, their real estate agent, and from Ms. Hileman, prior to making an offer. The Disclosure Statement was also included as an addendum to the Contract. *See* Exh. 2 at HILE 0607, 0628-31.[16]

The Disclosure Statement explained the Sellers' disclosure and disclaimer obligations under R.P. § 10-702, discussed *supra*. *See* Exh. 1 at HILE 0628. It stated that the owner of a property is not "required to undertake or provide any independent investigation or inspection of the property," and that "disclosure is based on [the owners'] personal knowledge of the condition of the property at the signing of this statement." *Id.* Further, it advised that "[t]he information provided is the representation of the Owners and is based upon the actual knowledge of the Owners as of the date noted," and that "[d]isclosure by the Owners is not a substitute for an inspection by an independent home inspection company." *Id.*

---

[16] The Disclosure Statement is not part of the Contract, however. Prior to trial, plaintiffs abandoned their breach of contract claim, predicated on the Disclosure Statement.

The form Disclosure Statement included nineteen pre-printed questions pertaining to the physical condition of the property, for which the sellers were instructed to "indicate . . . actual knowledge." *Id.* at HILE 0629-30. Each question was followed by check-mark boxes for "Yes," "No," and "Unknown" (and, for some questions, "Does Not Apply"), as well as a line for comments. *Id.*

The following portions of the Disclosure State are relevant to the issue of basement water intrusion:

2.  Basement:  Any leaks or evidence of moisture?   Yes.
Comments:  Drainage system in place.

*       *       *

19.  Are there any other material defects, including latent defects, affecting the physical condition of the property?   No.
Comments:  [blank]

Jim Newcomb conducted a five-hour inspection of the Property on August 11, 2008, on behalf of plaintiffs.  Ms. Hileman described Newcomb as one of the best inspectors in the area. The Lawleys were both present, as were Ms. Hileman, Ms. Gordy, and Mr. Lawley's father.[17] The Lawleys testified that they observed a sump pump in the basement, and that they understood it was used to prevent water from accumulating.  They also acknowledged that they saw evidence of water damage along the basement walls, such as "step cracks," deterioration of the masonry, water stains, and salt and mineral residue.  A detailed inspection report, introduced in evidence, noted the presence of basement "dampness," "efflorescence," and "water stains," as well as the sump pump.  *See* Exh. 4 at P00036.  In addition, the report noted "moderate fungal

---

[17] Mr. Lawley's father did not testify.  Nor did the home inspector or the plaintiffs' real estate agent.

growth" in the basement. *Id.* The Lawleys did not ask the inspector or the Sellers' agent, Ms. Hileman, any questions about water in the basement.

The Lawleys testified that the Disclosure Statement led them to believe that the Property was free of defects and deficiencies, aside from issues discovered during the home inspection or the Lawleys' own observations. For those issues, the Lawleys requested an "Amendment/Addendum" to the Contract, identifying several "items to be completed by the sellers as a result of the home inspection performed on August 11, 2008." *See* Exh. 2 at HILE 0592. The Sellers made the requested repairs or provided a monetary allowance for the Lawleys to do so. No requests were made pertaining to water intrusion.

### 3. *Expert Testimony on Property Value and Standard of Care*[18]

Colin F. McGowan testified for plaintiffs as an expert in the standard of care for licensed real estate agents and brokers in residential property transactions. He has been a licensed real estate broker since 1969, and owns a real estate brokerage company, CFM Enterprises, Inc., as well as the Frederick Academy of Real Estate, a school for real estate licensee training and education. In addition, McGowan is certified by the Maryland Real Estate Commission to train and conduct continuing education courses for real estate licensees, and he has been teaching real estate licensing courses since 1986. He has testified as an expert on the standard of care for real estate licensees before the Maryland General Assembly, Maryland State courts, and federal district and bankruptcy courts.

---

[18] Expert testimony was presented regarding the issue of mold in the home and the physical ailments allegedly suffered by Ms. Lawley as a result of her exposure to mold. Plaintiffs did not prevail on the claim of injuries due to mold, and the expert testimony is not material to the Brokers' Motion for Judgment. I will address the parties' use of experts in connection with the discussion of the motions for attorneys' fees.

In particular, McGowan testified as to the duties owed by real estate licensees to buyers of real property under the Maryland Code (2004 Repl. Vol.), § 17-322(b)(4) of the Bus. Occ. & Prof. Article, and the Code of Maryland Administrative Regulations (COMAR), Title 9, Subtitle 11, Chapter 2, discussed *infra*. McGowan stated, *inter alia*, that if a licensee is aware of material facts that conflict with the information disclosed to a purchaser, the licensee has a duty to resolve the discrepancy with the seller, and to ensure that the correct information is disclosed. According to McGowan, a licensee is in violation of the standard of care if the licensee intentionally or negligently fails to disclose material facts that the licensee knows or should know. McGowan opined that the Hilemans breached their duty of care to plaintiffs by failing to disclose their knowledge as to the history of water intrusion in the basement, even if the buyers already had such knowledge.

Thomas Weigand testified for plaintiffs as an expert in real estate appraisal and appraisal review. Among other qualifications, Weigand is licensed in Maryland as a Certified Public Accountant. He is also a Certified General Appraiser in Maryland, Virginia, Delaware, and Washington, D.C., and has completed the testing required to become a member of the Appraisal Institute, an association of professional real estate appraisers. He owns the Treffer Appraisal Group, which appraises residential and commercial properties, where he oversees a staff of fourteen. And, he has previously testified as an expert in state and federal court.

Based on an exterior review of the home and printed materials describing the condition of the home's interior, Weigand appraised the Property's value as of February 2012, when plaintiffs sold it to Shockley, using a sales comparison methodology. In particular, he reviewed the sales of five comparable properties within the same year and, adjusting for differences such as living space, lot size, mold, and water intrusion, concluded that the Property's fair market value was

$90,000. According to Weigand, the Property's history of water intrusion influenced his estimate, because water-related issues are an item of concern for the buying public and have an effect on a property's value. Weigand also reviewed all of the sales of real property in Worcester County, Maryland (excluding Ocean City) between 2008 and 2012. He calculated an overall decrease in value of 17.8 percent over that time period, attributable to general market conditions.

William O'Donnell testified for defendants as an expert in real estate appraisal. O'Donnell became an appraiser in 1984, and holds a certified residential appraisal license with the State of Maryland. He is also a licensed Maryland real estate sales person. He has testified as an expert several times in state court and at administrative hearings.

According to O'Donnell, the value of the Property as of February 2012 was $150,000. O'Donnell also estimated the Property's general decline in value due to market conditions. Based on his review, there was a 21 percent decrease in market value for homes in Worcester County between 2008 and 2012; a home valued at $192,500 in 2008 would be worth approximately $158,000 in 2012. O'Donnell criticized Weigand's appraisal methodology, asserting that Weigand did not use appropriate properties for his comparison or make appropriate adjustments.

Gary Bullard, a construction contractor and consultant, testified for plaintiffs as an expert in basement waterproofing and remediation. He owns a home improvement business, has worked in the industry for thirty years, and is a certified home inspector in Maryland. He addressed the scope, methods, and expense of remediating the Property to prevent further severe water intrusion. According to Bullard, the cost would be approximately $66,515, plus or minus $15,000.

Additional facts are included in the Discussion.

## Standard of Review

Rules 50(a) and (b) of the Federal Rules of Civil Procedure together govern motions for judgment as a matter of law. Under Rule 50(a), a party may submit a motion for judgment as a matter of law before the case is submitted to the jury, provided that the nonmoving party has been fully heard on the issue. Fed. R. Civ. P. 50(a); *Robinson v. Equifax Information Servs., LLC*, 560 F.3d 235, 240 (4th Cir. 2009). "A trial court may grant judgment as a matter of law when it 'finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for' the non-moving party." *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 292 (4th Cir. 2009) (quoting Fed. R. Civ. P. 50(a)(1)). Under Rule 50(b), "[i]f the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). Following entry of the jury's verdict, "the movant may file a renewed motion for judgment as a matter of law," governed by the standard set forth in Rule 50(a). *Id.* To avoid the burden of holding a new trial in the event that a Rule 50(a) motion is granted, but subsequently reversed on appeal, a district court is "encouraged" to exercise its discretion by deferring a Rule 50(a) motion, submitting the case to the jury, and then deciding the motion afterwards, should it be renewed. *See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 405 (2006).

"When a jury verdict has been returned, judgment as a matter of law may be granted only if, viewing the evidence in a light most favorable to the non-moving party (and in support of the jury's verdict) and drawing every legitimate inference in that party's favor, the *only* conclusion a reasonable jury could have reached is one in favor of the moving party." *Int'l Ground Transp. v. Mayor & City Council of Ocean City, Md.*, 475 F.3d 214, 218-19 (4th Cir. 2007) (emphasis added); *see Anderson v. G.D.C., Inc.*, 281 F.3d 452, 457 (4th Cir. 2002)

("Judgment as a matter of law is proper only if 'there can be but one reasonable conclusion as to the verdict.'") (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). The Supreme Court has instructed that, "in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record," and not limit its review to the evidence favoring the nonmoving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "In doing so, however, the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Id.*

## Discussion

### I.     Brokers' Motion for Judgment

In Maryland, "to assert a claim in negligence, the plaintiff must prove: '(1) that the defendant was under a duty to protect the plaintiff from injury, (2) that the defendant breached that duty, (3) that the plaintiff suffered actual injury or loss, and (4) that the loss or injury proximately resulted from the defendant's breach of the duty.'" *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 212-13, 60 A.3d 1, 10 (2013) (quoting *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 131-32, 916 A.2d 257, 270-71 (2007)) (emphasis omitted); *accord Schultz v. Bank of Am., N.A.*, 413 Md. 15, 27, 990 A.2d 1078, 1086 (2010) ("In a negligence case, there are four elements that the plaintiff must prove to prevail: 'a duty owed to him [or her] (or to a class of which he [or she] is a part), a breach of that duty, a legally cognizable causal relationship between the breach of duty and the harm suffered, and damages.'") (quoting *Jacques v. First Nat'l Bank*, 307 Md. 527, 531, 515 A.2d 756, 758 (1986)) (alterations in *Schultz*).

As indicated, the parties seems to agree that the Hilemans' failure to disclose the basement's history of water intrusion was the sole basis for the jury's finding of negligence. To find the Hilemans liable on this basis, a reasonable jury must have had sufficient evidence to

conclude that the Hilemans owed a duty to plaintiffs to disclose their knowledge as to the history of water intrusion in the basement; breached that duty by failing to disclose the information known to them; the failure to disclose was the proximate cause of the harm suffered by plaintiffs; and that damages resulted.

The Hilemans contend that a reasonable jury could not have returned a verdict against them on the negligence claim for three reasons: (1) the Hilemans did not breach a duty to disclose, because there was no material defect as to water intrusion; (2) the evidence does not support a finding of proximate cause; and (3) plaintiffs assumed the risk of flooding in the basement.

*1. Breach of a Duty*

The Hilemans claim that they did not breach a duty to disclose because "the condition that Plaintiffs blame for the December 2009 flood (*i.e.*, a high water table) is not a defect unique to the property in dispute; it is a condition almost uniformly present on land throughout the Eastern Shore of Maryland." Brokers' Memo at 21. Additionally, they contend that "there was no inaccuracy" in any disclosures pertaining to water intrusion because, at the time the Property was purchased, "the drainage system was in good operating condition," and no flooding occurred "until long after [plaintiffs] had bought the property." *Id.* at 22. However, the Hilemans do not dispute that they owed a duty to disclose material information to plaintiffs, as required by Bus. Occ. & Prof. § 17-322(b)(4) and COMAR, Title 9, Subtitle 11, Chapter 2.

Bus. Occ. & Prof. § 17-322, entitled "Denials, reprimands, suspensions, revocations, and penalties—Grounds," governs real estate licensees. It provides, in part:

> (b) Subject to the hearing provisions of § 17-324 of this subtitle, the Commission may deny a license to any applicant, reprimand any licensee, or suspend or revoke a license if the applicant or licensee:
> . . .

(4) intentionally or negligently fails to disclose to any person with whom the applicant or licensee deals a material fact that the licensee knows or should know and that relates to the property with which the licensee or applicant deals . . . .

COMAR 09.11.02 contains the code of ethics governing real estate licensees. COMAR 09.11.02.01.C provides, in part: "The licensee shall protect the public against fraud, misrepresentation, or unethical practices in the real estate field." Further, COMAR 09.11.02.01.D states: "The licensee shall make a reasonable effort to ascertain all material facts concerning every property for which the licensee accepts the agency, in order to fulfill the obligation to avoid error, exaggeration, misrepresentation, or concealment of material facts."

According to the Maryland Court of Appeals, Bus. Occ. & Prof. § 17-322 "prescribes the standard [of conduct] that a real estate broker must meet when dealing with the public." *Gross v. Sussex Inc.*, 332 Md. 247, 275, 630 A.2d 1156, 1170 (1993). In *Gross*, a sales associate at a real estate agency represented to the Grosses, the purchasers of an unbuilt home in a new residential subdivision, that "building permits had been obtained; that construction could begin immediately; and that . . . the home would be completed by the settlement date." *Id.* at 252, 630 A.2d at 1158. After listing their old residence for sale, renting a temporary residence, and enrolling their children in new schools, all in reliance on these representations, the Grosses discovered that the property had not been subdivided, and that the construction company did not have building permits. *Id.* They sued the real estate agency for fraud and negligent misrepresentation,[19] based on the conduct of the agency's sales associate. *Id.* at 253, 630 A.2d at 1159. The trial court granted summary judgment in favor of the real estate agency.

The Maryland Court of Appeals reversed. *Id.* at 276, 630 A.2d at 1170-71. It explained that the real estate agency's liability for negligent misrepresentation must be "assessed" in light

_____

[19] The Grosses also sued the builder and its officers for breach of contract, fraud, and negligent misrepresentation. *Id.* at 253, 630 A.2d at 1159.

of Bus. Occ. & Prof. § 17-322.[20]  *Id.* at 273-74, 630 A.2d at 1169-70.  The court observed, *id.* at 274, 630 A.2d at 1170: "The plain language of the statute makes apparent its purpose: to protect the public in its dealings with real estate brokers, to place a duty of good faith and fair dealing on real estate brokers."  Because the sales associate knew, but did not disclose, that the property had not been subdivided and that the permits had not been issued, the court reversed the award of summary judgment.

Together with the code of ethics for real estate licensees set forth in COMAR, Bus. Occ. & Prof. § 17-322 sets "minimum guidelines for professional conduct" for the purpose of "safeguard[ing] the public."  *Lewis v. Long & Foster Real Estate, Inc.*, 85 Md. App. 754, 760, 584 A.2d 1325, 1328 (1991) (holding that home buyers, who wanted to start a child care center in the home, stated a claim against a real estate broker for misrepresenting suitability of property for child care center); *see also Brooks v. Lewin Realty III, Inc.*, 378 Md. 70, 78, 835 A.2d 616, 620 (2003) ("[W]here there is an applicable statutory scheme designed to protect a class of persons which includes the plaintiff . . . the defendant's duty ordinarily 'is prescribed by the statute' or ordinance and . . . the violation of the statute or ordinance is itself evidence of negligence.").

Here, based on the expert testimony, the jury reasonably could have concluded that the Hilemans' failure to disclose material facts regarding the basement's history of flooding and chronic sump pump issues breached the duties set forth in Bus. Occ. & Prof. § 17-322 and COMAR 09.11.02.  *Cf. Thomas v. Bethea*, 351 Md. 513, 535, 718 A.2d 1187, 1198 (1998) ("The testimony of . . . a conceded expert[] sufficed to support the jury's determination that no reasonable attorney would have recommended acceptance of the settlement calling for the

---

[20] The statute was, at the time, codified at Bus. Occ. & Prof. § 16-322(a)(4).  It was renumbered in 1994 to § 17-322(b)(4).

release of [defendant] and that the case should have proceeded to trial."); *see also Cooper v. Laboratory Corp. of Am. Holdings, Inc.*, 150 F.3d 376, 379 (4th Cir. 1998) ("Professional negligence is usually proved through the use of expert testimony."); *Jones v. State*, 425 Md. 1, 26, 38 A.3d 333, 347-48 (2012) ("'[W]here the plaintiff alleges negligence by a professional, expert testimony is generally necessary to establish the requisite standard of care owed by the professional.' . . . [E]xperts are usually necessary to explain professional standards because such standards require specialized knowledge within the professional's field that are generally 'beyond the ken of the average layman.'") (citations omitted).

McGowan, plaintiffs' standard of care expert, testified that a real estate licensee violates § 17-322(b)(4) by failing to disclose a material fact. Moreover, he stated that all licensees must make reasonable efforts to ascertain all material facts regarding a property. Although sellers also have a duty to disclose, as prescribed by R.P. § 10-702, McGowan testified that a real estate licensee's duty exists independent of the § 10-702 disclosure requirements. In particular, a licensee aware of facts that conflict with the seller's disclosures must attempt to reconcile that conflict, and ensure that the purchaser receives disclosure of the material information.

According to McGowan, any information that would substantially alter the consideration tendered, such as the price or other conditions of a contract of sale, qualifies as a material fact for which disclosure is required. In his view, the history of water intrusion at the Property was a material fact that a real estate licensee was required to disclose under Bus. Occ. & Prof. § 17-322 and COMAR 09.11.02.01, regardless of whether the buyers already had such knowledge. McGowan indicated that the Disclosure Form did not adequately convey the Property's history of water intrusion to plaintiffs.

Similarly, Weigand, plaintiffs' appraisal expert, testified that water intrusion is a concern

for the buying public, and factors into the value of a home.  And, as noted, Bullard, an expert in construction, testified that the cost of remediating the Property to prevent further water intrusion would be approximately $66,515, plus or minus $15,000.

As to the Hilemans' argument that a high water table is common on the Eastern Shore, Dr. White testified otherwise.  Accordingly, the jury could reasonably conclude that the Property's susceptibility to substantial water intrusion was not common to all homes in the area.  And, even if "common," the jury was entitled to conclude that the information was nonetheless material.

Further, the jury reasonably could have concluded that the Hilemans had extensive knowledge of the water intrusion at the Property, based on the testimony of Bortz, Schneider, Carrigan, and the documentation of problems with the sump pump.  To the extent that Ms. Hileman denied such knowledge, the jury was entitled to discredit her testimony.

In sum, the jury was entitled to find that information about severe water intrusion and ongoing problems with the sump pumps was material to plaintiffs as prospective buyers.  Even if the sump pump was in good operating condition at the time the plaintiffs purchased the Property, and even if another flood did not occur until December 2009, the jury was nonetheless permitted to reach its conclusion.  And, the jury was entitled to determine that, by failing to disclose material facts of which the Hilemans had knowledge, the Hilemans breached the duties set forth in Bus. Occ. & Prof. § 17-322 and COMAR 09.11.02.

## 2. *Proximate Cause*

The Hilemans also contend that their failure to disclose was not the proximate cause of plaintiffs' injuries.  "It is a basic principle that '[n]egligence is not actionable unless it is a proximate cause of the harm alleged.'"  *Pittway Corp. v. Collins*, 409 Md. 218, 243, 973 A.2d

771, 786 (2009) (quoting *Stone v. Chicago Title Ins.*, 330 Md. 329, 337, 624 A.2d 496, 500 (1993)) (alteration in *Pittway*). A determination as to proximate cause involves not only a determination of cause-in-fact, but also a judgment as to whether an individual should "be held legally responsible for the consequences of an act or omission." *Peterson v. Underwood*, 258 Md. 9, 16, 264 A.2d 851, 855 (1970). "This determination is subject to considerations of fairness or social policy as well as mere causation." *Id.*

Thus, in Maryland, "[t]o be a proximate cause for an injury, 'the negligence must be 1) a cause in fact, and 2) a legally cognizable cause.'" *Pittway Corp.*, 409 Md. at 243, 973 A.2d at 786 (quoting *Hartford Ins. Co. v. Manor Inn*, 355 Md. 135, 156-57, 642 A.2d 219, 230 (1994)). "The first step in the analysis . . . is an examination of causation-in-fact to determine who or what caused an action. The second step is a legal analysis to determine who should pay for the harmful consequences of such an action." *Pittway Corp.*, 409 Md. at 244, 973 A.2d at 786.

Maryland courts treat the first step as a "threshold inquiry of 'whether [the] defendant's conduct actually produced an injury.'" *Id.* (quoting *Peterson*, 258 Md. at 16-17, 264 A.2d at 855). When only the defendant's negligent act is at issue, causation-in-fact is satisfied if the "the injury would not have occurred absent or 'but for' the defendant's negligent act." *Pittway Corp.*, 409 Md. at 244, 973 A.2d at 786-87. When an injury is the result of two or more independent negligent acts, causation-in-fact is satisfied if it is 'more likely than not' that the defendant's conduct was a substantial factor in producing the plaintiff's injuries." *Id.* at 244, 973 A.2d at 787.

The second step, "whether the defendant's actions constitute a legally cognizable cause of the complainant's injuries," is a test of foreseeability. *Id.* at 245-46, 973 A.2d at 787-88. A court must "consider whether the actual legal harm to a litigant falls within a general field of

danger that the actor should have anticipated or expected." *Id.* at 245, 973 A.2d at 787 (citing *Stone*, 330 Md. at 337, 624 A.2d at 500). If the harm was a foreseeable result of the defendant's negligent conduct, then the requirement for legal causation is generally met. *See Pittway Corp.*, 409 Md. at 246, 973 A.2d at 788. However, a court may limit liability where the injury is remote from the negligent conduct and the harm is out of proportion to the defendant's culpability. *See id.* at 246-47, 973 A.2d at 788.

Writing for the Maryland Court of Appeals in *Henley v. Prince George's County*, 305 Md. 320, 503 A.2d 1333 (1986), Judge McAuliffe explained:

> In applying the test of foreseeability . . . it is well to keep in mind that it is simply intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm, and to avoid the attachment of liability where, in the language of Section 435(2) of Restatement (Second) of Torts (1965), it appears "highly extraordinary" that the negligent conduct should have brought about the harm.

*Id.* at 334, 503 A.2d at 1340; *see Pittway Corp.*, 409 Md. at 246-47, 973 A.2d at 788 (discussing foreseeability test and quoting *Henley*).

The Hilemans' contention parallels the two steps of the proximate cause inquiry. First, they argue that the failure to disclose their knowledge of water intrusion cannot be the proximate cause of plaintiffs' injuries because, by the time the flood occurred in December 2009, the Lawleys had already decided to vacate. *See* Brokers' Memo at 16-17. In other words, the Hilemans assert that a failure to disclose the history of water intrusion is not the cause-in-fact of the harm suffered by plaintiffs. Second, the Hilemans argue that the flood in December 2009 was not reasonably foreseeable, and therefore, the Hilemans' conduct was not the legal cause of plaintiffs' injuries. *See id.* at 17-20. Neither argument is persuasive.

*a. Causation-in-fact*

The jury reasonably could have concluded that the Hilemans' failure to disclose the basement's history of water intrusion was a cause-in-fact of the harm suffered by plaintiffs, even though plaintiffs had decided to move out before the December 2009 flood. Specifically, the jury could have found that plaintiffs suffered harm in the form of the Property's reduced value on resale, which, according to the testimony, resulted in part from water intrusion problems in the basement.

As noted, plaintiffs' various expert witnesses testified that the housing market is highly sensitive to water intrusion, and that home buyers generally will pay less for a home that exhibits problems with moisture and water. The history of several instances of substantial water intrusion in the basement was not disclosed to the Lawleys, and the jury could have found that, had the Lawleys been made aware of such occurrences, they might not have purchased the Property, or might not have paid $192,450 for it.

The Lawleys claim that they disclosed the water intrusion problem to potential buyers, including Shockley. He purchased the home for only $100,000. This price was consistent with Weigand's $90,000 appraisal of the Property.

The defendants counter that plaintiffs resold the Property in the midst of the housing crisis, and thus they argue that the decline in value was due to poor market conditions, and not the condition of the Property. But, the jury was not required to accept that view. Rather, it was entitled to conclude that market conditions did not cause the full extent of plaintiffs' loss, and that some of plaintiffs' loss in reselling the Property was attributable to the issue of water intrusion that the Hilemans' failed to disclose.

As noted, evidence was introduced at trial showing an average decline in housing prices in Worcester County between 2008 and 2012 of between 17.8 percent (as estimated by plaintiffs' expert) and 21 percent (as estimated by defendants' expert). Based on those figures, the Property would have sold for approximately $150,000. Thus, even assuming that 21% of the Property's diminution in value was attributable to general market conditions, the jury could have concluded that the resale price fell an additional $50,000 as a result of other conditions associated with the condition of the home, including susceptibility to water intrusion.

That the Lawleys had already decided to move out before the flood occurred in December 2009 is a red herring. When they sought to sell the Property, they faced the issue of a basement that arguably was at risk of flooding. Disclosing this information to prospective buyers decreased the Property's resale price, thereby causing plaintiffs' loss. It is of no moment that the Lawleys were not living at the Property when they sold it.

*b. Legal Causation*

As to legal causation, the jury reasonably could have concluded, based upon the evidence presented at trial, that the failure to disclose a history of water intrusion created a foreseeable risk of harm to plaintiffs, such as a diminished resale price. *Cf. Rhee v. Highland Dev. Corp.*, 182 Md. App. 516, 536-37, 958 A.2d 385, 397 (2008) ("[W]hen concealment of a defect in real property is the . . . intended objective, and [the defendant] takes active measures to hide the defect, he is expecting that in the ordinary course of events the defect will remain concealed, not only from the initial purchasers but also from future purchasers, *i.e.*, that, absent an intervening event, the concealment will be passed on."). As McGowan and Weigand testified, water intrusion has a negative effect on the value of a home, and, according to Bullard's proposed scope of work, the costs to remediate the Property's water intrusion problems would have been

substantial. Accordingly, financial harm to plaintiffs was a foreseeable result of the Hilemans' failure to disclose that history.

The Hilemans mistakenly focus on the foreseeability of the flood.[21] *See* Brokers' Memo at 18-20. But, even accepting, *arguendo*, that the Hilemans could not have foreseen the December 2009 flood, it was foreseeable that failing to disclose the history of basement water intrusion would cause the very harm that occurred – diminished value. The information was material to the value of the Property. Therefore, the jury was entitled to find that plaintiffs proved legal causation and proximate cause.

### 3. Assumption of the Risk

At the defense's request, and over the objection of plaintiffs, the court instructed the jury as to assumption of the risk. Assumption of the risk is "a complete bar" to a plaintiff's recovery. *Crews v. Hollenbach*, 358 Md. 627, 640, 751 A.2d 481, 488 (2000). "The defense is grounded on the theory that a plaintiff who voluntarily consents, either expressly or impliedly, to exposure to a known risk cannot later sue for damages incurred from exposure to that risk." *Id.* A defendant who relies on the defense "must show that the plaintiff: (1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of the danger." *ADM P'ship v. Martin*, 348 Md. 84, 91, 702 A.2d 730, 734 (1997).

The jury was instructed that "[a] plaintiff cannot recover in negligence if the plaintiff has assumed the risk of injury or damages," and that "[a] person assumes the risk of injury or damage if that person knows and understands the risk of an existing danger, or reasonably should have known and understood the risk of an existing danger, and voluntarily chooses to encounter

---

[21] The Hilemans vacillate between arguing that the flood was not foreseeable and that the severity of the flood was not foreseeable. Neither argument is persuasive.

the risk." As noted, the jury specifically rejected the defense of assumption of the risk as to plaintiffs' negligence claim. *See* Supplemental Verdict ¶ 7a.

I see no basis to second guess the jury's conclusion. Maryland courts have said: "Assumption of the risk will apply *only if* 'the undisputed evidence and all permissible inferences therefrom *clearly* establish that the risk of danger was *fully* known to and *understood* by the plaintiff.'" *Warsham v. James Muscatello, Inc.*, 189 Md. App. 620, 640, 985 A.2d 156, 167 (2009) (quoting *Schroyer v. McNeal*, 323 Md. 275, 283, 592 A.2d 1119, 1123 (1991)) (first emphasis added). "The test of whether the plaintiff knows of, and appreciates, the risk involved in a particular situation is an objective one, and ordinarily is a question to be resolved by the jury." *Schroyer*, 323 Md. at 283, 592 A.2d at 1123 (internal citation omitted). Only when "it is clear that a person of normal intelligence in the position of the plaintiff must have understood the danger" is assumption of the risk "for the court." *Id.* at 283-84, 592 A.2d at 1123.

In this case, the evidence established that the Lawleys knew of the presence of a sump pump in the basement and saw evidence of moisture along the walls. Darren Lawley also knew that the purpose of a sump pump is to keep water out of a basement. To be sure, many basements have sump pumps or evidence of moisture on the walls. But, the jury was entitled to conclude that this did not make plaintiffs aware that the basement was subject to periodic, substantial water intrusion, several feet deep; or that there had been repeated problems with the sump pump, allegedly because it had to operate constantly, to keep out water; or that failure of the sump pump could result in extreme flooding. Thus, the jury reasonably could have concluded that plaintiffs did not assume the risk that the basement was subject to periodic, extensive water intrusion.

## II.     Attorneys' Fees

Plaintiffs and Sellers have moved for attorneys' fees, pursuant to Paragraph 35 of the

Contract.  It states:

> 35. ATTORNEY'S FEES:  In any action or proceeding between Buyer and Seller
> based, in whole or in part, upon the performance or non-performance of the terms
> and conditions of this Contract, including, but not limited to, breach of contract,
> negligence, misrepresentation or fraud, the prevailing party in such action or
> proceeding shall be entitled to receive reasonable attorney's fees from the other
> party as determined by the court or arbitrator.   In any action or proceeding
> between Buyer and Seller and/or between Buyer and Broker(s) and/or Seller and
> Broker(s) resulting in Broker(s) being made a party to such action or proceeding,
> including, but not limited to, any litigation, arbitration, or complaint and claim
> before the Maryland Real Estate Commission, whether as defendant, cross-
> defendant, third-party defendant or respondent, Buyer and Seller jointly and
> severally, agree to indemnify and hold Broker(s) harmless from and against any
> and all liability, loss, cost, damages or expenses (including filing fees, court costs,
> service of process fees, transcript fees and attorneys' fees) incurred by Broker(s)
> in such action or proceeding, providing that such action or proceeding does not
> result in a judgment against Broker(s).
>
> As used in this Contract, the term "Broker(s)" shall mean: (a) the two (2) Brokers
> as identified on Page 10 of this Contract; (b) the two (2) named Sales Associates
> identified on Page 10 of the Contract; and (c) any agent, subagent, salesperson,
> independent contractor and/or employees of Broker(s). . . .
>
> This Paragraph shall apply to any and all such action(s) or proceeding(s) against
> Broker(s) including those action(s) or proceeding(s) based, in whole or in part,
> upon any alleged act(s) or omission(s) by Broker(s), including, but not limited to,
> any alleged act of misrepresentation, fraud, non-disclosure, negligence, violation
> of any statutory or common law duty, or breach of fiduciary duty by
> Broker(s). . . . .

In a diversity case, a court applies the choice-of-law rules of the forum state.  As to

contract actions, Maryland courts ordinarily apply the law of the jurisdiction where the contract

was made, under the principle of *lex loci contractus*.  *Erie Ins. Exch. v. Heffernan*, 399 Md. 598,

618, 925 A.2d 636, 648 (2007).  Further, "[c]ontracts relating to the sale of realty are generally

governed by the law of the jurisdiction in which the property is located."  *Traylor v. Grafton*, 273

Md. 649, 660, 332 A.2d 651, 659 (1975). Here, the Contract was made in Maryland, where the Property is located. Therefore, I am satisfied that Maryland law applies.

Maryland follows the "American Rule,"[22] under which "a prevailing party is not awarded attorney's fees 'unless (1) the parties to a contract have an agreement to that effect, (2) there is a statute that allows the imposition of such fees, (3) the wrongful conduct of a defendant forces a plaintiff into litigation with a third party, or (4) a plaintiff is forced to defend against a malicious prosecution.'" *Nova Research, Inc. v. Penske Truck Leasing Co.*, 405 Md. 435, 445, 952 A.2d 275, 281 (2008) (quoting *Thomas v. Gladstone*, 386 Md. 693, 699, 874 A.2d 434, 437 (2005)). "Contract provisions providing for awards of attorney's fees to the prevailing party in litigation under the contract generally are valid and enforceable in Maryland." *Myers v. Kayhoe*, 391 Md. 188, 207, 892 A.2d 520, 532 (2006).

### 1. Plaintiffs' Motion

Plaintiffs contend that they are entitled to recover attorneys' fees from the Hilemans under Paragraph 35 of the Contract. They seek a total of $173,590 in legal fees. Riley Aff. ¶ 6; *see* ECF 173-2 (invoices). Although the Hilemans are not signatories to the Contract, plaintiffs claim that the Hilemans "were a party" to it. Plaintiffs' Motion ¶ 1. They argue that, under the plain language of Paragraph 35, "the Brokers . . . agreed that the attorneys' fees provision of the

---

[22] "'[I]n an ordinary diversity case where the state law does not run counter to a valid federal statute or rule of court, . . . state law denying the right to attorney's fees or giving a right thereto, which reflects a substantial policy of the state, should be followed.'" *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 259 n.31 (1975) (quoting 6 J. Moore, Federal Practice § 54.77(2), at 1712-1713 (2d ed. 1974)). In *Alyeska*, the Supreme Court stated that a forum state's "judicially created rule" as to attorney's fees, such as the American Rule, will be applied by a federal court sitting in diversity. *Alyeska*, 421 U.S. at 259 n.31. In any event, the Fourth Circuit also applies the American Rule. *See, e.g*, *United Food & Comm. Workers, Local 400 v. Marvel Poultry Co.*, 876 F.2d 346, 350 (1989) ("Without . . . express contractual or statutory authorization, courts generally adhere to the American Rule which requires each party to bear its own litigation costs, including attorney's fees.").

Contract would be applicable to them." Plaintiffs' Memo at 5.

The Hilemans insist that they are not parties to the Contract. Relying on the plain language of Paragraph 35, they contend that they are not contractually liable for plaintiffs' attorneys' fees. *See* ECF 180 at 1, 5-9.

In light of the American Rule, plaintiffs would have no entitlement to recover legal fees from the Hilemans, in the absence of a contractual or statutory obligation. No statutory basis exists here for the award of fees in this case. Although the parties dispute the interpretation of the Contract, they agree that Maryland law governs its interpretation.

Maryland follows an objective theory of contract interpretation, under which "[t]he court's duty is to determine the intention of the parties as reflected in the terms of the contract." *Sy-Lene of Wash., Inc. v. Starwood Urban Retail II, Inc.*, 376 Md. 157, 166, 829 A.2d 540, 546 (2003). Moreover, "'[t]he words employed in the contract are to be given their ordinary and usual meaning, in light of the context within which they are employed.'" *DIRECTV, Inc. v. Mattingly*, 376 Md. 302, 313, 829 A.2d 626, 632-33 (2003) (quoting *Wells v. Chevy Chase Bank, F.S.B.*, 363 Md. 232, 251, 768 A.2d 620, 630 (2001)).

"'[W]here the language employed in a contract is unambiguous, a court shall give effect to its plain meaning and there is no need for further construction by the court.'" *DIRECTV, Inc.*, 376 Md. at 312, 829 A.2d at 632 (citation omitted); *see Adloo v. H.T. Brown Real Estate, Inc.*, 344 Md. 254, 266, 686 A.2d 298 (1996)). Put another way, "the clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or was intended to mean." *Auction & Estate Representatives, Inc. v. Ashton*, 354 Md. 333, 340, 731 A.2d 441, 444 (1999).

"Further, a contract does not become ambiguous merely because the parties do not agree on its meaning." *Fultz v. Shaffer*, 111 Md. App. 278, 299, 681 A.2d 568, 578 (1996). Rather, a contract is ambiguous only "if it is subject to more than one interpretation when read by a reasonably prudent person." *Sy-Lene*, 376 Md. at 167, 829 A.2d at 547. Whether a contract is ambiguous, and the interpretation of any unambiguous language, is a question of law for the court. *Id.* at 163, 829 A.2d at 544; *see also Wash. Metro. Area Transit Auth. v. Potomac Inv. Props., Inc.*, 476 F.3d 231, 234 (4th Cir. 2007).

Moreover, a court will not "add or delete words to achieve a meaning not otherwise evident from a fair reading of the language used." *Brensel v. Winchester Constr. Co.*, 392 Md. 601, 624, 898 A.2d 472, 485 (2006). "It is a fundamental principle of contract law that it is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardship.'" *Calomiris v. Woods*, 353 Md. 425, 445, 727 A.2d 358, 368 (1999) (quoting *Canaras v. Lift Truck Servs.*, 272 Md. 337, 350, 322 A.2d 866, 873 (1974)); *see Loudin Ins. Agency, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 1443, 1992 WL 145269, at *5 (4th Cir. 1992) (per curiam) ("[A] court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck.").

Of import here, "'contractual attorney's fees provisions must be strictly construed to avoid inferring duties that the parties did not intend to create.'" *Thomas v. Capital Med. Mgmt. Assocs., LLC*, 189 Md. App. 439, 468, 985 A.2d 51, 68 (2009) (quoting *Nova Research*, 405 Md. at 455, 952 A.2d at 287). As the Maryland Court of Appeals said in *Talley v. Talley*, 317 Md. 428, 438-39, 564 A.2d 777, 782 (1989): "The power to award attorney's fees, being contrary to the established practice in this country, may be expressly conferred but will not be presumed from general language."

Plaintiffs' position constitutes a glaring misinterpretation of the Contract. The plain language of Paragraph 35 does not entitle plaintiffs to recover attorneys' fees from the Hilemans.

The first sentence of Paragraph 35 provides: "In any action or proceeding *between the Buyer and the Seller* based, in whole or in part, upon the performance or non-performance of the terms and conditions of this Contract . . . *the prevailing party* . . . shall be entitled to receive reasonable attorney's fees *from the other party* . . . ." Contract at HILE 0614 (emphasis added). "Buyer" and "Seller" are defined terms in the Contract. Dona Willoughby is identified as "Buyer," and Paul Northam and Lynn Immell are identified as "Seller." *Id.* at HILE 0601, 0618. Accordingly, this provision does not include the Hilemans.

Paragraph 35 includes an indemnification provision that states: "In any action between Buyer and Seller and/or *between Buyer and Broker(s) and/or Seller and Broker(s)* resulting in Broker(s) being made a party to such action . . . Buyer and Seller jointly and severally, agree *to indemnify and hold Broker(s) harmless* from and against any and all liability, loss, cost, damages or expenses (including filing fees, court costs, service of process fees, transcript fees and attorneys' fees) incurred by Broker(s) . . . *providing that such action . . . does not result in a judgment against Broker(s).*" *Id.* at HILE 0614 (emphasis added).

Plaintiffs point to the following portion of Paragraph 35 to support their position: "This Paragraph shall apply to any and all such action(s) or proceeding(s) against Broker(s) including those action(s) or proceeding(s) based, in whole or in part, upon any alleged act(s) or omission(s) by Broker(s) . . . ." *Id.* According to plaintiffs, this language indicates that their claims against the Hilemans fall within the scope of Paragraph 35, and therefore they are entitled to attorney's fees from the Hilemans as the prevailing parties. *See* Plaintiffs' Memo at 4-5. In plaintiffs' view, "[t]here is no other logical reading of the [C]ontract that can be made, without making the

language as to the applicability of Paragraph 35 to actions against the Broker impermissible surplusage." *Id.* at 5.

Plaintiffs' position turns the Contract on its head. Paragraph 35 offers broad protection to the Brokers, in the form of indemnification in a variety of proceedings, except in the event of an adverse judgment against them. In the event that the Brokers are not entitled to indemnification, however, the Contract does not create an affirmative duty on their part to pay legal fees. The language quoted by plaintiffs does not state that a party who prevails in an action against the Brokers shall be entitled to attorney's fees from the Brokers. Such a construction is tantamount to rewriting the Contract. And, it is at odds with the American Rule, which provides that a litigant cannot recover attorney's fees under a contract in the absence of an express agreement. *Talley*, 317 Md. at 438-39, 564 A.2d at 782; *see, e.g.*, *Nova Research*, 405 Md. at 455, 952 A.2d at 287 (refusing to grant attorney's fees incurred in first party action for breach of contract under an indemnification provision that did "not explicitly cover expenses in the enforcement of the contract"). Moreover, I cannot add terms to the Contract simply because plaintiffs are "no longer satisfied with the bargain [they] struck." *Loudin Ins.*, 1992 WL 145269, at *5; *see Brensel*, 392 Md. at 624, 898 A.2d at 485; *Calomiris*, 353 Md. at 445, 727 A.2d at 368.

It is also worth noting that there would be no reason to indemnify the Brokers for fees and costs if, as plaintiffs suggest, the Brokers would be entitled to attorney's fees as a prevailing party. Plaintiffs' construction of Paragraph 35 would render the indemnification provision wholly redundant, and contrary to the "general rule" that courts should "'avoid interpreting contracts in a way that renders [their] provisions superfluous.'" *Calomiris*, 435 Md. at 442, 727 A.2d at 366 (quoting *State Highway Admin. v. David A. Bramble, Inc.*, 351 Md. 226, 237, 717 A.2d 943, 948 (1998)).

Nor am I persuaded by plaintiffs' argument that the Hilemans are parties to the Contract, and are therefore liable for fees. Although the Hilemans did not sign the Contract, plaintiffs rely on the indemnification provision of Paragraph 35 to support their contention that the Hilemans are parties to the Contract. In their view, Paragraph 35 created a "set of mutual promises between and among the Buyers, Sellers and Brokers forming a tripartite contract among those parties as to the matter in Paragraph 35 . . . ." Plaintiffs' Memo at 6. They maintain that because "the indemnification under Paragraph 35 is 'contractual' in nature, some form of mutuality was required in order for contractual obligations to arise as between the Buyers and the Brokers." *Id.* Plaintiffs insist that, "absent a reading of the contract by which the Brokers agreed to the attorneys' fees provision . . . , there is no other consideration in Paragraph 35 in order to award the Brokers with the extraordinary benefit of indemnification they would otherwise enjoy." *Id.* at 6-7.

"'The general rule is that one cannot be held to a contract to which he is not a party.'" *Mehul's Inv. Corp. v. ABD Advisors, Inc.*, 130 F. Supp. 2d 700, 707 (D. Md. 2001) (quoting *Porter v. General Boiler Casing Co., Inc.*, 284 Md. 402, 410, 396 A.2d 1090, 1094 (1979)). Although "a party's conduct sufficient to manifest acceptance of the terms of a written contract will bind that party to the written contract," *Porter*, 284 Md. at 411, 396 A.2d at 1095, the Hilemans "never expressly adopted or engaged in conduct manifesting acceptance" of any duties under the Contract, let alone Paragraph 35. *Residential Warranty Corp. v. Bancroft Homes Greenspring Valley, Inc.*, 126 Md. App. 294, 316, 728 A.2d 783, 794 (1999). They did not sign the Contract and, on the only page where they are identified by name, the Contract states that their information is "provided for reference only." *See* Contract at HILE 0620. Further, the Contract does not impose any duties on the Hilemans. To the contrary, Paragraph 25 states, *id.*

at HILE 0611:

> BROKER LIABILITY: Brokers . . . do not assume any responsibility for the condition of the Property or for the performance of the Contract by any or all parties hereto. By signing this Contract, Buyer and Seller acknowledge that they have not relied on any representations made by Brokers . . . except those representations expressly set forth in the Contract.

The indemnification provision of Paragraph 35 protects the Hilemans as third party beneficiaries. "A third party beneficiary is not a party to a contract, but can bring suit to enforce it." *Dickerson v. Longoria*, 414 Md. 419, 995 A.2d 721, 741-42 (2010). A party may claim third party beneficiary status under a contract when "the contract was expressly made for the [party]'s benefit and . . . the [party] was intended to be the primary beneficiary of the contract." *Parlette v. Parlette*, 88 Md. App. 628, 640, 596 A.2d 665, 671 (1991); *accord Yaffe v. Scarlett Place Residential Condo., Inc.*, 205 Md. App. 429, 442, 45 A.3d 844, 851 (2012) (explaining that a party without contractual privity may only enforce a contract as a third party beneficiary).

Had the parties intended to obligate the "Broker(s)" for payment of attorney's fees to the prevailing party, they would have had to join as parties to the Contract, and the Contract would have had to say so. Case law from other jurisdictions offers examples of express language to that effect.[23] For example, in *Schumacher Properties, Inc. v. Rellinger*, 911 So.2d 193 (Fla. App. 2005), a contract for the sale of real property included an attorney's fees provision stating: "ATTORNEY FEES AND COSTS: In connection with any litigation arising out of this Contract, the prevailing party, whether Buyer, Seller, *or Broker*, shall be entitled to recover all costs incurred, including reasonable attorney's fees for services rendered in connection with such litigation, including appellate proceedings and post judgment proceedings." *Id.* at 195 (emphasis added). The court found that the broker in that case signed the contract as a party, *id.*, and held

---

[23] The Court is not aware of any Maryland case addressing similar contractual language, and the parties have not identified any such cases.

that "the attorney's fees provision unambiguously includes the broker within the provision's obligations and benefits." *Id.* at 196; *see also Polk v. St. Angelo*, No. 03-01-00356-CV, 2002 WL 1070550, at *2-3 (Tex. App. May 31, 2002) (finding that plain language of "earnest money contract" permitted recovery of attorney's fees by prevailing party, including broker, where it provided: "ATTORNEY'S FEES: If Buyer, Seller, Listing Broker, Other Broker or Escrow agent is a prevailing party in any legal proceeding brought under or with relation to this contract, such party shall be entitled to recover from the non-prevailing party all costs of such proceeding and reasonable attorney's fees."); *Young v. Frank*, No. 29550–8–III, 2012 WL 1798451, at *7 (Wash. App. May 17, 2012) ("If Buyer, Seller, or any real estate licensee or broker involved in this transaction is involved in any dispute relating to any aspect of this transaction or this Agreement, each prevailing party shall recover their reasonable attorney's fees."); *cf. Harsch Props., Inc. v. Nicholas*, 932 A.2d 1045, 198 (Vt. 2007) ("If the Broker is forced by collection or litigation effort to enforce the terms and conditions of this agreement, then the prevailing party will be entitled to reimbursement for all costs of collection, including attorney's fees.").

In sum, the Contract entitled the Hilemans to indemnification under certain circumstances. Thus, the Hilemans would be entitled to enforce the Contract's indemnification terms as third party beneficiaries. This status, however, does not make them parties to the Contract.[24] Accordingly, plaintiffs' motion for attorneys' fees will be denied.

---

[24] Although I need not reach the issue, the Hilemans also insist that, because they are not signatories to the Contract, enforcing the Contract against them would violate the Statute of Frauds. *See* R.P. § 5-104 ("No action may be brought on any contract for the sale or disposition of land or of any interest in or concerning land unless the contract on which the action is brought, or some memorandum or note of it, is in writing *and signed by the party to be charged* or some other person lawfully authorized by him.") (emphasis added). Plaintiffs suggests that the Hilemans are "estopped" from asserting a defense based on the Statute of Frauds, because they previously claimed indemnification under the Contract. ECF 185 at 4-5; *see La Belle Epoque, LLC v. Old Europe Antique Manor, LLC*, 406 Md. 194, 213, 958 A.2d 269 (2008) (addressing a

*2. Sellers' Motion*

Sellers claim that, under Paragraph 35 of the Contract, they are entitled to recover attorneys' fees as the prevailing party in an action between Buyers and Sellers. As noted, they claim attorneys' fees and expenses in the amount of $240,015.31. *See* Bernier Aff. ¶ 7 (ECF 171-7); Bernier Aff. II ¶ 7 (ECF 176-3). Plaintiffs do not dispute that their claims against Sellers were "based, in whole or in part, upon the performance or non-performance of the terms and conditions of [the] Contract, including, but not limited to, breach of contract, negligence, misrepresentation or fraud . . . ." *See* Contract at HILE 0614.

In *Stratakos v. Parcells*, 172 Md. App. 464, 915 A.2d 1022 (2007), purchasers of residential real property sued the sellers, alleging fraudulent and negligent misrepresentation and breach of warranty based on representations made by the sellers in a R.P. § 10-702 disclosure statement. *Id.* at 464-67, 915 A.2d at 1022-24. The contract of sale in that case provided: "In any action or proceeding involving a dispute between the Purchaser and the Seller arising out of this Contract, the prevailing party will be entitled to receive from the other party reasonable attorney's fees to be determined by the court or arbitrator(s)." *Id.* at 468, 915 A.2d at 1024. The Maryland Court of Special Appeals held that the plaintiffs' claims "arose out of" the contract of sale, thereby triggering the contract's attorneys' fees provision: "The dispute between the parties relating to the alleged misrepresentations in the disclosure statement mandated by R.P. § 10-702 'flowed from' or 'grew out of' the contract. Absent the contract for the sale of real property, appellants' claims of misrepresentations and breach of warranty simply could not have existed."

---

party's waiver of statute of frauds defense). Plaintiffs' position lacks merit. As indicated, the Hilemans were entitled to claim indemnification as third party beneficiaries, not as parties to the Contract. As such, their conduct does not constitute waiver.

*Id.* at 477, 915 A.2d at 1029. Similarly, plaintiffs' claims here "flowed from" or "grew out of" the Contract, and therefore Paragraph 35 applies.

Nonetheless, plaintiffs urge the Court to deny the Sellers' Motion "because they failed to include any request for attorneys' fees in their pleadings," ECF 179 at 1, and therefore did not comply with Fed. R. Civ. P. 9(g)'s requirement that "an item of special damage" be "specifically stated." *See* ECF 179 at 1-2. Plaintiffs also contend that the Sellers' Motion should be denied because Sellers failed to submit quarterly statements to plaintiffs' counsel, as required by Appendix B of this Court's Local Rules. *See id.* at 3-5. And, plaintiffs insist that, because Sellers' co-defendants, the Hilemans, were found liable, Sellers cannot claim prevailing party status. *See id.* at 5-6. Sellers oppose each of these arguments.

a.  *Special Damages*

Fed. R. Civ. P. 9(g) provides: "If an item of special damage is claimed, it must be specifically pled." "Special damages" are not defined by the Federal Rules of Civil Procedure, but, as a general matter, are considered "those elements of damages that are the natural, but not the necessary or usual, consequence of the defendant's conduct." WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1310, at 347 (3d ed. 2004); *accord Roberts v. Graham*, 73 U.S. 578, 579 (1867) ("*Special*, as contra distinguished from general damage, is that which is the natural, but not the necessary, consequences of the act complained of."); *see also Neal v. Honeywell, Inc.*, 191 F.3d 827, 832 (7th Cir. 1999) ("Whether a particular kind of injury gives rise to 'special' damages thus depends on the tort committed. The usual consequences of a wrong are 'general' damages, and unusual consequences are "special.'"). The purpose of Rule 9(g) is to give notice to the opposing party of all such damages, so as "to protect the defendant against being surprised at trial" and to "permit the most advantageous employment of . . . discovery

procedures." WRIGHT & MILLER § 1310, at 347-48; *see Hollerbach & Andrews Equip. Co., Inc. v. S. Concrete Pumping, Inc.*, CIV. A. No. HAR 95–826, 1996 WL 250657, at *1 (D. Md. Mar. 28, 1996) ("The purpose underlying Rule 9(g) is to give notice to the other side of those 'special' damages claimed.").

The Fourth Circuit has treated a claim for attorney's fees as special damages subject to Fed. R. Civ. P. 9(g). *See Atl. Purchasers, Inc. v. Aircraft Sales, Inc.*, 705 F.2d 712, 716 n.4 (4th Cir. 1983). In that case, the purchaser of an airplane sued the seller for fraud and breach of warranty. *Id.* at 714. The jury returned a verdict for the plaintiff and awarded damages. Thereafter, the plaintiff submitted a claim for treble damages and attorney's fees under the North Carolina Unfair Trade Practices Act. *Id.* at 714-15. In a footnote, the Fourth Circuit stated that attorney's fees were not available, in part because the plaintiff had not satisfied the statutory prerequisite for such fees, and because, under Fed. R. Civ. P. 9(g), the plaintiff had "failed to state specifically the claim for fees in the complaint." *Id.* at 716 n.4 (internal citations omitted); *see also C-Tech Corp. v. Aversion Techs.*, Civil Action No. DKC 11–0983, 2012 WL 3962508, at *8 (D. Md. Sept. 7, 2012) (denying defendants' claims for attorneys' fees under the Lanham Act and Maryland Uniform Trade Secrets Act for failing to plead such claims in a counterclaim under Rule 9(g)).

However, *Atlantic Purchasers* preceded the Supreme Court decision of *Budinich v. Becton Dickinson & Co.*, 486 U.S. 196 (1988), and the adoption of Fed. R. Civ. P. 54(d)(2) in 1993, governing claims for attorney's fees. Under *Budinich*, Rule 54(d)(2), and subsequent case law, a defendant's claim for attorney's fees under a contractual prevailing party provision does not constitute damages. Therefore, a defendant need not claim such fees in a pleading under Rule 9(g).

In *Budinich*, the Supreme Court addressed whether a district court's decision on the merits of a claim was final under 28 U.S.C. § 1291, notwithstanding an unresolved motion for attorney's fees predicated on prevailing party status in the underlying litigation. *See* 486 U.S. at 199. The Court held that the decision was final and appealable. *Id.* at 200. It explained: "As a general matter, . . . a claim for attorney's fees is not part of the merits of the action to which the fees pertain," because "[s]uch an award does not remedy the injury giving rise to the action." *Id.* The Court observed: "At common law, attorney's fees were regarded as an element of 'costs' awarded to the prevailing party." *Id.* at 201; *see also White v. New Hampshire Dep't of Empl. Sec.*, 455 U.S. 445, 451-52 (1982) (noting that when a statute provides for attorneys' fees to a prevailing party, "the court's decision of entitlement to fees will . . . require an inquiry separate from the decision on the merits—an inquiry that cannot even commence until the one party has 'prevailed'").

In 1993, the Supreme Court adopted Fed. R. Civ. P. 54(d)(2),[25] to "establish[] a procedure for presenting claims for attorneys' fees." Fed. R. Civ. P. 54(d)(2) advisory committee note (1993); *see Carolina Power & Light Co. v. Dynegy Mktg. & Trade*, 415 F.3d 354, 358 (4th Cir. 2005) (discussing passage of Fed. R. Civ. P. 54(d)(2)). Entitled *Attorney's Fees*, Rule 54(d)(2) provides: "(A) *Claim to be made by motion*. A claim for attorney's fees and related nontaxable expenses must be made by motion *unless the substantive law requires those fees to be proved at trial as an element of damages*." (Emphasis added). To illustrate, the 1993 Advisory Committee Note states that Rule 54(d)(2) "does not . . . apply to fees recoverable as an

---

[25] The Supreme Court also adopted amendments to Fed. R. Civ. P. 58, addressing how claims for attorneys' fees affect entry of judgment for purposes of finality. *See Carolina Power & Light*, 415 F.3d at 359.

element of damages, as when sought under the terms of a contract; such damages typically are to be claimed in a pleading and may involve issues to be resolved by a jury."

The Fourth Circuit has explained: "The rule . . . creates a division in the handling of attorneys fees claims between the claims that are not part of the underlying substantive claim, which must be made by motion, and claims that are an element of damages, which presumably must be made by complaint." *Carolina Power & Light*, 415 F.3d at 358. For example, attorney's fees claimed under a contract must be pled as damages if a contractual breach is a "condition precedent" to recovery. *See id.* 358-62. As case law makes clear, however, a defendant's claim for fees pursuant to a contractual prevailing party provision is not an element of damages, because the claim is based on the outcome of litigation, not the merits of the underlying substantive claim. *See Carolina Power & Light*, 415 F.3d at 358-62; *Grove v. George*, 192 Md. App. 428, 437, 994 A.2d 1032, 1037 (2010). Although the parties did not address whether state or federal law controls the categorization of attorney's fees as damages, this distinction holds in either circumstance.

*Carolina Power & Light*, an action by a coal-seller against a coal-buyer for breach of a coal-delivery contract, is instructive. In that case, after prevailing on its claim for breach of contract, the coal-seller moved for attorney's fees pursuant to "the contract's 'legal costs' provision, under which the nonbreaching party was entitled to 'reasonable out-of-pocket expenses incurred by it including legal fees, by reason of the enforcement and protection of its rights under [the contract].'" 415 F.3d at 356. Before the district court ruled on the motion, the coal-buyer filed a notice of appeal from the judgment. *Id.* The Fourth Circuit held that, under Fed. R. Civ. P. 54(d)(2) and 58(c), "a claim for legal costs based on a contractual provision that is not limited to expenses incurred during the underlying litigation is an element of damages to

be proved at trial under the substantive law governing the action, and that a judgment that leaves open such a claim is not final and appealable." *Id.* (internal citations omitted).

The Fourth Circuit explained that, under the contract, "the condition precedent to recovering legal costs [was] a breach of contract by the buyer, not the successful litigation of a claim by the seller." *Id.* For example, the contract's attorneys' fees provision made "legal costs . . . recoverable as a remedy for the buyer's failure 'to accept all or any part of the quantity of Coal to be delivered.'" 415 F.3d at 359. Thus, "unlike a right to nonsubstantive attorneys fees that are collateral to the merits of an action, which does not accrue until the litigation is actually brought, the seller's right to legal costs under the contract between the parties . . . arises as soon as the buyer rejects a delivery of coal." *Id.* The Court determined that, "when a contract provides for an award of attorneys fees or legal costs, not as costs to the prevailing party, but as an element of damages, the grant or denial of such an award is a substantive issue" for purposes of Rule 54(d)(2). *Carolina Power & Light*, 415 F.3d at 362. And, because "a judgment is not final until damages are fixed," the Court held that the judgment was not final for purposes of appeal until the coal-seller's request for attorney's fees had been resolved. *Id.* at 362.

The Court was careful to distinguish cases "where the attorneys' fees award depended on whether the claimant was a prevailing party in the underlying cause of action." *See id.* at 360. In such cases, as in *Budinich*, a claim for fees is not an element of damages, but rather a collateral fee-shifting mechanism for the prevailing party. *See id.* at 360-62 (citing *Budinich*, 486 U.S. at 197-200). The Fourth Circuit said: "This distinction was not only the basis of the decision in *Budinich* but also the essence of the 1993 amendments to Rules 54 and 58." *Id.* at 362.

This view accords with Maryland law. In *Grove v. George*, 192 Md. App. 428, 994 A.2d 1032 (2010), the purchaser of real estate sued the seller for negligent and intentional

misrepresentation based on the seller's alleged "failure to disclose an infestation of flying squirrels in the attic of the building on the property." *Id.* at 430, 994 A.2d at 1034. The defendant prevailed on summary judgment, and, thereafter, filed a motion for attorney's fees and costs, citing a contractual prevailing party provision similar to that in Paragraph 35. *See id.* at 431, 994 A.2d at 1034. Following the award of fees to the defendant, the plaintiff appealed on jurisdictional grounds. The plaintiff "assum[ed] the requested attorneys fees [were] an integral part of the final judgment, rather than a collateral issue," and therefore could not be awarded after the entry of final judgment. *Id.* at 432, 994 A.2d at 1035. Rejecting this argument, the Maryland Court of Special Appeals held that a defendant seeking attorney's fees under a contract's prevailing party provision was not required to make a claim for breach of contract or damages prior to judgment. *Id.* at 437, 1032 A.2d at 1037. Rather, a defendant's request for fees in such circumstances is "a collateral matter." *Id. Compare Bankers & Shippers Ins. Co. of N.Y. v. Electro Enters., Inc.*, 287 Md. 641, 661, 415 A.2d 278, 289 (1980) ("This was a case involving claims for attorneys' fees and expenses as damages for a breach of contract, and not one of those relatively unusual types of cases where the trial court is authorized to award the prevailing party in litigation before the court his reasonable attorneys' fees. Consequently, Bankers was entitled to have the amount of fees and expenses proven with the certainty and under the standards ordinarily applicable for proof of contractual damages.").

To be sure, as plaintiffs observe, Maryland appellate courts have said that attorney's fees "awardable pursuant to [a] contract form part of the claim for breach of contract." *G-C P'ship v. Schaefer*, 358 Md. 485, 488, 749 A.2d 823 (2000); *see, e.g.*, *AccuBid*, 188 Md. App. at 231, 981 A.2d at 737 ("[A] request for attorney's fees based on a contract provision is part of the damages claim under the contract."). But, cases cited by plaintiffs that endorse this proposition

concern contracts providing for attorney's fees in connection with enforcement of the contract, *i.e.*, where, as in *Carolina Power & Light*, a contractual breach is a condition precedent to recovery of those fees.

In *SunTrust Bank v. Goldman*, 201 Md. App. 390, 402-03, 29 A.3d 724 (2011), for example, the Maryland Court of Special Appeals concluded that the attorney's fee claim constituted damages, based on a credit agreement that stated: "We may hire or pay someone else to help collect this Agreement if you do not pay. You will pay us that amount. This includes . . . our costs of collection, including court costs and fifteen percent (15%) of the principal plus accrued interest as attorneys' fees or reasonable attorneys' fees as allowed by law, if any sums owing under this Agreement are collected by or through an attorney at law, *whether or not there is a lawsuit*, and legal expenses for bankruptcy proceedings . . . and appeals. . . ." *Id.* at 394, 402-03, 29 A.3d at 726, 731 (emphasis added); *see also G-C P'ship*, 358 Md. at 486-88, 749 A.2d at 824-25 (holding that attorney's fees constituted damages where "[t]he action was for breach of a guaranty agreement that also contained a provision under which the respondents-guarantors agreed to reimburse the petitioners 'for all legal and other expenses *paid or incurred in enforcing the Guaranty*'") (emphasis added).

Here, as in *Grove* and *Budinich*, the Contract provides for the award of attorneys' fees to the buyers or sellers as the prevailing party, which is a cost-shifting mechanism, not an element of damages. Breach of contract is not a "condition precedent" to an award of attorneys' fees here; the right to such fees "does not accrue until the litigation is actually brought" and decided. *See Carolina Power & Light,* 415 F.3d at 359. Indeed, Sellers did not assert a counterclaim for breach of contract, and, as noted, plaintiffs abandoned their claim for breach of contract prior to trial. Accordingly, the Sellers' claim for attorneys' fees is subject to the requirements of Rule

54(d)(2), but Sellers were not obligated to plead their claim under Rule 9(g).  *See, e.g.*, *Riordan v. State Farm Mut. Auto. Ins. Co.*, 589 F.3d 999, 1004-06 (9th Cir. 2009) (holding that plaintiff properly requested attorneys' fees by motion under Rule 54(d)(2), and was not required to plead them in his complaint under Rule 9(g)); *Specialty Retaliers, Inc. v. Main Street NA Parkade, LLC*, 804 F. Supp. 2d 68, 71 (D. Mass. 2011) (same) (citing *Flynn v. AK Peters, Ltd.*, 377 F.3d 13, 25-26 (1st Cir. 2004)).

Denying Sellers' claim for attorneys' fees based on failure to specify them as damages under Rule 9(g) would elevate form over substance.  Plaintiffs do not—and cannot—claim that they were not on notice of Paragraph 35's attorneys' fees provision.  Further, Sellers indicated that they would be seeking attorneys' fees pursuant to the Contract in the Proposed Joint Pretrial Order.  *See* ECF 125 at 12; *see also* ECF 143 at 12 (Revised Proposed Joint Pretrial Order).

### b. Appendix B

Plaintiffs assert that Sellers failed to provide quarterly statements in accordance with Appendix B to this Court's Local Rules.  Appendix B provides: "Counsel for a party intending to seek fees if the party prevails shall submit to opposing counsel quarterly statements showing the amount of time spent on the case and the total value of that time . . . .  Failure to submit these statements *may* result in a denial or reduction of fees.[]"  App. B, Guideline 1.c (emphasis added).  The use of the term "may" suggests that imposition of such a penalty is discretionary.  *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533 (1994) ("[T]he word 'may' clearly connotes discretion."); *Air Line Pilots Ass'n, Int'l v. U.S. Airways Grp., Inc.*, 609 F.3d 338, 342 (4th Cir. 2010) ("[T]he term 'may' typically indicates authorization without obligation."); *Lynchburg Foundry Co. v. Patternmakers League of N. Am.*, 597 F.2d 384, 387 (1979) ("'[M]ay' sometimes means 'won't.'") (citing David Paul Brown, THE FORUM; OR FORTY YEARS FULL PRACTICE AT

THE PHILADELPHIA BAR, I, 345 (1856)). Further, "[o]pposing counsel may not seek a denial or reduction of fees from the court if he/she did not first request that such statements be provided." App. B, Guideline 1.c at n.3.

Plaintiffs claim: "Plaintiff's [sic] counsel specifically requested that Defendants' counsel provide documentation supporting any claim for fees they may assert. No such documentation was provided." ECF 179 at 4. In support of this contention, plaintiffs provided, as an exhibit, a letter from plaintiffs' counsel to defendants' counsel, dated October 11, 2012, which stated:

> I have on several occasions requested documentation in support of the assertion that either of your insurance policies was being eroded by your fees and costs. I renew that request, and further specifically request that you provide documentation in support of any fees and costs that you belief you may be able to claim.

Sellers respond: "Plaintiffs' first and only request for quarterly fee statements was made on October 11, 2012." ECF 182 at 8. Notably, plaintiffs do not dispute this contention by way of a surreply, and have not offered any other support for their position. By its own terms, the letter does not support plaintiffs' assertion. Rather, the letter distinguishes plaintiffs' "renew[ed]" request, as to the erosion of defendants' insurance policies, from their "specific[]" request" for documentation of attorneys' fees.

Perhaps most important, plaintiffs' request as to information concerning legal fees, set forth in the letter of October 11, 2012, was quite belated; it was sent only two weeks before the commencement of trial, in a case that had been pending since April 2010. Sellers state: "[C]omplete billing documentation for the entire litigation was provided to Plaintiffs on November 30, 2012 (billing from July 2012 through September 2012) and December 12, 2012 (billing for the period of October 2012 through November 2012)." ECF 182 at 8. Sellers' response to plaintiffs, made several weeks later, was not unreasonable, given that the letter was

sent on the eve of trial, and the trial took approximately two weeks. Under the circumstances attendant here, Appendix B is not a bar to Sellers' pursuit of attorneys' fees.

*c. Prevailing Party*

As indicated, the Contract states that, in an action or proceeding between Buyer and Seller, the prevailing party is entitled to recover attorney's fees from the other party. However, plaintiffs contend that Sellers are not a "prevailing party" for purposes of Paragraph 35 because the co-defendants, the Hilemans, were found liable.[26]

As a general rule, "a litigant is a 'prevailing party' if he succeeds 'on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'" *Royal Inv. Grp., LLC v. Wang*, 183 Md. App. 406, 457, 961 A.2d 665, 695 (2008) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). For a plaintiff to be considered a prevailing party, the plaintiff must "at minimum . . . be able to point to a resolution of the dispute which changes the legal relationship between itself and the defendant." *Texas State Teachers Ass'n v. Garland Indep. Sch. Dist.*, 489 U.S. 782, 792 (1989). By comparison, dismissal of an action against a defendant "'generally means that the defendant is the prevailing party.'" *Mitchell-Tracey v. United Gen. Title Ins. Co.*, 839 F. Supp. 2d 821, 826 (D. Md. 2012) (quoting *Kollsman v. Cohen*, 996 F.2d 702, 706 (4th Cir. 1993)); *see, e.g.*, *Burda v. M. Ecker Co.*, 954 F.2d 434, 441 n. 9 (7th Cir. 1992) (holding that when action is dismissed for failure to state a claim, defendant is prevailing party).

As between plaintiffs and Sellers, there is no question that the Sellers prevailed. Notwithstanding the verdict against the Hilemans, plaintiffs did not succeed on a single claim

---

[26] Plaintiffs also make this argument with respect to the Sellers' motion for costs. However, the award of costs is not covered by the Contract. Instead, it is governed by Fed. R. Civ. P. 54(d)(1), discussed, *infra*.

against the Sellers. Nor did the verdict against the Hilemans alter plaintiffs' legal relationship with the Sellers. Despite the underlying factual overlap in regard to plaintiffs' claims against the various defendants, the duties owed by Sellers, as the owners and vendors of the Property, differed from those owed by the Hilemans, as licensed real estate professionals. Although plaintiffs claim that the Hilemans' liability should be attributed to Sellers because the Hilemans acted as Sellers' agent, *see* ECF 179 at 6, as Sellers note, "Plaintiffs' agency theory of liability *did not go to the jury*." ECF 182 at 9 (emphasis in original).

Plaintiffs' position is at odds with the plain language of the Contract. Paragraph 35 clearly states that, as between the Buyer and the Seller, the prevailing party shall be entitled to attorney's fees from the other party. Recovery under the Contract is not dependent upon the outcome of claims involving a trial against a third party. As stated earlier, "a court will not rewrite the parties' contract simply because one party is no longer satisfied with the bargain he struck." *Loudin Ins. Agency*, 1992 WL 145269, at *5; *see Calomiris*, 353 Md. at 445, 727 A.2d at 368.

Moreover, the case law cited by plaintiffs does not support their position. Plaintiffs refer to *Stichting Mayflower Recreational Fonds v. Newpark Resources, Inc.*, 917 F.2d 1239, 1248 (10th Cir. 1990), for the proposition that "there can generally be only one 'prevailing party'" under a prevailing party attorneys' fee provision. However, *Stichting* concerned a contract dispute between *two parties*, which involved multiple claims. *See id.* The Tenth Circuit instructed the district court to "consider all of the contract claims together in making a determination of who is the prevailing party," as opposed to "award[ing] fees on each individual claim." *Id.* Here, Sellers obtained a favorable verdict on all claims lodged against them by plaintiffs. Therefore, they are prevailing parties under *Stichting*.

Plaintiffs also look to *Mary Beth G. v. City of Chicago*, 723 F.2d 1263 (7th Cir. 1984), which involved a claim for attorneys' fees in a civil rights action. In *Mary Beth*, the court held that a plaintiff who only prevails against some defendants can still be a prevailing party for purposes of a statutory fee award, as long as the plaintiff succeeds on a "significant issue" in the case. *Id.* at 1278, 1281. *Mary Beth* has no applicability here, as it did not concern an award of attorney's fees pursuant to contract. And, the plain language of the Contract here refers to the prevailing party in an action between buyer and seller; it does not refer to the success of either party's claims against a broker or a third party.

Accordingly, Sellers qualify as the prevailing party under Paragraph 35, and are entitled to attorneys' fees.

### d. Calculation of Fees

#### i. <u>Governing Principles</u>

In a diversity action such as this, a party's right to recover attorney's fees is ordinarily governed by state law. *See Ranger Constr. Co. v. Prince William Cnty. Sch. Bd.*, 605 F.2d 1298, 1301 (4th Cir. 1979); *Rohn Prods. Int'l, LC v. Sofitel Capital Corp.*, Civ. No. WDQ-06-504, 2010 WL 3943747, at *4 n.13 (D. Md. Oct. 7, 2010); *Glassman Constr. Co. v. Md. City Plaza, Inc.*, 371 F. Supp. 1154, 1162 (D. Md. 1974). "Maryland law limits the amount of contractual attorneys['] fees to actual fees incurred, regardless of whether the contract provides for a greater amount." *SunTrust Bank*, 201 Md. App. at 398, 29 A.3d at 728. Moreover, "[e]ven in the absence of a contract term limiting recovery to reasonable fees, trial courts are required to read such a term into the contract and examine the prevailing party's fee request for reasonableness." *Myers*, 391 Md. at 207, 892 A.2d at 532; *see also Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 380 Md. 285, 316, 844 A.2d 460, 478 (2004); *SunTrust*, 201 Md. App. at 401, 29 A.3d at

730. Thus, "courts must routinely undertake an inquiry into the reasonableness of any proposed fee before settling on an award." *Monmouth Meadows Homeowners Ass'n, Inc. v. Hamilton*, 416 Md. 325, 333, 7 A.3d 1, 5 (2010). The "reasonableness of attorney's fees is a factual determination within the sound discretion of the court." *Myers*, 391 Md. at 207, 892 A.2d at 532.

"The burden is on the party seeking recovery to provide the evidence necessary for the fact finder to evaluate the reasonableness of the fees.'" *Ulico*, 380 Md. at 316, 844 A.2d at 478 (citation omitted). Therefore, the party seeking a fee award must provide "'detailed records'" that specify "'the services performed, by whom they were performed, the time expended thereon, and the hourly rates charged.'" *Rauch v. McCall*, 134 Md. App. 624, 639, 761 A.2d 76, 84 (2000) (citation omitted), *cert. denied*, 362 Md. 625, 766 A.2d 148 (2001). "'[W]ithout such records, the reasonableness, vel non, of the fees can be determined only by conjecture or opinion of the attorney seeking the fees and would therefore not be supported by competent evidence.'" *Id.* at 639, 761 A.2d at 85 (citation omitted).

Maryland courts ordinarily utilize the "lodestar" approach when determining attorneys' fees under fee-shifting statutes. *Friolo v. Frankel*, 373 Md. 501, 504-05, 819 A.2d 354, 356 (2003) ("*Friolo I*").[27] However, the Maryland Court of Appeals has held that the lodestar

---

[27] The *Friolo* litigation has spawned four reported opinions of the Maryland appellate courts, all dealing with issues concerning the award of attorneys' fees. *See Frankel v. Friolo*, 170 Md. App. 441, 907 A.2d 363 (2006) ("*Friolo II*") (holding that, when applying the lodestar approach, a court must provide a "clear explanation of the factors employed"), *aff'd*, 403 Md. 443, 942 A.2d 1242 (2008) ("*Friolo III*") (holding that an award of attorneys' fees under a fee-shifting statute should include "appellate fees . . . incurred in successfully challenging . . . the attorneys' fee awarded"); *Friolo v. Frankel*, 201 Md. App. 79, 28 A.3d 752 (2011) ("*Friolo IV*") (holding that award of attorneys' fees could be apportioned based on the litigant's degree of success, determined by comparing amount of the jury verdict with amount sought and the defendant's settlement offer), *cert. granted*, 424 Md. 54, 33 A.3d 981, No. 394, Sept. Term 2011 (Dec. 16, 2011). After a writ of certiorari was granted in *Friolo IV*, "a subsequent bankruptcy

approach is "an inappropriate mechanism for calculating fee awards" under contractual fee-shifting provisions in "disputes between private parties over breaches of contract." *Monmouth Meadows*, 416 Md. at 336, 7 A.3d at 7.  This is because a "contractual fee-shifting provision is designed by the parties, not by the legislature. . . .  Thus, it usually serves no larger public purpose than the interests of the parties." *Congressional Hotel Corp. v. Mervis Diamond Corp.*, 200 Md. App. 489, 505, 28 A.3d 75, 84 (2011).

In regard to an award based on a contract, a court "should use the factors set forth in Rule 1.5 [of the Maryland Rules of Professional Conduct ("MRPC")[28]] as the foundation for analysis of what constitutes a reasonable fee when the court awards fees based on a contract entered by the parties authorizing an award of fees." *Monmouth Meadows*, 416 Md. at 336-37, 7 A.3d at 8.  Nevertheless, cases decided under the lodestar approach can "provide helpful guidance" in contractual fee-shifting cases, *Congressional Hotel*, 200 Md. App. at 505, 28 A.3d at 85, because "there is likely to be some overlap between the Rule 1.5 factors and the mitigating factors typically considered in a lodestar analysis." *Monmouth Meadows*, 416 Md. at 337, 7 A.3d at 8.

MRPC 1.5(a) enumerates eight non-exclusive "factors to be considered in determining the reasonableness of a fee": [29]

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

---

filing stayed further litigation of the case." *Frazier v. Castle Ford, Ltd.*, 430 Md. 144, 165 n.24, 59 A.3d 1016, 1028 n.24 (2013).

[28] MRPC 1.5(a) is a standard of professional ethics, generally applicable to all attorney-client relationships, which mandates that an attorney "shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses."

[29] A list of factors similar to those in MRPC 1.5 was enunciated, for use in a lodestar analysis, in the seminal case of *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).  The so-called "*Johnson* factors" have been adopted for use in lodestar cases by the Fourth Circuit, *see Barber v. Kimbrell's, Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978), and in Maryland.  *See Friolo I*, 373 Md. at 522 n.2, 819 A.2d at 366 n.2.

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

"In order to apply Rule 1.5 to a fee award, a court does not need to evaluate each factor separately." *SunTrust*, 201 Md. App. at 401, 29 A.3d at 730; *see Monmouth Meadows*, 416 Md. at 337 n.11, 7 A.3d at 8 n.11. Indeed, a court need not "make explicit findings with respect to Rule 1.5" at all, or even "mention Rule 1.5 as long as it utilizes the rule as its guiding principle in determining reasonableness." *Monmouth Meadows*, 416 Md. at 340 n.13, 7 A.3d at 10 n.13. Moreover, when conducting an MRPC 1.5 analysis, a court "should consider the amount of the fee award in relation to the principal amount in litigation, and this may result in a downward adjustment. Although fee awards may approach or even exceed the amount at issue, the relative size of the award is something to be evaluated." *Id.* at 337, 7 A.3d at 8. And, a "trial court also may consider, in its discretion, any other factor reasonably related to a fair award of attorneys' fees." *Id.* at 337-38, 7 A.3d at 8.

ii.     Reasonableness Calculation

As indicated, Sellers seek $240,015.31 in attorneys' fees and expenses. They have provided documentation in support of their claim, in accordance with Local Rule 109.2. In particular, they have submitted invoices detailing the work performed in this case between July 20, 2010 and September 28, 2012, *see* ECF 171-3 (invoices for July 20, 2010 through December 27, 2012); ECF 171-4 (invoices from January 9, 2012 through September 28, 2012), and between

October 1, 2012 and November 30, 2012, *see* ECF 176-1. Sellers' request is supported by "a memorandum setting forth the nature of the case." Local Rule 109.2. Further, the Affidavit of Mr. Bernier (ECF 171-7) indicates the fees customarily charged by Sellers' counsel and attorneys of comparable experience, in accordance with Local Rule 109.2.

Sellers were represented by Ms. Smith, now Of Counsel at Segal McCambridge Singer & Mahoney, Ltd.; Mr. Bernier, a partner at Segal McCambridge Singer & Mahoney, Ltd.; and Andrew P. Gaudreau, an associate at their firm. In addition, various paralegals worked on the case. *See* Sellers' Memo at 7-8; Bernier Aff. ¶ 6. Smith and Bernier "focus their practice on the defense and trial of complex litigation, including toxic tort cases involving exposures to mold, carbon monoxide, lead-based paint, and other such materials." Sellers' Memo at 7. Ms. Smith was lead counsel for Sellers for the duration of the case, and has been licensed to practice law in Maryland since 1997. Bernier Aff. ¶ 6. "Due to the complexity of the case," Mr. Bernier, who has been licensed to practice law in Maryland since 1983, "became involved in pretrial [and] trial aspects of the case" beginning in January 2012. Sellers' Memo at 7; Bernier Aff. ¶¶ 3-4, 6. Both Ms. Smith and Mr. Bernier appeared for pretrial motions and were present throughout the trial. Mr. Gaudreau "assisted with pretrial motions and trial preparation." Sellers' Memo at 7. And, as noted, paralegals also provided support. *See id.* at 7-8.

Plaintiffs oppose the amount of fees claimed by Sellers on the ground that it would be a "windfall," ECF 181 at 4, but offer no arguments as to the particular fees that they consider excessive. Based on the factors outlined in the MRPC, I conclude that Sellers are not entitled to the full amount of their claim for legal fees.

At the outset, I decline to award fees for three attorneys for the Sellers, as well as multiple paralegals. In light of "the time and labor required, the novelty and difficulty of the

questions involved, and the skill requisite to perform the legal service properly," MRPC 1.5(a)(1), I will award legal fees for the work of one attorney.

Appendix B makes clear that, as a general rule, only one attorney for each party will be compensated for attending depositions and hearings, and that fees covering the attendance of multiple attorneys at trial should be evaluated "depend[ing] upon the complexity of the case and the role that each lawyer is playing." *See* App. B, Guideline 2.b-d. A district court may exercise its discretion in reducing a fee award for a case that was overstaffed. *Trimper v. City of Norfolk*, 58 F.3d 68, 76-77 (4th Cir. 1995) ("Properly reducing allowable hours because of overstaffing of attorneys is not an abuse of discretion."); *see Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) ("The district court . . . should exclude . . . hours that were not 'reasonably expended.' Cases may be overstaffed, and the skill and experience of lawyers vary widely."); *Schlacher v. Law Offices of Phillip J. Rotche & Assocs., P.C.*, 574 F.3d 852, 858 (7th Cir. 2009) ("[O]verstaffing cases inefficiently is common, and district courts are therefore encouraged to scrutinize fee petitions for duplicative billing when multiple lawyers seek fees."); *e.g.*, *Hairston v. Prince George's Cnty.*, Civil No. PJM 09-3431, 2012 WL 5995451, at *4 (D. Md. Nov. 28, 2012) ("Despite the case's straightforward nature, seventeen individuals show up in the billing records attached to [plaintiff's] fee petition, billing a total of 2,127 hours."); *Dause v. Broadway Servs., Inc.*, Civil No. JKB-11-3136, 2012 WL 1131524, at *2 (D. Md. Aug. 3, 2012) ("This was a one-lawyer case on the low end of the spectrum of complexity, but it was overstaffed so that an unreasonable number of hours have now been claimed as reimbursable by Plaintiff. This is particularly so given the years of experience each of the lawyers has had in litigating employment discrimination cases."); *Essex v. Randall*, No. Civ. A. DKC20033276, 2006 WL 83424, at *3 (D. Md. Jan. 11, 2006) (reducing fee award due to overstaffing).

To be sure, Mr. Bernier and Ms. Smith both ably and successfully represented their clients. Undoubtedly, they benefitted from the assistance of Mr. Gaudreau. But, the interests of the two sibling Sellers, and the facts pertinent to them, were virtually identical; the workload did not increase significantly because there were two Sellers. Although it was surely helpful for each attorney to have the assistance of a colleague, this does not mean that the Court must require plaintiffs to pay for the luxury of multiple lawyers in this case, which was in federal court based on diversity jurisdiction, and was not unduly complicated. It is also salient that, in many ways, the Sellers and the Brokers combined resources and conducted a joint defense as to certain aspects of the case, which reduced the need for multiple attorneys for the Sellers.

I am mindful that plaintiffs pursued a number of legal claims, adding to defense counsel's work-load. However, they all revolved around the same factual nucleus – failure to disclose latent defects. Given Ms. Smith's extensive experience in this area of the law, coupled with the assistance of counsel for the Hilemans, I will award fees only for legal work performed by Ms. Smith, but not her colleagues.

I am also of the view that the Sellers' procedural missteps complicated the parties' motions *in limine*, so as to increase their legal fees. In particular, the Sellers failed to timely provide plaintiffs with the report of their toxicology and industrial hygiene expert, John David Krause, Ph.D., in accordance with Fed. R. Civ. P. 26(a)(2) and the deadline of January 7, 2011, set in the Court's Scheduling Order (ECF 31). Instead, plaintiffs received Dr. Krause's report on July 20, 2012, in connection with the defense's motion *in limine* to exclude the testimony of plaintiffs' expert, Dr. White. As a result, plaintiffs moved to exclude the testimony of Dr. Krause, pursuant to Fed. R. Civ. P. 37(c)(1), and the defense's motion to exclude the testimony of Dr. White became unduly time consuming. Accordingly, I will not award fees associated with

the motion *in limine* as to Dr. Krause, and I will reduce fees associated with the motion *in limine* as to Dr. White. No further reductions are appropriate, however.

Ms. Smith's hourly rate of $150 is well below Appendix B's "Guidelines Regarding Hourly Rates" for attorneys of comparable experience. *See* App. B, Guideline 3; *see also Poole v. Textron, Inc.*, 192 F.R.D. 494, 509 (D. Md. 2000) (noting that Appendix B to the Local Rules "provide[s] a presumptively reasonable range of hourly rates"); *Gonzales v. Caron*, Civ. No. CBD-10-2188, 2011 WL 3886979, at *2 (D. Md. Sept. 2, 2011) ("[T]he Guidelines are not binding, generally this Court presumes that a rate is reasonable if it falls within these ranges."). Appendix B states that a reasonable hourly rate for lawyers admitted to the bar for nine to fourteen years, such as Ms. Smith, is $225-300. Based on fees customarily charged and the experience of the attorneys, Ms. Smith's rate is eminently reasonable. *See* MRPC 1.5(a)(3), (7).

Plaintiffs contend that awarding the full amount of fees would be a "windfall." ECF 181 at 4. I disagree. Plaintiffs' conduct was a substantial factor in the extensive legal fees and costs associated with the case. At the outset of the litigation, plaintiffs asserted fourteen claims against the Sellers, and Sellers' exposure was over $3,000,000. Yet, several claims were redundant, if not frivolous or unnecessary. Several of plaintiffs' claims also required expert testimony, for which the Court held a hearing under *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579 (1993), and Federal Rules of Evidence 702 and 703. And, after almost three years of litigation, Sellers prevailed on all of the claims against them. *See Hensley*, 461 U.S. at 436 (stating that, in calculating an award of attorney's fees, "the most critical factor is the degree of success obtained"); *Brodziak v. Runyon*, 145 F.3d 194, 196 (4th Cir. 1998) (same); MRPC 1.5(a)(4) (considering the result obtained). That outcome was hardly surprising, based on the evidence.

In view of the foregoing, I will deduct the fees charged for the services of Mr. Bernier, Mr. Gaudreau, and the paralegals, and reduce the fees for Ms. Smith.

According to the invoices provided by the Sellers, the fees for Mr. Bernier, Mr. Gaudreau, and the paralegals amount to $77,635, as follows:

**Mr. Bernier**: $63,195

**Mr. Gaudreau**: $8,760

**Paralegals**: $5,680

Additionally, as indicated, I will deduct fees associated with Ms. Smith's work on plaintiffs' motion *in limine* with regard to Dr. Krause and Dr. White. The invoices indicate that Ms. Smith spent approximately 35 hours reviewing and drafting an opposition to plaintiffs' motions *in limine*. Because plaintiffs' motions also included a request to exclude the testimony of another defense expert, Hung Cheung, M.D., I will divide these hours in half, for a reduction of 17.5 hours. The invoices also reveal that Ms. Smith spent approximately 14 hours on issues related to the disclosure of Dr. Krause's expert report, including preparation for the motions hearing and communications with plaintiffs' counsel. The invoices also indicate that Ms. Smith spent approximately 42 hours on issues pertaining to the defense's motion to exclude the testimony of Dr. White. Ultimately, Dr. White's testimony was not excluded, in part because the motion was based on information obtained from Dr. Krause. Therefore, I will award fees for 21 hours of defense work in regard to Dr. White. In connection with the motions *in limine,* I will reduce Sellers' fees by 52.5 hours, which, at an hourly rate of $150, amounts to $7,875.

Accounting for all of these reductions, Sellers are entitled to attorneys' fees in the amount of $154,505.31.[30]

---

[30] This amount is comparable to the $173,590 in attorneys' fees claimed by plaintiffs.

### III.    Costs

Both plaintiffs and Sellers have moved for costs pursuant to Fed. R. Civ. P. 54(d)(1), which provides: "Unless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party."  In particular, the Sellers claim they are entitled to costs as the prevailing party against plaintiffs, and plaintiffs claim they are entitled to costs as the prevailing party against the Hilemans.

In accordance with Local Rule 109.1(b) and this Court's Guidelines for Bills of Costs, Sellers have submitted a Bill of Costs for $6,610.80, *see* ECF 172, along with a supporting memorandum, ECF 172-1; an affidavit of verification, ECF 172-2; and supporting documentation, *see* ECF 172-3 (service costs); ECF 172-4 (transcript costs); ECF 172-5 (expert witness travel and subsistence costs).  In particular, Sellers' costs include $200 for service of subpoenas on witnesses, *see* ECF 172-3; $3,396.40 for deposition transcripts, *see* ECF 172-4; and $3,014.40 for Dr. Krause's food, lodging, and travel.  *See* ECF 172-5.

Plaintiffs have also submitted a Bill of Costs for $11,116.29, *see* ECF 174, along with supporting documentation, *see* ECF 174-1 (service costs); ECF 174-2 (transcript costs); ECF 172-3 (copying costs).  Specifically, plaintiffs' costs include $515 for service of process, *see* ECF 174-1; $7,663.27 for deposition transcripts of lay witnesses, *see* ECF 174-2; $1,632.19 in witness food and travel costs, *see* ECF 174; and $955.83 in copying and printing costs, *see* ECF 172-3.  And, the Hilemans have not opposed plaintiffs' request.

Fed. R. Civ. P. 54(d)(1) "creates the presumption that costs are to be awarded to the prevailing party."  *Cherry v. Champion Int'l Corp.*, 186 F.3d 442, 446 (4th Cir. 1999).  Although a "district court is given discretion to deny the award," *id.*, it must "justify its decision by 'articulating some good reason for doing so.'"  *Teague v. Baker*, 35 F.3d 978, 996 (4th Cir.

1994) (quoting *Oak Hall Cap & Gown Co. v. Old Dominion Freight Line, Inc.*, 899 F.2d 291, 296 (4th Cir. 1990)).  To justify a denial of an award of costs, there must be "an element of injustice," such as "their excessiveness in a particular case, the limited value of the prevailing party's victory, or the closeness and difficulty of the issues decided."  *Cherry*, 186 F.3d at 446 (citing *Teague*, 35 F.3d at 966).

There is no consensus as to an award of costs in a multi-defendant case, when a plaintiff prevails against some defendants, but not all of them.  *Compare Kollsman v. Cohen*, 996 F.2d 702, 706 (4th Cir. 1993) (holding that defendant was the prevailing party as to plaintiff's claims against him, even though plaintiff was the prevailing party as to claims against a co-defendant), *with Tropic Flowers, Inc. v. Kirkley's Florist, Inc.*, 908 F.2d 968, 1990 WL 101435, at *1 (4th Cir. 1990) (unpublished per curiam) ("Because [plaintiff] prevailed on some of its claims against two of the defendants and was awarded over $27,000, it was a prevailing party ordinarily entitled to costs.").  Indeed, a district court may even deny costs in a multi-defendant case where the plaintiff achieves a *de minimis* verdict against one of multiple defendants.  *See, e.g.*, *Philson v. Goldsboro Milling Co.*, 164 F.3d 625, 1998 WL 709324, at *6 (4th Cir. Oct. 5, 1998) (unpublished) ("We cannot say that the trial court's denial of the [plaintiffs'] costs was an abuse of discretion.  Out of their numerous claims against multiple defendants, the [plaintiffs] in the end prevailed on only one issue against a single defendant.").

In my view, plaintiffs, as a prevailing party with regard to the Hilemans, are entitled to recover $11,116.29 in costs from the Hilemans.  Conversely, Sellers are entitled to recover costs from the plaintiffs, against whom they obtained a completely favorable verdict.

Although plaintiffs insist that there can only be one prevailing party under Fed. R. Civ. P. 54(d)(1), the Fourth Circuit has indicated otherwise.  *See Kollsman*, 996 F.2d at 706.  Moreover,

plaintiffs' verdict of $33,600 on a single claim against the Hilemans was *de minimis*, compared to their initial claim for $3,000,000 in damages, on fourteen counts.  In light of "the limited value" of plaintiffs' "victory," *Cherry*, 186 F.3d at 446, I see no injustice in awarding costs to the Sellers, particularly because they are independent from the co-defendants.  *See Philson*, 1998 WL 709324, at *6.  However, for the reasons stated, *supra*, I will not award costs in connection with Dr. Krause's travel and attendance at the motions hearing in September 2012, for which Sellers claim $432.00 in subsistence costs and $849 in travel costs.  Therefore, Sellers are entitled to $5,329.80 in costs from plaintiffs.

## Conclusion

For the foregoing reasons, the Hilemans' Motion for Judgment (ECF 178) shall be denied;  Plaintiffs' Motion for Attorneys' Fees (ECF 173) shall be denied; Sellers' Motion for Attorneys' Fees (ECF 171) shall be granted, in part, in the amount of $154,505.31; Plaintiffs shall be awarded $11,116.29 in costs, against the Hilemans; and Sellers shall be awarded $5,329.80 in costs, against plaintiffs.  A separate Order consistent with this Opinion will follow.


Date: April 24, 2013                                  _____/s/_____
                                                                    Ellen Lipton Hollander
                                                                    United States District Judge